No. 26-4167

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

JOHN ANDREW, AUTUMN ELLANNA, and TERERESA FERGUSON,
on behalf of themselves and all those similarly situated,
*Plaintiffs-Appellants,*

*v.*

HEIDI HEDBERG, in her official capacity as Commissioner
of the Alaska Department of Health,
*Defendant-Appellee.*

---

On Appeal from the United States District Court for the District of Alaska
Case No. 3:23-cv-00044-SLG • Hon. Sharon L. Gleason

---

# APPELLANTS' OPENING BRIEF

---

GORIUNE DUDUKGIAN
NICHOLAS FERONTI
MIYE D'OENCH
NORTHERN JUSTICE PROJECT, LLC
406 G Street, Suite 207
Anchorage, AK 99501
(907) 308-3395

SAIMA AKHTAR
NATIONAL CENTER FOR LAW
AND ECONOMIC JUSTICE
50 Broadway, Suite 1500
New York, NY 10004
(212) 633-6967

JACOB I. CHEFITZ
DLA PIPER LLP (US)
1251 Avenue of the Americas, 27th Floor
New York, NY 10020
(212) 335-4500

CHRISTOPHER M. YOUNG
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101
(619) 699-2700

*Attorneys for Plaintiffs-Appellants*
*[Additional Counsel Listed on Inside Cover]*

SEAN P. FULTON
DLA PIPER LLP (US)
1900 N. Pearl Street, Suite 2200
Dallas, TX 75201
(214) 743-4572

CONSTANCE I. DU
DLA PIPER LLP (US)
444 W Lake Street, Suite 900
Chicago, IL 60606
(312) 368-8921

# TABLE OF CONTENTS

**Page**


INTRODUCTION .......... 1

JURISDICTIONAL STATEMENT .......... 4

CONSTITUTIONAL AND STATUTORY AUTHORITIES .......... 5

ISSUES PRESENTED .......... 6

STATEMENT OF THE CASE .......... 7

I. OVERVIEW OF SNAP ADMINISTRATION. .......... 7

II. ALASKA'S LONG HISTORY OF SEVERE DELAYS IN PROVIDING SNAP BENEFITS. .......... 9

III. PLAINTIFFS FILE THIS CASE, CERTIFY TWO CLASSES, AND SECURE A PRELIMINARY INJUNCTION. .......... 13

IV. THE DISTRICT COURT LATER REVERSED COURSE AND DISMISSED THE CASE. .......... 15

SUMMARY OF THE ARGUMENT .......... 17

STANDARD OF REVIEW .......... 21

ARGUMENT .......... 22

I. THE DISTRICT COURT ERRED IN HOLDING THAT THE SNAP ACT PROVISIONS ARE UNENFORCEABLE UNDER 42 U.S.C. § 1983. .......... 22

A. The Plain Text of the SNAP Act Unambiguously Creates Privately Enforceable Rights. .......... 24

B. *Medina* Does Not Support the District Court's Conclusion. .......... 32

C. The SNAP Act's Implementing Regulations Confirm That the Provisions Here Are Rights-Creating. .......... 36

D. Alternative Enforcement Mechanisms Do Not Displace the Private Enforcement of the Relevant SNAP Act Provisions. ...38

II. THE DISTRICT COURT ERRED IN FINDING NO DUE PROCESS VIOLATIONS. ...40

A. The SNAP Act Confers a Constitutionally Protected Property Interest to SNAP Applicants. ...41

B. The State's Delays Deprive Plaintiffs of Their Property Interests. ...42

1. A deprivation occurs when the State fails to render a decision and issue benefits by the SNAP Act's deadline. ...42

2. Alternatively, a deprivation occurs when the State's delays become unreasonable. ...45

3. The district court erred in finding no deprivation and declining to reach the *Mathews* test. ...46

C. The State's Process Is Constitutionally Inadequate Under the *Mathews* Test. ...47

1. The district court relied on faulty metrics in its analysis. ...47

2. Defendants' delays flunk the *Mathews* test. ...52

D. The District Court Never Considered Plaintiffs' Notice Theory. ...60

CONCLUSION ...63

STATEMENT OF RELATED CASES ...64

CERTIFICATE OF COMPLIANCE ...65

CERTIFICATE OF SERVICE ...66

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Arnett v. Kennedy*,
416 U.S. 134 (1974)....................................................................................40

*Atkins v. Parker*,
472 U.S. 115 (1985)..............................................................................28, 41

*Barry v. Corrigan*,
79 F. Supp. 3d 712 (E.D. Mich. 2015), *aff'd sub nom. Barry v. Lyon*, 834 F.3d 706 (6th Cir. 2016) ......................................................24

*Bd. of Regents v. Roth*,
408 U.S. 564 (1972)....................................................................................43

*Brady v. Gebbie*,
859 F.2d 1543 (9th Cir. 1988) ......................................................................61

*Briggs v. Bremby*,
792 F.3d 239 (2d Cir. 2015) ........................................................................39

*Caswell v. Califano*,
583 F.2d 9 (1st Cir. 1978)............................................................................52

*Cleveland Bd. of Educ. v. Loudermill*,
470 U.S. 532 (1985)................................................................40, 47, 60, 61

*Curtis v. Inslee*,
154 F.4th 678 (9th Cir. 2025) ..................................................................26, 28

*Dist. of Columbia v. U.S. Dep't of Agric.*,
444 F. Supp. 3d 1 (D.D.C. 2020)...........................................................45, 53

*Does v. Gillespie*,
867 F.3d 1034 (8th Cir. 2017) ......................................................................27

*Exxon Mobil Corp. v. Corporación CIMEX, S.A. (Cuba)*,
146 S. Ct. 1909 (2026)..................................................................................30

*Fusari v. Steinberg*,
419 U.S. 379 (1975)........................................................56, 57, 58, 59, 60

*Goldberg v. Kelly*,
397 U.S. 254 (1970).............................................. 28, 41, 43, 52, 53, 54, 57, 60

*Gonzaga Univ. v. Doe*,
536 U.S. 273 (2002).................... 2, 17, 22, 23, 24, 25, 26, 28, 29, 30, 31, 34, 38

*Gonzalez v. Pingree*,
821 F.2d 1526 (11th Cir. 1987) ..........................................................................39

*Hall v. United States Dep't of Agric.*,
984 F.3d 825 (9th Cir. 2020) .................................................................................7

*Haskins v. Stanton*,
794 F.2d 1273 (7th Cir. 1986) ...........................................................................52

*Haskins v. Stanton*,
794 F.2d at 1276–77 ..............................................................................................45

*Health and Hosp. Corp. of Marion Cnty. v. Talevski*,
599 U.S. 166 (2023).................................... 17, 22, 23, 24, 26, 27, 28, 29, 30, 38

*Holmes v. Bax*,
No. 25-1987, 2026 U.S. App. LEXIS 24979 (8th Cir. Aug. 19, 2026) ...........................................................................27, 42, 53, 54

*Immigrant Defs. L. Ctr. v. Noem*,
781 F. Supp. 3d 1011 (C.D. Cal. 2025) ...............................................................55

*Johnson v. Shalala*,
2 F.3d 918 (9th Cir. 1993) ....................................................................................52

*Kapps v. Wing*,
404 F.3d 105 (2d Cir. 2005) ...................................................................................41

*Kelly v. R.R. Ret. Bd.*,
625 F.2d 486 (3d Cir. 1980) ..........................................................................44, 56

*Kraebel v. N.Y.C. Department of Housing Preservation & Development*,
959 F.2d 395 (2d Cir. 1992) ....................................................................46

*Lil' Man in the Boat, Inc. v. City & Cnty. of San Francisco*,
5 F.4th 952 (9th Cir. 2021) ......................................................................21

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)..........................................................................36, 37

*Lopez v. Heckler*,
713 F.2d 1432 (9th Cir. 1983) ...........................................................52, 55

*Maine v. Thiboutot*,
448 U.S. 1 (1980)..................................................................................22

*Mathews v. Eldridge*,
424 U.S. 319 (1976)......... 3, 15, 16, 19, 45, 46, 47, 52, 53, 54, 56, 57, 58, 60, 61

*Medina v. Planned Parenthood S. Atl.*,
606 U.S. 357 (2025)..................... 2, 17, 18, 22, 23, 25, 29, 30, 32, 33, 34, 35, 36

*Montclair v. Ramsdell*,
107 U.S. 147 (1882)................................................................................32

*Nat'l Ass'n of Radiation Survivors v. Derwinski*,
994 F.2d 583 (9th Cir. 1992) ....................................................................42

*Pennhurst State School & Hosp. v. Halderman*,
451 U.S. 1 (1981)..................................................................................22

*Pimentel v. Dreyfus*,
670 F.3d 1096 (9th Cir. 2012) ....................................................................7

*United States ex rel. Polansky v. Exec. Health Res., Inc.*,
599 U.S. 419 (2023)................................................................................31

*Portman v. Cnty. of Santa Clara*,
995 F.2d 898 (9th Cir. 1993) ....................................................................41

*Rancho Palos Verdes v. Abrams*,
544 U.S. 113 (2005)................................................................................38

*Ressler v. Pierce*,
692 F.2d 1212 (9th Cir. 1982) ....................................................42, 57, 60

*Rhode Island State Council of Churches v. Rollins*,
158 F.4th 304 (1st Cir. 2025)....................................................................1

*Schroeder v. City of Chicago*,
927 F.2d 957 (7th Cir. 1991) ..................................................................43

*Sebelius v. Auburn Reg'l Med. Ctr.*,
568 U.S. 145 (2013).................................................................................30

*Shanks v. Dressel*,
540 F.3d 1082 (9th Cir. 2008) ................................................................41

*Sullivan v. Dollar Tree Stores, Inc.*,
623 F.3d 770 (9th Cir. 2010) ..................................................................21

*United States v. Kwai Fun Wong*,
575 U.S. 402 (2015).................................................................................30

*Veterans for Common Sense v. Shinseki*,
678 F.3d 1013 (9th Cir. 2012) ........................................................45, 46, 50, 51

*Victorian v. Miller*,
813 F.2d 718 (5th Cir. 1987) ("[T]he Act does not foreclose a
[Section] 1983 remedy[.]")........................................................................39

*Vietnam Veterans of Am. & Veterans of Modern Warfare v. Shinseki*,
599 F.3d 654 (D.C. Cir. 2010).................................................................50

*Yagman v. Garcetti*,
852 F.3d 859 (9th Cir. 2017) ..................................................................46

**Statutes**

7 U.S.C. § 2011 .....................................................................................7, 36

7 U.S.C. § 2013(a) ....................................................................................7

7 U.S.C. § 2013(c) ..................................................................................36

7 U.S.C. § 2014(a) ...............................................................................27, 42

7 U.S.C. § 2020 .......... 13, 17, 23, 24, 35

7 U.S.C. § 2020(a)(3)(B) .......... 25

7 U.S.C. § 2020(a)(3)(B)(ii) .......... 17, 23, 24, 29, 31

7 U.S.C. § 2020(e) .......... 34

7 U.S.C. § 2020(e)(2)(B)(i) .......... 8

7 U.S.C. § 2020(e)(2)(B)(iii) .......... 6, 8, 14, 27, 33

7 U.S.C. § 2020(e)(3) .......... 6, 8, 23, 25, 26, 27, 31, 43

7 U.S.C. § 2020(e)(4) .......... 6, 9, 27, 43, 44

7 U.S.C. § 2020(e)(9) .......... 6, 8, 23, 26, 27, 31, 35, 43

7 U.S.C. § 2020(e)(10) .......... 6, 9, 14, 28, 34

7 U.S.C. § 2023(a)(2) .......... 7

7 U.S.C. § 2023(b) .......... 25

7 U.S.C. § 2025(a) .......... 7

7 U.S.C. § 2027(a)(2) .......... 23, 31

28 U.S.C. § 1291 .......... 4

28 U.S.C. § 1331 .......... 4

28 U.S.C. § 1367 .......... 4

28 U.S.C. § 1441(a) .......... 4

28 U.S.C. § 2107(a) .......... 4

42 U.S.C. § 1396a(a)(23) .......... 33, 34

42 U.S.C. § 1396r(c)(2) .......... 30

42 U.S.C. § 1983 .......... 2, 6, 13, 15, 17, 18, 22, 23, 24, 27, 35, 38, 40

Food Stamp Act of 1964 .......... 7

**Constitutional Provisions**

United States Constitution Fourteenth Amendment ............................................13

Alaska Constitution ..........................................................................................13

**Regulations**

7 C.F.R. § 272.4(d)(1)(i) .....................................................................................37

7 C.F.R. § 273.2(a)(1) ....................................................................................36, 37

7 C.F.R. § 273.2(c)(1)(ii) .....................................................................................37

7 C.F.R. § 273.2(c)(1)(iii) ....................................................................................37

7 C.F.R. § 273.2(c)(6) ..........................................................................................37

7 C.F.R. § 273.2(e)(1) ..........................................................................................37

7 C.F.R. § 273.15(f) .............................................................................................37

**Other Authorities**

Ninth Circuit Rule 28-2.7 ......................................................................................5

Ninth Circuit Rule 28-2.6 ....................................................................................64

Ninth Circuit Rule 32-1 .......................................................................................65

Fed. R. App. P. 32(a)(5) .......................................................................................65

Fed. R. App. P. 32(a)(6) .......................................................................................65

Fed. R. App. P. 32(f) ............................................................................................65

H.R. Rep. No. 95-464 (1977) ...............................................................................40

## INTRODUCTION

For low-income Americans, the Supplemental Nutrition Assistance Program ("SNAP") "is a vital bulwark against hunger and food insecurity." *Rhode Island State Council of Churches v. Rollins*, 158 F.4th 304, 307 (1st Cir. 2025). Without SNAP, "tens of millions would go hungry." *Id.*

Yet in Alaska, the bulwark has broken. For years, Alaskans have endured unlawful delays while waiting on the State to process SNAP applications and provide benefits. 3-ER-492–93 ¶ 11; 3-ER-444. Thousands of applications have festered in backlogs. 2-ER-181 ¶ 86; 2-ER-253–58. Households have waited as long as seven months for the SNAP benefits needed to afford food. 2-ER-128.

Plaintiffs filed this case in 2023 to address the crisis in Alaska's SNAP operations. The suit challenged the State's failure to timely process applications and issue written notices to those facing delays, as required by the SNAP Act and the Due Process Clause. In 2024, the district court granted a preliminary injunction, finding a likelihood of success on the merits of Plaintiffs' SNAP Act claims.

Nonetheless, the district court later reversed course and granted summary judgment to the State, dismissing Plaintiffs' claims under both the SNAP Act and the Due Process Clause. Despite acknowledging the State's SNAP Act violations, the district court found that Alaskans are powerless to hold their state accountable in court. That was error.

First, the district court wrongly concluded that the five SNAP Act provisions here do not confer rights enforceable under Section 1983. Under the test established in *Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002), each provision contains clear, rights-creating language. Each is unmistakably focused on individual households. Each compels the State to provide an individual household with clear and definite entitlements, and each is located in a section of the SNAP Act that expressly contemplates enforcement through private lawsuits, thereby giving the State clear notice of suits like this one. In concluding otherwise, the district court misapplied the *Gonzaga* test and misinterpreted the Supreme Court's recent precedent in *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357 (2025). *Medina* applied the *Gonzaga* test to a Medicaid Act provision that, unlike the SNAP Act here, did not clearly signal an individually enforceable right and did not put the state on notice of private lawsuits.

Second, the district court erred in dismissing the Plaintiffs' due process claims. Plaintiffs alleged two due process violations: (1) the failure to determine eligibility and issue benefits on time; and (2) the failure to provide notice of delays. The district court found no "deprivation" of a protected property interest *at all* and never addressed whether the process was adequate. This was erroneous. The delays constituted a deprivation not only because they violated the timeframes in the SNAP Act, but also because they were unreasonably long. Moreover, both the delays and

the lack of notice render the process inadequate under the *Mathews v. Eldridge*, 424 U.S. 319 (1976), balancing test.

This Court should therefore reverse and remand to the district court to apply the correct legal standard to the evidence in the record.

## JURISDICTIONAL STATEMENT

On January 20, 2023, Plaintiffs filed this case in Alaska state court. 4-ER-836. On March 1, 2023, the State removed this case to the district court under 28 U.S.C. § 1441(a). 4-ER-884–86. The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1367. 1-ER-8. On May 21, 2026, the district court granted summary judgment to the State. 1-ER-3–50. On May 28, 2026, the district court entered a final judgment. 1-ER-2. On June 25, 2026, Plaintiffs filed a timely notice of appeal. 4-ER-889; *see* 28 U.S.C. § 2107(a). This Court has jurisdiction under 28 U.S.C. § 1291.

## CONSTITUTIONAL AND STATUTORY AUTHORITIES

All relevant constitutional and statutory authorities appear in this brief's Addendum. *See* Ninth Cir. R. 28-2.7.

## ISSUES PRESENTED

I. Did the district court err in finding that 7 U.S.C. §§ 2020(e)(2)(B)(iii), (e)(3), (e)(4), (e)(9), and (e)(10) of the SNAP Act are not privately enforceable under 42 U.S.C. § 1983?

II. Did the district court err in finding no due process violation despite the State's months-long delays in determining SNAP eligibility and failure to provide notice of delays?

## STATEMENT OF THE CASE

### I. OVERVIEW OF SNAP ADMINISTRATION.

The Food Stamp Act of 1964 "established a state-administered, federal food assistance program" now called SNAP. *Pimentel v. Dreyfus*, 670 F.3d 1096, 1098–99 (9th Cir. 2012). SNAP's purpose is to "alleviate . . . hunger and malnutrition by increasing the food purchasing power of low-income households." *Hall v. United States Dep't of Agric.*, 984 F.3d 825, 831 (9th Cir. 2020) (citing 7 U.S.C. § 2011) (internal quotations omitted). Accordingly, SNAP entitles eligible households to monthly benefits, or "allotments," to use "to purchase food from retail food stores." *Id.* (citing 7 U.S.C. § 2013(a)).

SNAP operates via cooperative federalism. "State participation is optional." *Pimentel*, 670 F.3d at 1099. Yet, if states participate, the federal government pays all benefits and half of administrative costs. 7 U.S.C. §§ 2013(a), 2025(a).[1] In exchange, all "participating states must," *inter alia*, "comply with applicable federal laws and regulations." *Pimentel*, 670 F.3d at 1099. Although the federal government determines "eligibility criteria," states "certify[] qualifying households and issu[e] benefits." *Id.* (citing 7 U.S.C. §§ 2014–2017).

[1] Under recent SNAP Act amendments, in coming years the federal government will pay between 85% and the full cost of benefits, and will cover 25% of administrative costs. 7 U.S.C. §§ 2023(a)(2), 2025(a).

The SNAP Act requires states administering SNAP to provide "timely, accurate, and fair service to applicants." 7 U.S.C. § 2020(e)(2)(B)(i). Specifically, states must undertake at least three actions in determining a household's SNAP eligibility.

First, states must ensure that the household can file an application the first time they contact the state. 7 U.S.C. § 2020(e)(2)(B)(iii).

Second, states must verify the household's identity, income, and financial resources. 7 U.S.C. §§ 2020(e)(3); 2020(e)(9)(C); 2020(e)(26); 2020(n). States must give each applicant household "a clear written statement explaining what acts the household must perform to cooperate in obtaining verification and otherwise completing the application process." 7 U.S.C. § 2020(e)(3).

Finally, after evaluating a household's application and supporting documentation, states must make an eligibility determination and issue either SNAP benefits if the household is eligible or a notice of denial conveying fair hearing rights if the household is found ineligible. States must provide SNAP benefits to an eligible household within 30 days of the filing of a new application. 7 U.S.C. § 2020(e)(3). For households with especially limited finances, the deadline is expedited to seven days. *Id.* § 2020(e)(9).

To continue receiving benefits, a household must periodically apply to "recertify" its benefits and update certain verification documents. *See id.* §

2020(e)(4). The SNAP Act provides that, if a household timely reapplies for benefits and remains eligible for them, the household "must receive its allotment no later than one month after the receipt of the last allotment issued to it pursuant to its prior certification." *Id.* In other words, states have approximately 30 days to process a recertification application before benefits lapse. For any household aggrieved by an action of a state that affects the household's SNAP participation, states must provide a fair hearing and prompt determination of the issues heard. 7 U.S.C. § 2020(e)(10).

Alaska participates in SNAP and administers the program via its Department of Health ("DOH"). 1-ER-5.

## II. ALASKA'S LONG HISTORY OF SEVERE DELAYS IN PROVIDING SNAP BENEFITS.

Alaska has long violated the SNAP Act. For years before this lawsuit, the State persistently failed to timely render eligibility determinations and issue SNAP benefits to thousands of Alaskans. 3-ER-492–93 ¶ 11.[2] In the months leading up to

[2] The Federal Food and Nutrition Administration ("FNA") considers a state to be in compliance with the timely processing standard if its "Application Processing Timeliness" ("APT") rate is at 95% or above. USDA, Updated Guidance for Improving State Agency APT Rates: Standardizing the Escalation Process (Aug. 2, 2023, as updated Aug. 1, 2024), https://www.fns.usda.gov/snap/admin/improving-state-timeliness-rates-escalation-processguidance; 2-ER-178 ¶¶ 77–78. The APT is calculated by dividing the number of initial SNAP applications that were approved timely within a month by the total number of initial applications approved within the month, and multiplying that by 100.

the January 2023 filing of this lawsuit, the State's timeliness plummeted. From July through November 2022, the State timely processed just 53% of initial applications, 41% of expedited applications, and 30% of recertifications. 4-ER-738 ¶ 12.

Meanwhile, the number of SNAP recipients nosedived. 3-ER-491–92 ¶ 9. In July 2022, 97,915 Alaskans received SNAP benefits. 3-ER-502. By December 2022, that number dropped to 38,161. 3-ER-503.

The delays continued even after this lawsuit was filed and Plaintiffs secured a preliminary injunction. As detailed in the below chart, the State reported that, in the first half of 2025, its timely processing rate never exceeded 64% for initial or expedited applications, and its timely processing rate for recertifications never rose above 30%:

| **Alaska Supplemental Nutrition Assistance Program Timeliness** | | | | |
|---|---|---|---|---|
| **Month** | **Non-Expedite Applications** | **Expedite Applications** | **Recertifications** | **All Applications** |
| Jan-25 | 62% | 64% | 18% | 52% |
| Feb-25 | 62% | 49% | 23% | 48% |
| Mar-25 | 64% | 53% | 29% | 51% |
| Apr-25 | 61% | 55% | 18% | 49% |
| May-25 | 52% | 62% | 14% | 44% |
| Jun-25 | 53% | 61% | 22% | 46% |

2-ER-180 ¶ 84. From October 2025 through March 2026, the State further reported that only 46% of initial applications, 25% of expedited applications, and 31% of recertifications were processed timely. 2-ER-130.

These delays continue to harm thousands of Alaskans. When this case was filed in early 2023, 16,000 applications were awaiting eligibility determinations. 2-ER-181 ¶ 87. Even after the preliminary injunction in late 2024, the number of overdue applications remained steadily around 4,000. 2-ER-181 ¶ 88. This means that approximately 4,000 SNAP households each month go without subsistence benefits and face nearly impossible decisions about how to secure food.

The harms that Plaintiffs have faced and continue to face are immense. Zoya Jenkins was starving in her own home. 4-ER-670 ¶ 40. John Andrew's family had to ration food. 4-ER-700 ¶ 15. Rachel Grant wanted to start her own business but instead had to focus on finding money for food. 3-ER-597 ¶ 11. Roger Gaston and his wife eliminated every non-essential expense, maxed out credit cards, and had to rely on family assistance to buy food. 3-ER-602 ¶ 16. Autumn Ellanna had to try to feed her family with $5.01 in the bank. 4-ER-683 ¶ 31. One class member's four-year-old child tried to steal food from a store. 3-ER-468 ¶ 17. *See also* 4-ER-728 ¶ 9; 4-ER-704 ¶¶ 5–6; 4-ER-724 ¶ 16; 4-ER-661 ¶ 20; 4-ER-691 ¶¶ 14–18; 4-ER-717 ¶¶ 17–19. And these are not isolated incidents; thousands of class members have faced the same hunger and hardship, year after year. 4-ER-722–25, 3-ER-599–600; 3-ER-601–04; 4-ER-666–71, 3-ER-608–09.

Moreover, the delays are lengthy. As of March 6, 2023, overdue applications sat unprocessed for, on average, 97 days for initial applications, 79 days for

expedited applications, and 96 days for recertifications. These averages decreased after this lawsuit began, but by January 2025, they started rising again. By May 6, 2025, on average, a new application sat unprocessed for 98 days; an expedited application languished for 26 days; and a recertification waited for 94 days. 2-ER-181–82 ¶¶ 89–90. These are just averages, and many delays were far longer.






Those delays cannot be remedied after-the-fact. No one eats retroactively. Every day without SNAP benefits is a day that Plaintiffs confront hunger. Plaintiffs have had to make terrible decisions between purchasing food or heating fuel. 4-ER-728 ¶ 9; 3-ER-602 ¶ 16; 3-ER-606 ¶ 17; 4-ER-724 ¶ 16; 4-ER-700 ¶ 12. Parents have gone hungry so their children can eat. 4-ER-670 ¶¶ 36–38; 4-ER-712 ¶ 24; 4-ER-700 ¶ 14; 4-ER-706 ¶ 14. And health conditions have worsened. 3-ER-605 ¶¶ 1–7; 3-ER-609 ¶ 16; 4-ER-723 ¶ 11. The State has persistently failed to ensure that eligible Alaskans receive SNAP benefits promptly, causing avoidable hunger, stress, and financial hardship for those least able to bear it. This continues right now.

## III. PLAINTIFFS FILE THIS CASE, CERTIFY TWO CLASSES, AND SECURE A PRELIMINARY INJUNCTION.

Stymied by delays, in January 2023, Plaintiffs filed this class action lawsuit under 42 U.S.C. § 1983, alleging violations of the SNAP Act and the Fourteenth Amendment of the United States Constitution.[3] 4-ER-874–76.

Plaintiffs claimed that the State had violated five provisions of the SNAP Act, 7 U.S.C. § 2020. 4-ER-874–75. Three provisions—Sections 2020(e)(3), 2020(e)(4),

[3] Plaintiffs also raised a language access claim, but subsequently stipulated to its dismissal. 1-ER-6 n.12. Further, Plaintiffs raised a due process claim under the Alaska Constitution, but the district court ceased exercising supplemental jurisdiction over it, and dismissed it without prejudice, after otherwise granting summary judgment for the State. 1-ER-48–50.

and 2020(e)(9)—impose specific deadlines for when the State "shall" render SNAP eligibility determinations and provide benefits. The fourth provision, Section 2020(e)(2)(B)(iii), protects the right to apply, requiring the State to permit a household to apply for benefits on the first day that they contact an office in person. Finally, the fifth provision, Section 2020(e)(10), provides for a fair hearing, and a prompt determination thereafter, for any household aggrieved by state actions that impact the household's SNAP participation. Plaintiffs alleged violations of each of those provisions.

Plaintiffs also alleged that the State had violated the Fourteenth Amendment's Due Process Clause. Specifically, Plaintiffs claimed the State's failure to provide "timely and adequate written notice of eligibility or delayed processing for SNAP benefits" that conveys fair hearing rights deprived them of due process. 4-ER-875–76. Plaintiffs also claimed that the State's failure to render timely eligibility determinations and provide required notices arbitrarily deprived them of SNAP benefits, also in violation of the Due Process Clause. *Id.*

In May 2023, the parties stipulated to certification of two classes: (1) an "Untimely Eligibility Class" of Alaskans who face delays in receiving SNAP eligibility determinations; and (2) a "Right to File Class" of Alaskans that are denied the right to apply for SNAP on the first day they contact an office. 4-ER-650–52.

On December 31, 2024, the district court granted a preliminary injunction against the State. 3-ER-432–63. The district court found that the State's "non-compliance [with timely processing was] historical, persistent, and significant," and noted that "State Fiscal Year 2023, which includes the months leading up to this lawsuit, shows a sharp decline from what was already notable non-compliance." 3-ER-444.

## IV. THE DISTRICT COURT LATER REVERSED COURSE AND DISMISSED THE CASE.

Despite granting a preliminary injunction, the district court reversed course in May 2026 and granted summary judgment in favor of the State. The district court first concluded that the five SNAP Act provisions at issue were unenforceable under Section 1983. The district court acknowledged that those provisions have "[s]imilar language" to other provisions that the Supreme Court has found enforceable under Section 1983. 1-ER-18. Nonetheless, the district court concluded that the provisions were not sufficiently rights-creating, so it dismissed all the SNAP Act claims. 1-ER-19.

Further, the district court rejected Plaintiffs' due process claims. 1-ER-36–48. The district court asserted that Plaintiffs' two due process claims were "the second and third prongs of the three-pronged Due Process inquiry," loosely referencing *Mathews v. Eldridge*. 1-ER-37. The district court found that Plaintiffs suffered no

"unconstitutional deprivation" of their protected property interest in SNAP, relying on faulty metrics and failing entirely to apply the *Mathews* test. 1-ER-47. In so ruling, the district court did not evaluate the State's failure to issue notices or consider the importance of such notices to class members experiencing delays. This appeal followed.

## SUMMARY OF THE ARGUMENT

Plaintiffs have a private right of action to enforce the five relevant provisions of the SNAP Act through 42 U.S.C. § 1983. Under the test established in *Gonzaga University v. Doe*, 536 U.S. 273 (2002), and reaffirmed in *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 374–76 (2025), a statutory provision presumptively confers a Section 1983-enforceable right when it has plain and unambiguous rights-creating language and thereby provides states with clear notice that they may be subject to private suits. The SNAP Act provisions in this case meet that standard. Each resides in 7 U.S.C. § 2020, which expressly contemplates "action[s] filed by a household to enforce any provision of this chapter." 7 U.S.C. § 2020(a)(3)(B)(ii). And each provision at issue bears the classic hallmarks of rights-creating language: each has an "unmistakable focus on the benefited class" and uses mandatory language to create clear and specific entitlements for each individual household. *Health and Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 183 (2023).

The provisions here thus differ significantly from the Medicaid Act provision in *Medina* in at least four respects. Unlike here, the Medicaid Act (i) does not expressly contemplate private lawsuits to enforce its provisions; (ii) does not use mandatory terms like "shall" or "must" to describe the state's obligations to the relevant individuals; (iii) is not focused exclusively on individuals receiving the

benefits; and (iv) contains various exceptions. The district court's reliance on *Medina* was therefore misplaced.

While the SNAP Act's text alone shows that the provisions clearly and unambiguously confer rights, the SNAP Act's implementing regulations further confirm that the provisions are rights-creating. The SNAP regulations explicitly use the language of rights in describing those aspects of the eligibility process required by the statutory provisions at issue, and the regulations also contemplate private lawsuits to enforce them.

The provisions here are therefore presumptively enforceable under Section 1983. There is no express or implicit preclusion of private enforcement in the SNAP Act that would rebut that presumption. The State has never identified an express provision of the SNAP Act that would forbid lawsuits, and none exists. Nor can the State point to a remedial scheme that is incompatible with enforcement of rights via Section 1983. Accordingly, this Court should reverse the district court's decision and remand for further proceedings.

The State also violated due process. The due process analysis has three prongs: a property interest, a deprivation of that property interest, and a lack of process. The State conceded, as it must, that SNAP applicants have a cognizable property interest in their SNAP benefits.

A deprivation occurred as well. When the State violated the SNAP Act's deadlines, the applicants were deprived of their property interests. And even if the SNAP Act did not codify timeframes, the deprivation would have occurred when the delays became unreasonable under *Mathews v. Eldridge*.

The district court found that no deprivation occurred, and so never reached the question of whether process was adequate. This was erroneous. Not only did a deprivation occur, but this Court has found that process is sometimes due "pre-deprivation."

The State's process is inadequate under the *Mathews* balancing test. In its partial engagement with *Mathews* balancing, the district court relied on faulty metrics. Under *Mathews*, the State's delays were unconstitutional. *Mathews* balancing weighs the private interest, government interest, and risk of erroneous deprivation. The private interest in securing food is extraordinarily high. The government interest is low, if not non-existent, because administrative costs do not weigh heavily, the government has a countervailing interest in caring for the poor, and the government can have *no interest* in violating the law—i.e., violating the timeframes in the SNAP Act. And the risk of erroneous deprivation is unusually high because Plaintiffs are waiting on an *initial* determination, meaning that *no* arbiter has done even an initial pass to determine eligibility.

Caselaw from this Court and the Supreme Court demonstrate that the State's delays in this case render the process inadequate. Accordingly, this Court should reverse the district court's findings on due process.

## STANDARD OF REVIEW

This Court "review[s] de novo both a grant of summary judgment in general and pure questions of law decided on summary judgment." *Sullivan v. Dollar Tree Stores, Inc.*, 623 F.3d 770, 776 (9th Cir. 2010) (internal citations omitted). Further, this Court must "determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Lil' Man in the Boat, Inc. v. City & Cnty. of San Francisco*, 5 F.4th 952, 956 (9th Cir. 2021).

# ARGUMENT

## I. THE DISTRICT COURT ERRED IN HOLDING THAT THE SNAP ACT PROVISIONS ARE UNENFORCEABLE UNDER 42 U.S.C. § 1983.

"[S]ince the 1870s," Section 1983 has "provided an express cause of action to any person deprived (by someone acting under color of state law) of any rights . . . secured by the Constitution and laws." *Talevski*, 599 U.S. at 171. As the Supreme Court has reiterated, "1983's unqualified reference to 'laws' 'means what it says.'" *Id.* (quoting *Maine v. Thiboutot*, 448 U.S. 1 (1980)). Therefore, "any federal law can" secure rights within the scope of Section 1983, *id.* at 175, so long as "Congress 'speaks with a clear voice,' and manifests an 'unambiguous' intent to confer individual rights," *Gonzaga University v. Doe*, 536 U.S. 273, 280 (2002) (quoting *Pennhurst State School & Hosp. v. Halderman*, 451 U.S. 1, 17, 28, and n.21 (1981)).

In *Gonzaga*, the Supreme Court set forth its "established method for ascertaining unambiguous conferral." *Talevski*, 599 U.S. at 183; *see also Medina*, 606 U.S. at 375-76 (reaffirming the *Gonzaga* test). Under *Gonzaga*, "[c]ourts must employ traditional tools of statutory construction to assess whether Congress has 'unambiguously conferred' 'individual rights upon a class of beneficiaries' to which the plaintiff belongs." *Talevski*, 599 U.S. at 183 (quoting *Gonzaga*, 536 U.S. at 283, 285-86). If the court determines that Congress has done so, a state may rebut the presumption of private enforcement by showing that the authorizing statute

foreclosed claims under Section 1983. *Gonzaga*, 536 U.S. at 284 n.4. The *Gonzaga* test is "stringent." *Talevski*, 599 U.S. at 180, 186. Courts must distinguish between "rights"—which are actionable under Section 1983—and "the broader or vaguer 'benefits' or 'interests'"—which are not. *Gonzaga*, 536 U.S. at 283. Still, the test "is satisfied where the provision in question is 'phrased in terms of the persons benefited' and contains 'rights-creating,' individual-centric language with an 'unmistakable focus on the benefited class.'" *Talevski*, 599 U.S. at 183 (quoting *Gonzaga*, 536 U.S. at 284, 287).

As the Supreme Court reiterated in *Medina*, the key issue is notice. That is, spending-clause statutes must confer rights unambiguously so that a state has "clear and unambiguous notice that, if it accepts federal funds, it may face private suits asserting an individual right." *Medina*, 606 U.S. at 378. States must, in other words, receive "'unmistakable' notice" "that they might be subject 'to private suits . . . whenever they fail to comply with a federal funding condition.'" *Medina*, 606 U.S. at 375 (quoting *Gonzaga*, 536 U.S. at 286-87).

The SNAP Act provisions here meet that standard. Each resides in 7 U.S.C. § 2020, which expressly contemplates "action[s] filed by a household to enforce any provision of this Act." 7 U.S.C. § 2020(a)(3)(B)(ii); *see also id.* §§ 2023(b), 2027(a)(2). That undoubtedly includes the provisions at issue. Each uses "individual-centric language with an 'unmistakable focus on the benefited class,'"

and each uses mandatory language to impose specific duties on the state with respect to each individual household. *Talevski*, 599 U.S. at 183 (quoting *Gonzaga*, 536 U.S. at 287). The text of the SNAP Act thus clearly and unambiguously creates enforceable rights—a conclusion that the statute's implementing regulations only confirm. And because the State cannot show that Congress, in the SNAP Act, intended to displace private lawsuits through an alternative enforcement scheme, the provisions here are enforceable under Section 1983.

### A. The Plain Text of the SNAP Act Unambiguously Creates Privately Enforceable Rights.

"[S]tart" by considering where each of the provisions "reside[s]." *Talevski*, 599 U.S. at 184. All are located in 7 U.S.C. § 2020, which requires states to have records available "in any action ***filed by a household*** to enforce ***any*** provision of this Act (including regulations issued under this chapter)." 7 U.S.C. § 2020(a)(3)(B)(ii) (emphasis added). That provision plainly contemplates private enforcement of the SNAP Act's provisions, and even its regulations. As one court has observed, "this provision would make little sense if Congress did not intend for the SNAP Act to be enforceable by private action." *Barry v. Corrigan*, 79 F. Supp. 3d 712, 735 (E.D. Mich. 2015), *aff'd sub nom. Barry v. Lyon*, 834 F.3d 706 (6th Cir. 2016).

And that is not the only provision of the SNAP Act contemplating private lawsuits. Section 2023 likewise contemplates "judicial action arising under this Act," including actions seeking the restoration of "allotments"—*i.e.*, a household's monthly SNAP benefits—that were "wrongfully withheld." 7 U.S.C. § 2023(b). Indeed, Section 2023 is titled "[a]dministrative and judicial review; restoration of ***rights***." *Id.* (emphasis added).[4] And another provision—Section 2027(a)(2)—expressly allows for the use of federal funds to pay for legal help "with any proceeding or action before any State or Federal agency or court."

The SNAP Act thus expressly contemplates private lawsuits from individual households to enforce their SNAP Act rights—and even warns states that their records must be available for those lawsuits. *See* 7 U.S.C. § 2020(a)(3)(B). In doing so, the SNAP Act gives states "'unmistakable' notice . . . that they might be subject 'to private suits . . . whenever they fail to comply with a federal funding condition.'" *Medina*, 606 U.S. at 374 (quoting *Gonzaga*, 536 U.S. at 286-87). Put differently, through Sections 2020(a)(3)(B)(ii), 2023(b), and 2027(a)(2), "Congress alerted the State in advance, clearly and unambiguously, that responding to private enforcement suits was a condition of its offer." *Id.* at 373 (quotations and alterations removed).

[4] While a statutory title "cannot enlarge or confer powers by itself," it still "may underscore that the statutory text creates a right." *Medina*, 606 U.S. at 382 (quotation omitted).

And there can be no doubt that the five SNAP Act provisions at issue are among those privately enforceable provisions. Each has an "unmistakable focus on the benefited class" and, using mandatory language, creates clear and specific entitlements for each individual household. *Talevski*, 599 U.S. at 183 (quoting *Gonzaga*, 536 U.S. at 287).

7 U.S.C. § 2020(e)(9) is illustrative. That provision mandates that a state provide SNAP benefits within seven days to any applicant-household facing especially dire financial circumstances. Specifically, Section 2020(e)(9) requires that a state "shall . . . provide benefits no later than 7 days after the date of any application to ***any household***" that meets the specified statutory criteria. 7 U.S.C. § 2020(e)(9) (emphasis added). By focusing on "any household," the provision "has an individual, rather than an aggregate, focus." *Talevski*, 599 U.S. at 193 (quoting *Gonzaga*, 536 U.S. at 290). It also uses the mandatory "shall" and imposes "specific and definite" obligations that the state must perform for each household. *Curtis v. Inslee*, 154 F.4th 678, 687 (9th Cir. 2025) (quoting *Gonzaga*, 536 U.S. at 283). Section 2020(e)(9) thus provides a clear, specific, and individualized statutory entitlement.

The other provisions are in accord. Section 2020(e)(3) mandates that a state "shall" give "***each applicant household***, at the time of application, a clear written statement explaining what acts the household must perform to cooperate in obtaining

verification and otherwise completing the application process," as well as a prompt determination regarding the "eligibility of ***each applicant household***." 7 U.S.C. § 2020(e)(3) (emphasis added). Here, too, the provision is individually-focused—it applies to "each applicant household"—and it uses mandatory language to impose specific duties on the state.

Section 2020(e)(4), likewise, requires that a state "***shall*** insure" that "***each*** participating household" receives a notice, before its benefits expire, to renew its SNAP eligibility and that, if the household timely reapplies, a state "shall" continue to provide "***each*** such household" with "its allotment" within one month of "the receipt of the last allotment issued to it."

Similarly, Section 2020(e)(2)(B)(iii) requires that a state "shall permit ***an applicant household***" to apply for SNAP benefits on the same day that "***the household***" contacts an office in person.[5]

---

[5] Recently, the Eighth Circuit held that Section 2020(e)(2)(B)—along with Section 2014(a) of the SNAP Act—is not enforceable under Section 1983. *See Holmes v. Bax*, No. 25-1987, 2026 U.S. App. LEXIS 24979, at *30 (8th Cir. Aug. 19, 2026). This Court, however, should chart a different course. Even though Section 2020(e)(2)(B) focuses directly on the individual "applicant household," the Eighth Circuit viewed the provision as not sufficiently individually focused to be enforceable under Section 1983 because it "addresses 'the government official who will regulate the recipient of federal funding.'" *Id.* at *30 (quoting *Does v. Gillespie*, 867 F.3d 1034, 1041 (8th Cir. 2017)). But the Supreme Court explained in *Talevski* that the fact that a provision "establish[es] who it is that must respect and honor [the] statutory rights" does not make the provision any less individually focused. *Talevski*, 599 U.S. at 185 (holding that such a provision in the FNHRA is privately

Finally, Section 2020(e)(10), the Act's "fair-hearing provision," *Atkins v. Parker*, 472 U.S. 115, 125 (1985), entitles "***any household*** aggrieved by the action of the State agency" to a "fair hearing and a prompt determination thereafter." 7 U.S.C. § 2020(e)(10) (emphasis added). That provision, too, is individually-focused—it applies to "any household." While it does not use "shall," the provision is still rights-creating. It was enacted "in response to th[e] [Supreme Court's] decision in *Goldberg v. Kelly*, 397 U.S. 254 (1970)," and expressly entitles an aggrieved household to specific procedural due process rights. *See Atkins*, 472 U.S. at 124-25.

Each of these provisions is thus unambiguously rights-creating. They all "speak 'in terms of the person benefited,' and have an 'unmistakable focus on the benefited class.'" *Talevski*, 599 U.S. at 186 (quoting *Gonzaga*, 536 U.S. at 287, 290). Each also compels the state to provide "specific and definite" entitlements to each individual household applying or participating in SNAP. *See Curtis v. Inslee*, 154 F.4th 678, 687 (9th Cir. 2025) (quoting *Gonzaga*, 536 U.S. at 283). And the SNAP Act expressly puts states on notice that "a household" may file an "action . . . to

enforceable). The Eighth Circuit did not explain how its holding is consistent with *Talevski*, nor did it consider the multiple provisions in the SNAP Act expressly contemplating private lawsuits to enforce its provisions. Its holding should not be followed.

enforce" those very provisions. 7 U.S.C. § 2020(a)(3)(B)(ii). The text of the SNAP Act thus creates clear statutory entitlements for individual households and provides "unmistakable notice" to states "that they might be subject to private suits whenever they fail to comply" with those entitlements. *Medina*, 606 U.S. at 375 (cleaned up). In short, the relevant provisions are clearly and unambiguously "rights-creating" and satisfy the *Gonzaga* test.

The district court's contrary conclusion was mistaken. In concluding that the provisions are not rights-creating, the district court contrasted them with the FNHRA provisions that the Supreme Court held were enforceable in *Talevski*. 1-ER-18–20. Despite acknowledging that the SNAP Act provisions share important features with the FNHRA provisions—including mandatory language and a focus on the individual beneficiaries—the district court deemed the statutes "dispositive[ly] differen[t]" because the SNAP Act provisions "do not confer 'rights'" and reside in a section titled "contents of a State plan of operation" that does "little to 'alert' a State that SNAP funding comes with a duty to answer private suits.'" 1-ER-19–20 (quoting *Medina*, 606 U.S. at 379-80). As for the SNAP Act's express contemplation of private suits to enforce its provisions, the district court agreed that "there might be a privately enforceable right somewhere in the SNAP Act," but concluded that those rights are not in the provisions at issue, which, in the district court's view, do not contain explicit rights-creating language. 1-ER-30.

That was error. To start, the absence of the word "right" in the SNAP Act provisions here does not mean that they are not "rights-creating." The *Gonzaga* test is not a magic-words requirement, but rather a clear statement rule—it asks whether a statute "clearly and unambiguously" confers an individual right. *Medina*, 606 U.S. at 374. As the Supreme Court has repeatedly underscored, a clear statement rule "does not mean 'Congress must incant magic words.'" *United States v. Kwai Fun Wong*, 575 U.S. 402, 409 (2015) (quoting *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013)); *see also Exxon Mobil Corp. v. Corporación CIMEX, S.A. (Cuba)*, 146 S. Ct. 1909, 1918, 1924 (2026) (explaining that a requirement that a statute be "unmistakably clear" does not mean that Congress must use "magic words"). Indeed, *Talevski* held that FNHRA's "predischarge-notice provision," located within a subsection titled "[t]ransfer and discharge rights," is rights-creating even though the provision's operative text does not itself contain the word "right." 42 U.S.C. § 1396r(c)(2).

So too here. Like the predischarge-notice provision in *Talevski*, the SNAP Act provisions are individual-focused and impose clear, mandatory obligations on the state with respect to each individual household. While the SNAP Act provisions are not located under a section heading that uses the word "rights," they are located in a section that expressly contemplates their enforcement through private lawsuits. *See*

7 U.S.C. § 2020(a)(3)(B)(ii); *see also id.* §§ 2023(b), 2027(a)(2). They are therefore rights-creating as well.

The district court further erred in downplaying the SNAP Act's express contemplation of private suits. The district court entirely ignored Sections 2023(b) and 2027(a)(2) of the SNAP Act, and its treatment of Section 2020(a)(3)(B)(ii) does not withstand scrutiny. Per the district court, "there might be a privately enforceable right somewhere in the SNAP Act to which § 2020(a)(3)(B)(ii) would apply" but none of the provisions at issue are such a right because, in the district court's view, none contain rights-creating language sufficient to satisfy *Gonzaga*. 1-ER-30. But Section 2020(a)(3)(B)(ii) is itself part of the statutory text that informs whether the provisions at issue are rights-creating. And by expressly contemplating "action[s] filed by a household" to enforce "any provision" of the SNAP Act, the statute makes clear to state agencies that household-focused SNAP entitlements—like those at issue here—are privately enforceable.

Moreover, the district court's suggestion that there "might" (but "might" not) be a privately enforceable right in the SNAP Act is erroneous. There is no ambiguity in Sections 2020(a)(3)(B)(ii), 2023(b), and 2027(a)(2), which make clear that there *is* a privately enforceable right in the SNAP Act. Any other interpretation would render these provisions surplusage. *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 432 (2023) ("'[E]very clause and word of a statute' should

have meaning." (quoting *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1882))). Indeed, "surplusage" does not go far enough, as the district court's suggestion erases the plain meaning of these provisions when no ambiguity exists.

In short, the SNAP Act's plain text clearly and unambiguously confers rights to individual households to sue state agencies for violations of the relevant provisions.

### B. *Medina* Does Not Support the District Court's Conclusion.

In finding that the provisions here are unenforceable, the district court misapplied *Medina.* 1-ER-20–27. The district court analogized the SNAP Act provisions here to the Medicaid Act's "any-qualified-provider" provision at issue in *Medina*, and concluded that, "as in *Medina*, the statutory provisions at issue here do not clearly and unambiguously use rights-creating language." 1-ER-24. However, the any-qualified-provider provision differs sharply from the SNAP Act provisions here in at least four critical respects.

*First*, as explained above, the SNAP Act provisions here are located in a section that expressly contemplates private lawsuits to enforce its provisions, and the SNAP Act contains multiple, other provisions contemplating such lawsuits. In so doing, the SNAP Act "alert[s] grantees that accepting federal funds comes with a duty to answer private suits." *Medina*, 606 U.S. at 380. By contrast, the Supreme

Court identified no such "clear and unambiguous" notice in the Medicaid Act. *Id.* at 378.

*Second*, unlike almost all the SNAP Act provisions here, the any-qualified-provider provision does not use mandatory terms like "shall" or "must" to describe the state's obligations to the relevant individuals. Rather, the provision requires a state Medicaid plan simply to "provide that . . . any individual eligible for medical assistance (including drugs) ***may*** obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required." 42 U.S.C § 1396a(a)(23) (emphasis added). Congress could have provided that the state "shall permit" an eligible individual to obtain assistance from any qualified provider—like the mandatory language used in Section 2020(e)(2)(B)(iii) of the SNAP Act. *See* 7 U.S.C. § 2020(e)(2)(B)(iii) (a state "***shall*** permit ***an applicant household***." (emphasis added)). But it did not. The provision simply states that an individual "***may*** obtain" assistance from any qualified provider. 42 U.S.C § 1396a(a)(23) (emphasis added).

The district court elided this distinction. The district court observed that, like the SNAP Act provisions, the any-qualified-provider provision is in a subsection of a broader provision that provides what state Medicaid plans "must" contain. 1-ER-23. Hence, the district court concluded, "the statute at issue in *Medina* contained similar language and the Supreme Court held that it did not create a privately

enforceable right." *Id.* But the district court ignored that the Medicaid Act uses the word "must" *not* to describe what the state must do for individual Medicaid recipients but rather what the state must include in its overall Medicaid plan. *See* 42 U.S.C. § 1396a(a)(23). The any-qualified-provider provision itself contains neither the word "shall" or any comparable, mandatory language. Here, however, all but one of the SNAP Act provisions at issue use the mandatory term "shall" not *only* to describe what the state must include in its "plan of operation" but *also* what the state must provide for each individual household. *See* 7 U.S.C. § 2020(e). Put differently, the Medicaid Act requires that states "must" have Medicaid plans that, in turn, "may" allow something, while the SNAP Act requires that states "shall" have SNAP plans that, in turn, "shall" require them to provide specific entitlements. The only exception, Section 2020(e)(10), is still rights-creating—and distinct from the any-qualified-provider provision—because it was expressly enacted to codify the state's obligation to provide an aggrieved household specific procedural due process protections.

*Third*, the any-qualified-provider provision is not focused exclusively on individuals receiving Medicaid. Instead, it expressly benefits not just individuals but also providers writ large. *See Medina*, 606 U.S. at 377 ("Doubtless, too, this provision seeks to benefit both providers and patients."). It thus lacks an "unmistakable focus on the benefited class." *Gonzaga*, 536 U.S. at 287. By contrast,

each SNAP Act provision here creates an entitlement *exclusively* for each individual household. *See, e.g.*, 7 U.S.C. § 2020(e)(9) (providing that the state "shall . . . provide benefits no later than 7 days after the date of application to any household."). The district court ignored this distinction.

*Fourth,* as the Supreme Court observed in *Medina*, the any-qualified-provider provision "carve[s] out various exceptions," and it is unlikely that "Congress sought to convey a right against the States in one breath but let States control its scope in the next." 606 U.S. at 378-79. Not so here. As the district court acknowledged, the SNAP Act provisions create absolute obligations and permit no exceptions. 1-ER-24–25.

To be sure, the SNAP Act provisions here and the Medicaid Act provision in *Medina* both appear in subsections that outline the requirements of state plans. But the Supreme Court *explicitly* clarified that this similarity is not dispositive—it does not "suffice to prove that [the provision] is unenforceable under § 1983." *Medina*, 606 U.S. at 379-80. Rather, as always, the Court examined the text of the provision and the surrounding statutory context. In the case of the Medicaid Act, it concluded that there was no unambiguous notice to the state.

Here, unlike the Medicaid Act (and even FNHRA), there is clear and unambiguous notice through the explicit contemplation of private suits to enforce Section 2020 and the individual-centric, mandatory, and specific language that each

specific provision at issue uses. The SNAP Act provisions here are thus fundamentally distinct from the any-qualified-provider provision in *Medina*, and the district court's application of *Medina* was erroneous.

### C. The SNAP Act's Implementing Regulations Confirm That the Provisions Here Are Rights-Creating.

The SNAP Act's text resolves this appeal and shows that the provisions here clearly and unambiguously confer rights. That conclusion is only underscored by the SNAP Act's implementing regulations. "[C]ourts may—as they have from the start—seek aid from the interpretations of those responsible for implementing particular statutes." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024). In the SNAP Act, Congress directed the Secretary of Agriculture to "issue such regulations consistent with this Act [7 USCS §§ 2011 et seq.] as the Secretary deems necessary or appropriate for the effective and efficient administration of the [SNAP] program." 7 U.S.C. § 2013(c). And the regulations show that the agency has long understood—and the State has been on clear notice—that these SNAP Act provisions are rights-creating.

The SNAP Act regulations explicitly use the language of rights in describing those aspects of the eligibility process required by the statutory provisions at issue. Under 7 C.F.R. § 273.2(a)(1), the state is required to "have a procedure for informing

persons who wish to apply for SNAP benefits about the application process and their ***rights*** and responsibilities." *Id.* (emphasis added). The household's rights include a:

- "Right to file in writing," 7 C.F.R. § 273.2(c)(1)(ii);
- "Right to same-day filing," 7 C.F.R. § 273.2(c)(1)(iii);
- "[R]ight to reapply at any time subsequent to a withdrawal" 7 C.F.R. § 273.2(c)(6); and
- "[R]ight to request a fair hearing" 7 C.F.R. § 273.15(f).

The regulations further require that a state interviewer "advise households of their ***rights*** and responsibilities during the interview, ***including the appropriate application processing standard***." 7 C.F.R. § 273.2(e)(1) (emphasis added).

The regulations also expressly contemplate that "a State agency [may be] sued by any person(s) in a State or Federal Court in any matter which involves the State agency's administration of SNAP." 7 C.F.R. § 272.4(d)(1)(i). "Class action suits," in fact, are among the lawsuits that the regulation contemplates, and the regulations impose detailed reporting requirements on states subject to such lawsuits. *Id.*

The SNAP Act's implementing regulations thus underscore that the authorizing statutory provisions are "rights-creating." While the Court need not defer to the agency's interpretation of the SNAP Act, it may consider the agency's well-informed views when determining whether these statutory provisions are rights-creating. *Loper Bright*, 603 U.S. at 394. And the repeated use of the term

"right" is another signal that the SNAP Act provisions themselves are clearly and unambiguously rights-creating.

### D. Alternative Enforcement Mechanisms Do Not Displace the Private Enforcement of the Relevant SNAP Act Provisions.

Because the relevant provisions confer rights under *Gonzaga*, they are presumptively enforceable. *Talevski*, 599 U.S. at 186 n.13. To rebut that presumption, the State bears the burden of showing that the statute either "expressly forbid[s] § 1983's use" or "implicitly" does so "by creating 'a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.'" *Id.* at 186 (quoting *Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120 (2005)). The State cannot meet that burden here.

To start, the State has never identified any express provision of the SNAP Act forbidding lawsuits under Section 1983, and none exists. As for implicit preclusion, "[t]he crucial consideration is whether Congress intended a statute's remedial scheme to be *the exclusive avenue* through which a plaintiff may assert his claims." *Id.* at 187 (cleaned up). Accordingly, the "attendant presumption is that § 1983 can play its textually prescribed role as a vehicle for enforcing those rights, even alongside a detailed enforcement regime that also protects those interests, so long as § 1983 enforcement is not 'incompatible' with Congress's handiwork." *Id.* at 188 (cleaned up).

The State cannot rebut that presumption. As discussed, multiple provisions of the SNAP Act expressly contemplate private lawsuits brought by individual households to enforce the provisions of the SNAP Act. *See supra* at Section I.A. Further, as courts have long recognized, "Congress did not impliedly preclude private enforcement of the [SNAP] Act's time limits by granting enforcement powers to the Secretary of Agriculture." *See Briggs v. Bremby*, 792 F.3d 239, 245 (2d Cir. 2015); *see also Gonzalez v. Pingree*, 821 F.2d 1526, 1528–30 (11th Cir. 1987) (rejecting that the SNAP Act's comprehensiveness, including its fair hearing procedures and its provisions for federal enforcement or funding cutoffs, precluded private enforcement); *Victorian v. Miller*, 813 F.2d 718, 724 (5th Cir. 1987) ("[T]he Act does not foreclose a [Section] 1983 remedy[.]").

The district court's passing suggestion that the SNAP Act might displace Section 1983's general cause of action with a more specific remedy should be rejected. The district court conflated the availability of an alternative enforcement mechanism with incompatibility. 1-ER-30. There is no indication, from the district court or otherwise, that attorney general enforcement via Section 2020(g) is "incompatible" with the private enforcement at issue. *Briggs*, 792 F.3d at 245. In fact, the district court even cited legislative history on why alternative remedies in the SNAP Act "should not be construed as abrogating in any way private causes of

action against states." 1-ER-30–31 n.105 (citing H.R. Rep. No. 95-464, at 398 (1977)).

The district court's denial of Plaintiffs' claims to enforce five provisions of the SNAP Act should be reversed and remanded for further proceedings consistent with the determination of this Court.

## II. THE DISTRICT COURT ERRED IN FINDING NO DUE PROCESS VIOLATIONS.

Alaskans applying for SNAP benefits wait months for the State to determine their eligibility and issue benefits. These delays violate not only the SNAP Act, but also the Fourteenth Amendment's Due Process Clause. Given the wide use of Section 1983 to enforce provisions of the SNAP Act, courts have had limited opportunities to consider due process vis-à-vis SNAP benefits. But "[t]he right to due process 'is conferred, not by legislative grace, but by constitutional guarantee.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985) (citing *Arnett v. Kennedy*, 416 U.S. 134, 167 (1974)). Accordingly, Plaintiffs' due process claims stand on their own—independent of the SNAP Act's enforceability.

Plaintiffs claim that the State violates due process in two ways: first, by failing to determine SNAP eligibility and issue benefits timely; and second, by failing to provide a notice conveying fair hearing rights when determinations are delayed. 4-

ER-875–76. In short, due process demands a timely *decision*, and if the decision is delayed, due process demands a *notice* of the delays.

"To obtain relief on a procedural due process claim, the plaintiff must establish the existence of '(1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; [and] (3) lack of process.'" *Shanks v. Dressel*, 540 F.3d 1082, 1090 (9th Cir. 2008) (quoting *Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993)). Each step is analyzed below.

### A. The SNAP Act Confers a Constitutionally Protected Property Interest to SNAP Applicants.

All agree—and the State conceded below—that the SNAP Act creates a constitutionally protected property interest. Indeed, there could be no dispute. The SNAP Act confers a property interest through its non-discretionary nature. *Atkins v. Parker*, 472 U.S. 115, 128 (1985) ("Food-stamp benefits, like the welfare benefits at issue in *Goldberg v. Kelly*, 397 U.S. 254 (1970), 'are a matter of statutory entitlement for persons qualified to receive them.'"). And applicants for SNAP benefits hold a protected property right, just as SNAP benefit recipients do. *See Kapps v. Wing*, 404 F.3d 105, 115 (2d Cir. 2005) ("Every circuit to address the question, however, has concluded that applicants for benefits, no less than current benefits recipients, may possess a property interest in the receipt of public welfare

entitlements.") (collecting cases); *accord Nat'l Ass'n of Radiation Survivors v. Derwinski*, 994 F.2d 583, 588 n.7 (9th Cir. 1992) ("[B]oth applicants for and recipients of [service-connected death and disability] benefits possess a constitutionally protected property interest in those benefits."); *Ressler v. Pierce*, 692 F.2d 1212, 1214-16 (9th Cir. 1982) (holding that applicants for federal rent subsidies have a constitutionally protected property interest); *Holmes*, 2026 U.S. App. LEXIS 24979, at *31 ("[W]e conclude that SNAP applicants have a protected property interest in receipt of these benefits via their SNAP applications."); *see also* 7 U.S.C. § 2014(a) ("Assistance under this program shall be furnished to all eligible households who make application for such participation.").

### B. The State's Delays Deprive Plaintiffs of Their Property Interests.

The State routinely violates the SNAP Act's requirements to deliver timely eligibility and recertification decisions to Alaskans. This constitutes a deprivation, both because the delays exceed the time authorized by Congress and because they are independently unreasonable.

#### 1. A deprivation occurs when the State fails to render a decision and issue benefits by the SNAP Act's deadline.

When the State violates the SNAP Act's timeliness requirements, it deprives Plaintiffs of their property interests. "Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by

existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972).

One such "dimension" concerns timing. Where there is a "source in positive law for an entitlement to be awarded . . . within a fixed interval of the application," a delay beyond the fixed interval constitutes a deprivation of a property right. *Schroeder v. City of Chicago*, 927 F.2d 957, 959 (7th Cir. 1991). Put differently, "[i]f you are entitled to receive $1,000 on May 1, 1989, and you receive it on May 2, you have been deprived of an entitlement. It is a limited, temporary, and easily reparable deprivation—the loss, in effect, of a day's interest on $1,000, which is less than a dollar. But it is a deprivation nevertheless, and we may assume that it would be actionable." *Id.*

Class members eligible for SNAP have a "substantive entitlement to begin receiving [a benefit] within a fixed interval of the application." *See id.* The SNAP Act requires the state to process non-expedited applications within thirty days and expedited applications within seven days. 7 U.S.C. §§ 2020(e)(3), (e)(9). The SNAP Act further mandates that recertifying SNAP recipients who timely submit renewal materials continue receiving SNAP benefits without interruption. *See* 7 U.S.C. § 2020(e)(4); *Goldberg v. Kelly*, 397 U.S. 254, 265 (1970) ("The same governmental interests that counsel the provision of welfare, counsel as well its uninterrupted

provision to those eligible to receive it."). Thus, any delay beyond statutory limits constitutes a deprivation of a protected property interest.

The deprivation is most stark for individuals recertifying their SNAP benefits. The statute demands that these individuals receive *uninterrupted* benefits. 7 U.S.C. § 2020(e)(4). When the State fails to render a timely recertification determination, the SNAP case closes automatically. *Id.* The household stops receiving benefits, not because they are ineligible or failed to reapply, but because the State failed to timely render a new eligibility determination. 7 U.S.C. § 2020(e)(4); *see, e.g.*, 3-ER-601–02 ¶¶ 7-8, 18 (declaring that, after recertifying, Plaintiff waited five months to begin receiving benefits again).

A similar deprivation arises for individuals submitting new applications. *See Kelly v. R.R. Ret. Bd.*, 625 F.2d 486, 490 (3d Cir. 1980) ("[D]ue process must attach to the process of determining ineligibility, whether at the outset or after receipt of benefits."). For non-expedited applicants, the SNAP Act requires the State to make a determination and issue benefits to eligible households in 30 days. If that time expires and the applicant does not receive a decision, the applicant is deprived of SNAP benefits until the State makes a determination. *See e.g.*, 3-ER-605 ¶¶ 9, 11

(declaring that, after applying, Plaintiff waited nearly six months to begin receiving benefits).[6]

This, of course, does not prove a constitutional violation. The question remains whether the State provides adequate process. But the deprivation occurs when the eligibility determinations become untimely under the SNAP Act.

### 2. Alternatively, a deprivation occurs when the State's delays become unreasonable.

Even if the SNAP Act had no codified timeframes, there would still be a deprivation in this case because the delays are unreasonable under the *Mathews* test.

In *Veterans for Common Sense v. Shinseki*, the Ninth Circuit examined delays in VA benefits. 644 F.3d 845, 850 (9th Cir. 2011), *vacated on other grounds*, 678 F.3d 1013, 1028 (9th Cir. 2012).[7] This Court explained:

> We understand these cases to support the commonsense proposition that an unreasonable delay in the delivery of an entitlement can amount to a deprivation of that entitlement. . . . Whether that deprivation is

---

[6] *Cf. Dist. of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 43 (D.D.C. 2020) ("Going without food is an irreparable harm. This sort of deprivation of nutrition, and the psychological and physical distress attending that deprivation, are quite likely to impose lingering, if not irreversible effects." (quotations omitted); *Haskins v. Stanton*, 794 F.2d at 1276–77 ("the deprivation of food [resulting from the denial of food stamps] is extremely serious and is quite likely to impose lingering, if not irreversible, hardships upon recipients") (quotations omitted)).

[7] The Ninth Circuit sitting en banc vacated the panel's opinion on jurisdictional grounds. 678 F.3d at 1028.

> actually *unconstitutional*, because inflicted without due process, is a distinct question to which we turn next.

*Id.* at 874 & n.28. The *Shinseki* court did not attempt to pinpoint the moment when delays became unreasonable but instead proceeded to analyze the adequacy of the agency's process under *Mathews*. *Id.*; *see also Kraebel v. N.Y.C. Department of Housing Preservation & Development*, 959 F.2d 395, 398–99 (2d Cir. 1992) (holding that the plaintiffs had a property interest and remanding to determine whether the delays are "reasonable" under *Mathews*); *id.* at 405 ("[E]ven before the state makes a definitive decision as to entitlement, the road to that determination must be paved by due process."). In other words, a delay long enough to undermine the process is, by definition, the kind of "unreasonable" delay that rises to the level of deprivation. *See Shinseki*, 644 F.3d at 874. The *Mathews* test is analyzed in full below.

#### 3. The district court erred in finding no deprivation and declining to reach the *Mathews* test.

The district court erred in finding no deprivation when the State's delays exceeded the codified timeframes in the SNAP Act and were otherwise unreasonable under *Mathews*. Yet, the district court still should have examined whether the process was adequate because this Court has held that process may be due "pre-deprivation." *See Yagman v. Garcetti*, 852 F.3d 859, 864 (9th Cir. 2017) ("[T]here are no 'hard and fast' rules for determining the requisite timing and adequacy of pre-

and post-deprivation procedures. Rather, once this court has concluded a protected interest is at stake, it must apply the three-part balancing test established in *Mathews v. Eldridge.*" (cleaned up)). In other words, there can be a constitutional violation before a deprivation actually occurs. And so, courts must analyze the adequacy of the process, even if they have not pinpointed the moment of deprivation.

Here, the district court failed to apply *Mathews* to the facts in the record. Rather, it merely distinguished Plaintiffs' cited cases as "inapposite" because they did not specifically concern SNAP or application delays or involved a different number of days. Thus, the district court erred by granting summary judgment without first conducting its own *Mathews* analysis.

### C. The State's Process Is Constitutionally Inadequate Under the *Mathews* Test.

The Supreme Court has settled that delays will, at some point, render a process inadequate. *See Loudermill*, 470 U.S. at 547 ("At some point, a delay in the post-termination hearing would become a constitutional violation."). The key questions are (1) how to measure the relevant delays and (2) whether those delays are too long under *Mathews*.

#### 1. The district court relied on faulty metrics in its analysis.

At various points, the district court relied on a 47-day, 65-day, and 98-day figure to calculate the delays affecting Plaintiffs. These are faulty metrics because

they represent (1) overinclusive data, (2) arbitrary timeframes, and (3) misleading statistical methods.

In determining that Plaintiffs suffered no "unconstitutional deprivation" of their SNAP benefits, the court focused on the 47-day average processing time for one specific month, March 2026.[8] 1-ER-45 (distinguishing caselaw because "the most recent average number of days for the processing of all SNAP applications was 47 days in March 2026").

The first problem with this figure is that it averages *all* applications, not just untimely applications. This necessarily includes the non-delayed applications of non-class members. Plaintiffs are, by definition, SNAP applicants and recipients who did not receive or will not receive a *timely* eligibility determination. 4-ER-650. Using a metric to quantify delay that encompasses persons not subjected to delay obscures the severity of the harm to class members. It is erroneous to evaluate the duration of delays that class members suffer using a metric that encompasses the data of non-injured persons outside the class. Thus, to the extent the court relied on this 47-day figure, it erred.

---

[8] This metric captures the average time to complete the eligibility determination process.

The district court also wrongly referenced the average pending time for *untimely* unprocessed applications identified in just two status reports—98 days in one month and 65 days in another month.[9] 1-ER-47. While those numbers are at least confined to class members' delays, they are still faulty because the court selected them arbitrarily. The court offered no explanation as to why it selected these particular status reports. Using two seemingly random and disparate point-in-time metrics does not constitute a thorough and reasoned evaluation of the delays—the deprivation—to which the State subjected Plaintiffs over years.

To the extent the district court considered averages, it should have focused solely on the average pending time for untimely initial applications, expedited applications, and recertifications, and it should have considered each category over a period of years, not two isolated months. That data shows that the State consistently delayed eligibility determinations for initial applications and recertifications, leaving them pending for over 100 days. 2-ER-181–82 ¶¶ 89–90; 2-ER-259–335; 3-ER-337–88. Had the court looked to the trends in the data, it would have seen the State's fluctuating rates and observed that those rates did not remain low for long. By

---

[9] This report captures how many days an untimely application has been sitting unprocessed as of the date that the report was run. It does not capture the full time to complete the eligibility determination process.

looking at the averages for only two, seemingly random months, the district court erred.

Finally, the district court erred by considering only *averages*, which obscure constitutional violations. The Ninth Circuit has explained generally why averages are a misleading statistic:

> Indeed, an *average* processing time tells us nothing about the causes for such processing time. VCS alleges that the average processing time for mental health claims is too long, but the district court would have no basis for evaluating that claim without inquiring into the circumstances of at least a representative sample of the veterans whom VCS represents; then the district court would have to decide whether the processing time was reasonable or not as to each individual case.

*Veterans for Common Sense v. Shinseki*, 678 F.3d 1013, 1027 (9th Cir. 2012). In that case, this Court rejected claims based on the "average" delays. Averages, this Court explained, obfuscate the actual experience of any real individual and give no basis to evaluate the constitutional question. The D.C. Circuit put it this way: "[T]he average processing time does not cause affiants injury; it is only *their* processing time that is relevant. If, for example, affiants fell at the quick-processing end of a bell-shaped curve, a high average processing time would be irrelevant to them, and to reverse the analysis, a low average would not avoid injury if affiants were at the other end of the curve." *Vietnam Veterans of Am. & Veterans of Modern Warfare v. Shinseki*, 599 F.3d 654, 662 (D.C. Cir. 2010).

For the same reason, analyzing *only* the average in this case "disguise[s]" the constitutional violations. *See Shinseki*, 678 F.3d at 1027. In reality, the actual delays of many SNAP applicants far exceed the average by the very nature of the metric. When this case was filed, Kayla Birch and Nataliia Moroz had been waiting four months for their benefits. 4-ER-704 ¶ 5; 4-ER-691 ¶ 13. When the preliminary injunction was filed, Roger Gaston had waited five months (3-ER-601–02 ¶¶ 5, 12), and Steve Younker had waited six (3-ER-605 ¶ 11). The State's own May 2026 status report showed 588 applicants had been waiting over 61 days to receive a determination; and 205 of those applicants waited at least 211 days—approximately 7 months for what should have been provided within 30 days. 2-ER-128. The court should have considered whether persistently occurring, lengthy delays constitute a deprivation and indicate the inadequacy of the State's process, even if the average did not.

Thus, the district court erred by (1) considering the average processing time for *all* applications as a measure of class members' delays; (2) relying on data from arbitrarily selected months, rather than the aggregate trends over time, which were worse; and (3) considering only averages, which obfuscate the more severe harms and elide the reality of individuals. On this basis *alone*, the panel should reverse and remand.

### 2. Defendants' delays flunk the *Mathews* test.

To determine whether delays violate due process, courts look to the *Mathews* test. The test weighs three factors: the private interest, the public interest, and the risk of erroneous deprivation. *Mathews*, 424 U.S. at 335. The delays here—whether seven months, 98 days, or even 31 days—violate due process under *Mathews.*

Here, the private interest is paramount. The Supreme Court has ruled that waiting for welfare benefits "may deprive an *eligible* recipient of the very means by which to live." *Goldberg*, 397 U.S. at 264 (emphasis in original). In the interim, an applicant becomes "immediately desperate." *Id.* The applicant's "need to concentrate upon finding the means for daily subsistence, in turn, adversely affects his ability to seek redress from the welfare bureaucracy." *Id.*[10] Courts have noted the profound injury to individuals forced to go without SNAP benefits: "[T]he deprivation of food is extremely serious and is quite likely to impose lingering, if not irreversible, hardships upon recipients." *Haskins v. Stanton*, 794 F.2d 1273,

[10] Indeed, the Ninth Circuit held that hardship from waiting for social security income is "irreparable injury" vis-à-vis the *Winter* preliminary injunction factors. *Johnson v. Shalala*, 2 F.3d 918, 922 (9th Cir. 1993). It is "simply not true that a claimant for disability benefits, not infrequently in dire financial circumstances due to his disability, is truly made whole by retroactive payments which he has had to survive well over a year without." *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983) (quoting *Caswell v. Califano*, 583 F.2d 9, 14 (1st Cir. 1978)).

1276–77 (7th Cir. 1986) (quotations omitted); *accord Dist. of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 43 (D.D.C. 2020).

Ninety-eight days is an unreasonably long time to wait for SNAP. In that time, hunger takes a serious physiological toll. And indeed, falling behind on monthly expenses for three months could mean eviction, child custody consequences, repossession of vehicles, or accruing debt. It can, and has, put families in a hole that takes years to climb out of. And of course, seven months is even more difficult to fathom.

There is, indeed, a spectrum of exigency with respect to public benefits, and SNAP benefits are at the zenith. The Supreme Court in *Mathews* explained that "the hardship imposed upon the erroneously terminated disability recipient may be significant. Still, the disabled worker's need is likely to be less than that of a welfare recipient." 424 U.S. at 342. And in fact, the need for disability benefits was not as exigent *because* "the worker's household unit can qualify for food stamps if it meets the financial need requirements." *Id.* at 342 n.27. The Eighth Circuit likened SNAP benefits to the welfare benefits at issue in *Goldberg*, recognizing that "SNAP benefits, for qualified recipients, provide the means to obtain essential food." *Holmes*, 2026 U.S. App. LEXIS 24979, at *33. Thus, it is not hyperbolic to say that the private interest in this case is the highest possible.

Meanwhile, the government's interest in maintaining the status quo is low, if not non-existent, for three reasons. First, though the State below pointed to supposed administrative burdens, "[f]inancial cost alone is not a controlling weight in determining whether due process requires a particular procedural safeguard prior to some administrative decision." *Mathews*, 424 U.S. at 348; *Goldberg*, 397 U.S. at 266 ("[T]hese governmental interests [of conserving fiscal and administrative resources] are not overriding in the welfare context."); *Holmes*, 2026 U.S. App. LEXIS 24979, at *34 ("Although requiring [the state] to provide applicants with meaningful access to the SNAP interview process entails administrative costs, this imposes a comparatively modest burden on the Government-particularly where post-deprivation remedies are inadequate to compensate for the loss of essential food assistance.").

Second, the government has no interest in neglecting destitute and hungry citizens. In *Goldberg*, the Supreme Court explained: "[I]mportant governmental interests are promoted by affording recipients [of public assistance benefits] a pre-termination evidentiary hearing. From its founding the Nation's basic commitment has been to foster the dignity and well-being of all persons within its borders." 397 U.S. at 264-65 (1970). Indeed, "welfare guards against the societal malaise that may flow from a widespread sense of unjustified frustration and insecurity." *Id.* The Ninth Circuit has added:

> Our society as a whole suffers when we neglect the poor, the hungry, the disabled, or when we deprive them of their rights or privileges. Society's interest lies on the side of affording fair procedures to all persons, even though the expenditure of governmental funds is required. It would be tragic, not only from the standpoint of the individuals involved but also from the standpoint of society, were poor, elderly, disabled people to be wrongfully deprived of essential benefits for any period of time.

*Lopez*, 713 F.2d at 1437.

Third, the government cannot have a legitimate interest in breaking the law. Unlike some benefits-delay cases, here, there is a codified timeframe in the SNAP Act, which the State is violating. As this Court held in *Seattle Audubon Society v. Evans*, "[t]he problem here has not been any shortcoming in the laws, but simply a refusal of administrative agencies to comply with them. This invokes a public interest of the highest order: the interest in having government officials act in accordance with law." 771 F. Supp. 1081, 1096 (W.D. Wash. 1991), *aff'd*, 952 F.2d 297, 298 (9th Cir. 1991) ("We affirm the district court's injunction and incorporate by reference into this Opinion the district court's Memorandum Decision."); *cf. Immigrant Defs. L. Ctr. v. Noem*, 781 F. Supp. 3d 1011, 1053-54 (C.D. Cal. 2025) ("DHS neither has the discretionary authority nor legitimate reasons to enforce programs that violate the constitution or federal law."). Thus, the government interest is not just weak, but illegitimate. There is, accordingly, nothing, or at least nothing substantial, on the government's side of the ledger.

Finally, the risk of erroneous deprivation is unusually high. The delays at issue concern *initial eligibility determinations*. This means that *no arbiter* made an initial pass through these applications. This distinguishes this case from others about, say, an appeal of a decision denying unemployment benefits;[11] the entire administrative process for disability benefits, including three tiers of review;[12] or a hearing to contest an agency's initial decision to terminate social security benefits.[13] Prior to the delays at issue here, there is *no process* for a SNAP applicant. Eligible applicants consequently go without their SNAP benefits for *months*—an erroneous outcome.

Caselaw applying the *Mathews* test to delays in process demonstrates that the delays in this case violate due process—whether the wait times are measured as seven months, 98 days, or *even* 31 days. Weighing the remarkably high private interest and risk of erroneous deprivation against the government's low, if not non-existent, interest in delays, the constitutional analysis comes into focus. Not only does the SNAP Act inform the *Mathews* analysis (as the government cannot have an interest in breaking the law), but the caselaw demonstrates that the SNAP Act's deadlines well approximate the constitutional minimum.

---

[11] *Fusari v. Steinberg*, 419 U.S. 379, 389 (1975).

[12] *Kelly v. R.R. Ret. Bd.*, 625 F.2d 486, 488, 490 (3d Cir. 1980).

[13] *Mathews*, 424 U.S. at 323.

To begin, the Supreme Court has held that "when welfare is discontinued, only a pre-termination evidentiary hearing provides the recipient with procedural due process." *Goldberg*, 397 U.S. at 264. This holding most clearly applies to class members seeking recertification. But the Court's reasoning applies to initial applicants as well. The Court in *Goldberg* explained that the "crucial factor" is that delays deprive an eligible applicant "of the very means by which to live while he waits." *Id.* Those seeking recertification and those seeking an initial eligibility determination are similarly "desperate," as only indigent households are eligible for SNAP. *See id.*

Moreover, in *Ressler v. Pierce*, this Court held that due process requires a decision on a Section 8 housing application in *fifteen* days, after reasoning that *Mathews* balancing required "some time limit on eligibility determinations." 692 F.2d 1212, 1220 (9th Cir. 1982). This fifteen-day ceiling primarily reflects the exigencies of finding shelter—which are surely no higher than the exigency of feeding oneself.

Finally, in *Fusari v. Steinberg*, the Supreme Court considered a challenge to Connecticut's process for reviewing denials of unemployment benefits. 419 U.S. 379, 379–80 (1975). The *Fusari* district court found that delays in the unemployment appeal process violated due process when nearly 90% of the appeals took 100 days or more to resolve. *Id.* at 383-84. The *Fusari* district court closely examined the

length of delay and the harm it imposed on the plaintiffs faced with the possibility of going 18 weeks without another source of income, before finding the state process at issue was not constitutionally adequate to protect the plaintiffs' property interest in their unemployment benefits. 364 F. Supp. 922, 934-35 (D. Conn. 1973).

Although the Connecticut Legislature improved its administrative process before the Supreme Court could rule on the merits of the appeal, 419 U.S. at 380, the Court reasoned that the constitutional question was "significantly affected by the length of the period of deprivation of benefits." *Id.* 387–88.[14]

Compared to the facts in *Fusari*, every part of the *Mathews* test tilts further toward Plaintiffs. The private interest in unemployment benefits, while high, is not as urgent as the private interest in SNAP—a benefit that provides basic sustenance to Alaska's most impoverished citizens. *Cf. Mathews*, 424 U.S. at 342 ("[T]he disabled worker's need is likely to be less than that of a welfare recipient"). The risk of erroneous deprivation is far higher in this case, as Plaintiffs waited for an *initial*

[14] The Supreme Court wrote, "While we can determine on this record that Connecticut's previous system often failed to deliver benefits in a timely manner, we can only speculate how the new system might operate. And, assuming that the federal statutory requirements were satisfied, it would prove equally difficult to assess the question of procedural due process." *Id.* at 388–89. Accordingly, the Court suggested that Connecticut's previous system violated due process, and *indeed* that the constitutional minimum was even more stringent than the statutory minimum, but the Court stopped short of holding as much.

decision on their applications, not an appeal of an initial denial. Finally, the government interest is lower here, because the SNAP Act provides *clear* timeframes (30 days and seven days) that the State itself is interested in meeting.

The district court failed to meaningfully grapple with *Fusari*. The court found *Fusari* "distinguishable" because it "addressed a post-termination appeal delay, which is not at issue here." 1-ER-44. Plaintiffs agree that there is a difference between a delay in post-termination appeals and a delay in initial determinations. But this distinction makes the constitutional violation here *more obvious*. As noted above, the fact that there was an initial determination in *Fusari* lowers the risk of erroneous deprivation. *See Fusari*, 419 U.S. at 383 ("The findings reveal that the reversal rate of appealed denials of benefits was significant, ranging from 19.4% to 26.1% during the periods surveyed."). Therefore, this is a distinction that *supports* Plaintiffs' position. If 100 days is a constitutional violation under the facts in *Fusari*, then surely the State's delays violate the Constitution here.

Taken together, these precedents counsel that the delays here are unconstitutional. This appeal concerns *initial determinations* of a *supremely exigent* benefit, when the government is plainly breaking the law with its delays and can only point to administrative costs. Accordingly, the constitutional harm is manifest when considering the proper metrics—six- and seven-month waits. Indeed, it is also apparent when considering 98-day, 47-day, or 31-day waits.

Thus, the district court's *Mathews* analysis was erroneous both in its metrics and its legal analysis. Properly analyzing the *Mathews* factors, and using *Goldberg*, *Ressler*, *Fusari*, and the deadlines mandated by the SNAP Act as benchmarks, this Court should conclude that the State's SNAP processing delays are too long under *Mathews* balancing.

**D. The District Court Never Considered Plaintiffs' Notice Theory.**

Properly construed, Plaintiffs' two due process theories seek two remedies: a notice and a timely eligibility determination. Each requires its own *Mathews* analysis, because the administrative burdens on the government are potentially different. Indeed, due process often involves stages, and each stage of process constitutes different analysis. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 547 (1985) ("[T]he allegation of a distinct due process violation in the administrative delay is not an alternative theory supporting the same relief, but a separate claim altogether."). Under some circumstances, the bare minimum requirement of notice is due long before other procedural safeguards. For instance, in *Loudermill*, the Supreme Court explained that *some process*—namely, notice and an "initial check" hearing—was due prior to a full-fledged post-termination hearing. 470 U.S. at 547. Here, if the State does not meet its due process obligation to process SNAP applications on time, a notice of the delay is due.

Because the district court found no *deprivation*, it failed to consider the notice theory *at all*. The district court improperly collapsed Plaintiffs' two theories into one analysis. It reasoned that the delays were really only a question of "deprivation," while the notice was a question of "process." 1-ER-37. Therefore, Plaintiffs' two claims "are in fact the second and third prongs of the three-pronged Due Process inquiry." *Id.* Because the court reasoned that the delays did not constitute a deprivation, it never reached the question of "notice." That was erroneous.

Notice is the bare minimum of due process. *See Mathews*, 424 at 333 ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"); *Brady v. Gebbie*, 859 F.2d 1543, 1554 (9th Cir. 1988) ("At a minimum, due process requires notice and a hearing where the individual has a meaningful opportunity to confront the evidence against him."). This Court should hold that *at a minimum* Plaintiffs are entitled to a notice of the State's delays.

Indeed, the only difference in the *Mathews* analysis is the burden on the government. As above, the private interest and the risk of erroneous deprivation are the highest possible. And to the extent that the Court may weigh administrative burdens *at all*, the State represented below that it no longer bears *any* administrative burden to send out notices. 1-ER-33 (citing the State's brief: "Now that that the reprogramming is complete and the notices are automated, there is no reason for

DOH to stop sending the notices."). Because the district court wholly failed to address Plaintiffs' claim that the State must provide notice of delay articulating fair hearing rights when it fails to render a timely eligibility determination, remand to the district court for a determination consistent with the opinion of this Court is necessary.

## CONCLUSION

For the above reasons, this Court should reverse the judgment of the district court, and remand to the district court for a summary judgment determination on the merits.

Date: September 9, 2026

Respectfully submitted,

*/s/ Jacob I. Chefitz*

JACOB I. CHEFITZ
DLA PIPER LLP (US)
1251 Avenue of the Americas
27th Floor
New York, NY 10020
(212) 335-4500

GORIUNE DUDUKGIAN
NICHOLAS FERONTI
MIYE D'OENCH
NORTHERN JUSTICE PROJECT, LLC
406 G Street, Suite 207
Anchorage, AK 99501
(907) 308-3395

SAIMA AKHTAR
NATIONAL CENTER FOR LAW
AND ECONOMIC JUSTICE
50 Broadway, Suite 1500
New York, NY 10004
(212) 633-6967

*Attorneys for Plaintiffs-Appellants*

## STATEMENT OF RELATED CASES

Plaintiffs-Appellants are not aware of any related cases within the meaning of Ninth Circuit Rule 28-2.6.

Date: September 9, 2026

*/s/ Jacob I. Chefitz*

JACOB I. CHEFITZ
DLA PIPER LLP (US)
1251 Avenue of the Americas, 27th
27 Floor
New York, NY 10020
(212) 335-4500

*Attorney for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the word limit of Ninth Circuit Rule 32-1 because this brief contains 12,765 words, including words manually counted in any visual images, and excluding the items exempted by Fed. R. App. P. 32(f). I also hereby certify that this brief complies with the type size and typeface requirements of Fed. R. App. P. 32(a)(5) and (6).

Date: September 9, 2026

*/s/ Jacob I. Chefitz*

JACOB I. CHEFITZ
DLA PIPER LLP (US)
1251 Avenue of the Americas
27th Floor
New York, NY 10020
(212) 335-4500

*Attorney for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on September 9, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Appellate Electronic Filing system, and that I served it on all attorneys of record using the Court's CM/ECF filing system.

Date: September 9, 2026

*/s/ Jacob I. Chefitz*

JACOB I. CHEFITZ
DLA PIPER LLP (US)
1251 Avenue of the Americas
27th Floor
New York, NY 10020
(212) 335-4500

*Attorney for Plaintiffs-Appellants*