**No. 26-4167**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

JOHN ANDREW, AUTUMN ELLANNA, and TERESA FERGUSON,
on behalf of themselves and all those similarly situated,

*Plaintiffs-Appellants*,

v.

HEIDI HEDBERG, in her official capacity as Commissioner
of the Alaska Department of Health,

*Defendant-Appellee*.

On Appeal from the United States District Court
for the District of Alaska
No. 3:23-cv-00044-SLG
Hon. Sharon L. Gleason

# APPELLEE'S ANSWERING BRIEF

CORI MILLS
ACTING ATTORNEY GENERAL
STATE OF ALASKA

Jennifer Teitell
Assistant Attorney General
Department of Law
1031 West Fourth Ave, Suite 200
Anchorage, AK 99501
(907) 269-6612
jennifer.teitell@alaska.gov

*Attorney for Appellee*
Heidi Hedberg

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................4

INTRODUCTION ....................................................................9

CONSTITUTIONAL AND STATUTORY AUTHORITIES ....................................................................11

ISSUES PRESENTED ....................................................................11

STATEMENT OF THE CASE ....................................................................11

I. Alaska administers the SNAP program subject to federal oversight, which includes remedies for noncompliance. ....................................................................11

II. The State has been working with the federal government to increase timely SNAP application processing since early 2023. ....................................................................15

III. As Alaska began its work with the federal government, Appellants filed a class action alleging that the State's administration of SNAP violates various statutory and constitutional provisions. ....................................................................18

IV. In *Medina*, the Supreme Court clarified the test for inferring private causes of action from spending-power statutes like SNAP. ....................................................................21

V. The district court granted summary judgment for the State, finding no private right of action to enforce the SNAP provisions at issue and no federal due process violation. ....................................................................22

SUMMARY OF THE ARGUMENT ....................................................................28

STANDARD OF REVIEW ....................................................................32

ARGUMENT ....................................................................33

I. The district court correctly dismissed Appellants' statutory claims because the SNAP provisions at issue are not privately enforceable. 33

A. *Medina* sets out a stringent test for private rights of action that only a rare spending-power statute will satisfy. ....................................................................33

B. The SNAP provisions are missing the clear and unambiguous rights-creating language required by *Medina*. ....................................................................37

C. The tenuously related SNAP subsections Appellants identify do not overcome the plain language of the provisions at issue. ....48

D. The SNAP Act's existing enforcement mechanisms further suggest Congress did not intend private enforcement. ............53

II. The district court correctly dismissed Appellants' federal due process claim because moderate processing delays do not constitute deprivation of a property interest. ....................................................55

A. Appellants do not have a constitutionally protected interest in eligibility determinations that strictly adhere to the SNAP Act's statutory timeframes. ..........................................................55

B. The processing delays here are not long enough to constitute deprivation of a property interest. .........................................58

C. Even if reached, the *Mathews* balancing test does not favor finding a due process violation. .............................................63

CONCLUSION .........................................................................................66

STATEMENT OF RELATED CASES ............................................................67

CERTIFICATE OF COMPLIANCE ...............................................................68

CERTIFICATE OF SERVICE .......................................................................69

# TABLE OF AUTHORITIES

## Cases

*Alexander v. Sandoval*,
532 U.S 275 (2001) .......... 29, 44, 45, 49

*Atkins v. Parker*,
472 U.S. 115 (1985) .......... 55

*Barry v. Corrigan*,
79 F. Supp. 3d 712 (E.D. Mich. 2015) .......... 25, 48

*Blessing v. Freestone*,
520 U.S. 329 (1997) .......... 22, 25, 33, 46, 48

*Cleveland Bd. of Educ. v. Loudermill*,
470 U.S. 532 (1985) .......... 56

*Coe v. Thurman*,
922 F.2d 528 (9th Cir. 1990) .......... 56

*Collins v. Gee W. Seattle LLC*,
631 F.3d 1001 (9th Cir. 2011) .......... 32, 33

*Dayton Bd. of Educ. v. Brinkman*,
433 U.S. 406 (1977) .......... 62

*Does v. Gillespie*,
867 F.3d 1034 (8th Cir. 2017) .......... 47

*EEOC v. Luce, Forward, Hamilton & Scripps*,
345 F.3d 742 (9th Cir. 2003) .......... 33

*Emigrant Co. v. County of Adams*,
100 U.S. 61 (1879) .......... 35

*Ferm v. Cameron*,
No. 26-cv-00089, 2026 WL 2606628 (D. Utah Sept. 3, 2026) .......... 47

*Fusari v. Steinberg*,
419 U.S. 379 (1975) .......... 59, 60, 61, 62

*Gelman v. Guinn*,
No. 25-cv-4948, 2026 WL 2922941 (S.D.N.Y. Sept. 29, 2026) .......... 47

*Goldberg v. Kelly*,
397 U.S. 254 (1970) .......... 56, 64

*Gonzaga Univ. v. Doe*,
536 U.S. 273 (2002) ........................................................................... *passim*

*Griffith v. Rodgers*,
No. 26-cv-08014, 2026 WL 2718451 (D. Ariz. Sept. 15, 2026) .................. 47

*Head Money Cases*,
112 U.S. 580 (1884) ........................................................................... 35

*Health & Hosp. Corp. of Marion Cnty. v. Talevski*,
599 U.S. 166 (2023) ........................................................................... *passim*

*Holmes v. Bax*,
187 F.4th 1028 (8th Cir. 2026) ............................................................. 48

*Isaacs v. Bowen*,
865 F.2d 468 (2d Cir. 1989) ..................................................... 32, 59, 64

*Kelly v. R.R. Ret. Bd.*,
625 F.2d 486 (3d Cir. 1980) ..................................................... 31, 56, 58

*Kraebel v. N.Y.C. Dep't of Hous. Pres. & Dev.*,
959 F.2d 395 (2d Cir. 1992) ..................................................................... 58

*Littlefield v. Heckler*,
824 F.2d 242 (3d Cir. 1987) ..................................................... 32, 59, 64

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ..................................................................... 29, 44

*Mathews v. Eldridge*,
424 U.S. 319 (1976) ........................................................................... *passim*

*Medina v. Planned Parenthood S. Atl.*,
606 U.S. 357 (2025) ........................................................................... *passim*

*Neil, Moore & Co. v. Ohio*,
3 How. 720 (1845) ................................................................................ 34

*Oppenheimer & Co. v. Mitchell*,
135 F.4th 837 (9th Cir. 2025) ................................................................. 32

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981) ......................................................................... 37, 54

*Reed v. Goertz*,
598 U.S. 230 (2023) ..................................................................... 31, 55

*Ressler v. Pierce*,
692 F.2d 1212 (9th Cir. 1982) ................................................................. 59

*Rodriguez Diaz v. Garland*,
53 F.4th 1189 (9th Cir. 2022) ....................64

*R.W. v. Columbia Basin Coll.*,
77 F.4th 1214 (9th Cir. 2023) ....................62, 63

*Schechner v. KPIX-TV*,
686 F.3d 1018 (9th Cir. 2012) ....................63

*Schroeder v. City of Chicago*,
927 F.2d 957 (7th Cir. 1991) ....................*passim*

*Shanks v. Dressel*,
540 F.3d 1082 (9th Cir. 2008) ....................55

*Veterans for Common Sense v. Shinseki*,
678 F.3d 1013 (9th Cir. 2012) ....................62

*Wilder v. Virginia Hospital Ass'n*,
496 U.S. 498 (1990)....................22, 25, 33

*Wright v. Califano*,
587 F.2d 345 (7th Cir. 1978) ....................65

*Wright v. Roanoke Redevelopment & Hous. Auth.*,
479 U.S. 418 (1987)....................22, 25, 33

**Federal Statutes**

7 U.S.C. § 2011....................11

7 U.S.C. § 2011–2036d....................11, 50

7 U.S.C. § 2012(f)....................13

7 U.S.C. § 2013(a) ....................11

7 U.S.C. § 2014 ....................12, 25

7 U.S.C. § 2020 .................... 12, 25, 43, 47, 49

7 U.S.C. § 2020(a) ....................11, 49

7 U.S.C. § 2020(a)(3)(B)(ii)....................48, 49, 50, 51

7 U.S.C. § 2020(c) ....................41

7 U.S.C. § 2020(e) ....................*passim*

7 U.S.C. § 2020(e)(2)(B) ....................47

7 U.S.C. § 2020(e)(2)(B)(i)....................47

7 U.S.C. § 2020(e)(2)(B)(iii) ........ 11, 13, 29
7 U.S.C. § 2020(e)(2)(C)(iii)(III) ........ 41
7 U.S.C. § 2020(e)(3) ........ 11, 12, 13, 29, 39, 40
7 U.S.C. § 2020(e)(4) ........ 11, 12, 13, 29
7 U.S.C. § 2020(e)(9) ........ 11, 12, 13, 29
7 U.S.C. § 2020(e)(10) ........ 11, 14, 29
7 U.S.C. § 2020(g) ........ 15, 30, 49, 51, 53, 54
7 U.S.C. § 2021(e) ........ 49
7 U.S.C. § 2021(f) ........ 49
7 U.S.C. § 2022(b) ........ 47
7 U.S.C. § 2022(b)(5) ........ 51
7 U.S.C. § 2023(a)(5) ........ 49, 51
7 U.S.C. § 2023(b) ........ 50, 51
7 U.S.C. § 2025(a) ........ 11
7 U.S.C. § 2025(c) ........ 35, 66
7 U.S.C. § 2025(c)(1)(G) ........ 15
7 U.S.C. § 2027(a)(2) ........ 51, 52
42 U.S.C. § 1396a(a)(23)(A) ........ 36, 43
42 U.S.C. § 1396r(c) ........ 38
42 U.S.C. § 1396r(c)(1)(A)(ii) ........ 38
42 U.S.C. § 1396r(c)(2)(A) ........ 39
42 U.S.C. § 1983 ........ *passim*

**Federal Regulations**

7 C.F.R. § 271.3(a) ........ 12
7 C.F.R. § 272.3(c) ........ 30, 46
7 C.F.R. § 272.4(d)(1)(i) ........ 45
7 C.F.R. § 273.2(c) ........ 45
7 C.F.R. § 273.15(f) ........ 45
7 C.F.R. § 275.16 ........ 15

7 C.F.R. § 275.17 .......................................................................................15
42 C.F.R. § 431.51 .......................................................................................45
42 C.F.R. § 431.51(a)(4) ...............................................................................45
42 C.F.R. § 483.10 .......................................................................................45

**Legislative History**

H.R. Rep. No. 96-788 (1980) .......................................................................52

**Alaska Regulations**

Alaska Admin. Code tit. 7, § 49.020 .............................................................14

**Court Rules**

Alaska R. App. P. 601(b) ...............................................................................49
Alaska R. App. P. 602(a)(2) ...........................................................................49

**Other Authorities**

U.S. Dep't of Agric., USDA Announces Actions to Better Serve States, Nutrition Program Recipients, and the American Taxpayer (Apr. 30, 2026), https://perma.cc/D3P9-65C2 ...........................................................12

## INTRODUCTION

The Supplemental Nutrition Assistance Program (SNAP) Act is one of many federal spending-power statutes that create benefits for individuals and families in need. The benefits these statutes provide are undoubtedly vital, but statutes do not confer privately enforceable rights as a matter of course, and spending-power statutes are "especially unlikely to do so." *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 369 (2025). Only Congress can decide to create a new statutory right because doing so requires a delicate weighing of competing costs and benefits. And when Congress chooses to do so, it must provide unequivocal notice to states that they will consent to private suits by accepting federal funds. The U.S. Supreme Court recently crystallized these principles in *Medina*, which explained that private plaintiffs seeking to enforce a spending-power statute "must show that the law in question 'clear[ly] and unambiguous[ly]' uses 'rights-creating terms'" and "displays 'an unmistakable focus' on individuals like the plaintiff." *Id.* at 368 (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284, 290 (2002)).

The SNAP Act provisions Appellants seek to enforce do not create private rights of action under *Medina*. Those provisions appear in 7 U.S.C. § 2020(e), which lists the many requirements for state plans for SNAP administration. They do not use clear and unambiguous language rights-creating language, and they bear no resemblance to the statutory provisions in *Talevski*, the only controlling case

where the Supreme Court has held that a spending-power statute creates a private right of action. Instead, the state-plan requirements at issue recall the Medicaid Act provision that *Medina* determined was not privately enforceable. The necessary conclusion that private plaintiffs cannot enforce these procedural requirements does not leave states free to flout them; the SNAP Act empowers the federal government to compel corrective action and, in cases of continued noncompliance, seek injunctive relief and withhold federal funding.

Appellants attempt to constitutionalize their invalid SNAP Act claims by arguing that the State violates due process whenever it fails to process a SNAP application within precise statutory timeframes. But no court has recognized a constitutionally protected property interest in strict adherence to statutory processing rules—and with good reason, as doing so would wreak havoc on public-benefit programs and circumvent the rules articulated in *Medina*. The State's current processing delays do not rise to the level of functionally depriving Appellants of the property interests they *do* possess: a fair eligibility determination and, if eligible, SNAP benefits. The State continues to work closely with the federal government to reduce processing delays, as the SNAP Act envisions.

The district court properly granted summary judgment to the State on Appellants' class action claims for these reasons. This Court should affirm.

## CONSTITUTIONAL AND STATUTORY AUTHORITIES

All relevant constitutional and statutory authorities appear in this brief's Addendum. *See* 9th Cir. R. 28-2.7.

## ISSUES PRESENTED

1. *Private rights of action.* Did the district court err in holding that 7 U.S.C. § 2020(e)(2)(B)(iii), (3), (4), (9), and (10) of the SNAP Act do not pass the stringent test to create privately enforceable rights because they do not contain clear and unambiguous rights-creating language?
2. *Due process.* Did the district court err in holding there was no due process violation because the State's moderate SNAP processing delays are not long enough to constitute deprivation of a protected property interest?

## STATEMENT OF THE CASE

### I. Alaska administers the SNAP program subject to federal oversight, which includes remedies for noncompliance.

SNAP is a federally funded, state-administered benefit program. *See* 7 U.S.C. §§ 2011–2036d. The program strives to "rais[e] levels of nutrition among low-income households" by providing eligible households with monthly benefits to purchase food. *Id.* § 2011. The federal government pays for the SNAP benefits and partial administrative costs, while participating states are responsible for determining households' eligibility, issuing benefits, and paying the remaining administrative costs. *Id.* §§ 2013(a), 2020(a), 2025(a).

To participate in SNAP, states must have a state operation plan approved by the Food and Nutrition Administration (FNA)[1] within the U.S. Department of Agriculture.[2] *Id.* § 2020(d). In Alaska, the Division of Public Assistance (DPA) of the Department of Health (DOH) administers SNAP under the State's FNA-approved state plan. 1-ER-5. The SNAP Act sets out numerous requirements for state plans in 7 U.S.C. § 2020(e), entitled "Requisites of State plan of operation." Section 2020(e) has twenty-six subsections, many containing additional subsections, which detail the requirements and options for what a state plan must contain. Appellants seek to privately enforce five of § 2020(e)'s subsections. *See* 1-ER-14–16.

Three of the five state-plan requirements at issue in this appeal—§ 2020(e)(3), (4), and (9)—concern timeframes for processing SNAP applications. To participate in SNAP, households must meet eligibility requirements and apply. 7 U.S.C. §§ 2014, 2020. Once a state receives an initial application for benefits, it must verify the household's income and financial resources to determine the

---

[1] The summary judgment order and other parts of the record refer to FNA by its former name, the Food and Nutrition Service (FNS). The agency's name changed in April 2026. *See* Press Release, U.S. Dep't of Agric., USDA Announces Actions to Better Serve States, Nutrition Program Recipients, and the American Taxpayer (Apr. 30, 2026), https://perma.cc/D3P9-65C2.

[2] SNAP Act provisions refer to "the Secretary," but the Secretary of Agriculture has delegated SNAP administration to FNA. 7 C.F.R. § 271.3(a).

household's eligibility. *Id.* § 2020(e)(3), (9)(C). Section 2020(e)(3) provides that the state "shall . . . promptly determine the eligibility of each applicant household . . . so as to complete certification of and provide an allotment retroactive to the period of application to any eligible household not later than thirty days following its filing of an application." For applications filed by certain very low-income households, this timeframe is expedited; § 2020(e)(9) provides that a state "shall . . . provide benefits no later than 7 days after the date of application to any household." Once a household is deemed eligible for SNAP, it is entitled to benefits for a duration of time referred to as a "certification period." *Id.* §§ 2012(f), 2020(e)(4). After that period expires, the household must seek recertification to continue receiving benefits. *Id.* § 2020(e)(4). For households that timely submit recertification applications and remain eligible, § 2020(e)(4) requires the state to "insure that each participating household . . . shall, if found to be still eligible, receive its allotment no later than one month after the receipt of the last allotment issued to it pursuant to its prior certification."

The fourth state-plan requirement that Appellants seek to privately enforce is § 2020(e)(2)(B)(iii), the "first contact" provision. This subsection requires that a state "shall permit an applicant household to apply to participate in the program on the same day that the household first contacts a supplemental nutrition assistance program office in person during office hours." *Id.* § 2020(e)(2)(B)(iii). The first-

contact provision applies only to in-person contact at a SNAP office during office hours. *Id.* It does not address the other methods by which applicants may contact DPA, such as phone, email, and mail. *Id.*

The fifth and final state-plan requirement at issue in this appeal is § 2020(e)(10). This subsection provides for "the granting of a fair hearing and a prompt determination thereafter to any household aggrieved by the action of the State agency under any provision of its plan of operation as it affects the participation of such household in the supplemental nutrition assistance program." *Id.* § 2020(e)(10). DPA's SNAP application form advises applicants of their ability to request a fair hearing, 3-ER-451, and state regulations provide that DOH must provide an opportunity for a hearing when a SNAP application is "not acted upon with reasonable promptness," Alaska Admin. Code tit. 7, § 49.020.

The federal government, through FNA, closely oversees states' implementation of these and many other state-plan requirements in § 2020(e). Specifically regarding § 2020(e)'s application-processing timeframes, FNA considers a state in compliance if its "Application Processing Timeliness" (APT) rate is 95% or higher.[3] 3-ER-443. If a state fails to comply with its plan of operation, the SNAP Act, or the Act's implementing regulations "without good

---

[3] A state's APT rate is calculated by dividing the number of timely approved initial SNAP applications by the total number of initial applications approved within the same time period, multiplied by 100. 3-ER-443 & n.45.

cause," Congress has outlined how FNA should address the issue. 7 U.S.C. § 2020(g). When FNA learns a state is noncompliant, it must immediately inform the state of its failure and "shall allow the State agency a specified period of time for the correction of such failure." *Id.* FNA's actions may include requiring a state to "develop and implement [a] corrective action plan[]." *Id.* § 2025(c)(1)(G); *see also* 7 C.F.R. §§ 275.16, 275.17.

If a state does not come into compliance within the specified time, FNA has multiple options for enforcement. 7 U.S.C. § 2020(g). FNA "may refer the matter to the Attorney General with a request that injunctive relief be sought to require compliance forthwith by the State agency." *Id.* And FNA may cut federal funds from the state; § 2020(g) specifies that regardless of whether FNA refers the matter to the Attorney General, it "shall proceed to withhold from the State such funds authorized [by the SNAP Act] as [FNA] determines to be appropriate." *Id.*

## II. The State has been working with the federal government to increase timely SNAP application processing since early 2023.

In recent years, DOH has struggled to process SNAP initial applications and recertifications within § 2020(e)'s timeframes due to workforce shortages and technological issues. *See* 3-ER-453–55. At the end of 2022, DOH was experiencing severe processing delays. *See* SER-39. In response to these delays, FNA met with DOH in January 2023 and issued an advance warning letter. SER-51–55. The letter asked Alaska to submit a Corrective Action Plan (CAP), which

FNA approved in April 2023.[4] 3-ER-446; SER-45–51. Under the CAP, FNA closely monitors DOH's compliance with the plan and reviews other aspects of DOH's administration of the SNAP program. *See* SER-38–43. The CAP sets specific benchmarks for improvement and outlines targeted solutions for what FNA has identified as the causes of noncompliance. *See, e.g.*, SER-32–39, SER-43, SER-45–50.

FNA has collaborated closely with DOH regarding this CAP since early 2023. SER-3–4, SER-38–43; 2-ER-101–03. The partnership has included weekly and monthly data reporting, bi-weekly meetings between DOH and FNA, multiple site visits from FNA, and frequent ad hoc communication via phone and email. SER-3–4. FNA has not sought any injunctions or taken action to withhold federal funding from DOH. Nor has FNA determined that Alaska is out of compliance with its state-plan provisions regarding first-contact filing. SER-4. However, separate from its enforcement of application-processing timelines, FNA has imposed significant monetary penalties on DOH due to Alaska's rate of erroneous benefit *over*payments. FNA fined the State approximately $12 million and $4.6 million for payment errors in FY 2023 and FY 2024, respectively. SER 5, SER 11.

Under the CAP, DOH has taken significant steps to improve its processing efficiency. These efforts have included modernizing core technology to shift SNAP

---

[4] The CAP has since been amended several times. *See, e.g.*, SER-32–36.

benefits management to a new system that allows for more efficient application processing. 2-ER-131–40; 3-ER-454; SER-25–26. DOH has also worked with FNA and the state legislature to implement Broad-Based Categorical Eligibility, which allows families who qualify for other state-operated, need-based benefits to qualify for SNAP without having to specifically demonstrate SNAP eligibility. 3-ER-454; SER-17, SER-23–24. And DOH has obtained key waivers from FNA, including a waiver to use a simplified certification process for elderly or disabled households and a waiver to allow contractors to conduct eligibility determinations, reducing the impact of workforce shortages. 2-ER-101–02. These are just a few of the many solutions DOH has pursued to improve processing timelines. *See* 2-ER-99–162; 3-ER-453–55; SER-21–31.

These measures have been paying off. DOH has drastically reduced the high number of pending, overdue applications that precipitated the CAP in early 2023. 2-ER-103, 2-ER-181; 3-ER-445–47. In March 2023, the average overdue application had been pending for 97 days for initial applications, 79 days for expedited applications, and 96 days for recertifications. 2-ER-181–82. By September 2025, those averages had dropped to 65 days for initial and recertification applications, and 21 days for expedited applications. 1-ER-47. That is, among applications that had not been timely resolved, initial and recertification applications were on average 35 days overdue, and expedited applications were on

average 14 days overdue. When the district court ruled on summary judgment, the six-month rolling average for overall processing times—including both timely and untimely determinations—was 47 days. 1-ER-41. Of course, there is still substantial room for improvement. DOH continues to work with FNA on solutions that balance timeliness with FNA's various other priorities for SNAP administration in Alaska.

## III. As Alaska began its work with the federal government, Appellants filed a class action alleging that the State's administration of SNAP violates various statutory and constitutional provisions.

Shortly after Alaska began engaging with FNA to resolve processing delays, Appellants sued DOH in state court under 42 U.S.C. § 1983, alleging that DOH is violating the SNAP Act and due process under the Alaska and U.S. Constitutions. 4-ER-874–76. The class action suit requested declaratory and injunctive relief to compel DOH to process all SNAP applications on time, allow households to apply for SNAP on first in-person contact with DOH, send written notices to households whose application processing is delayed, and provide interpretation and written translations to households with limited English proficiency. 4-ER-876–81. DOH removed the case to federal court. 4-ER-884–86. Before the federal district court, the parties stipulated to certification of two classes: (1) a timeliness class, "comprised of all Alaska residents who since January 20, 2021, have applied, are applying, or will apply for SNAP benefits through an initial application or an

application for recertification and did not or will not receive an eligibility determination within the legally required timeframes"; and (2) a first-contact-filing class, "comprised of all Alaska residents who since October 1, 2022, were or will be denied the right to file a SNAP application the first time they contact DPA during office hours." 4-ER-650. The district court denied certification of a third proposed "limited English proficiency class." 3-ER-475–87.

In May 2024, Appellants sought a preliminary injunction regarding their timeliness claims. 3-ER-432; 4-ER-908. The district court granted the injunction in December 2024, requiring DOH to: (1) promptly process SNAP applications within statutory timeframes; and (2) provide written notice and an opportunity to request a fair hearing when processing is delayed beyond statutory timeframes. 3-ER-461. Though the injunction ordered DOH to timely process SNAP applications, it recognized that "immediate compliance is untenable." 3-ER-462. The injunction also acknowledged the "considerable efforts already in place, with oversight from [FNA], to remedy DOH's non-compliance," including "modernization of core technology" and multiple different efforts to address "intractable staffing shortages." 3-ER-454. Therefore, the injunction required DOH to submit monthly status reports to the district court providing its timely processing rates and updates on its efforts to address the underlying causes of the processing delays. 3-ER-462.

When determining that Appellants had demonstrated a likelihood of success on their statutory claims, the district court did not meaningfully analyze whether those statutory provisions are privately enforceable. *See* 3-ER-434. Instead, because the parties had not yet raised that issue, the court assumed in passing that the SNAP Act can be privately enforced via § 1983.[5] 3-ER-434. The court noted that DOH historically fell below federal standards for timely processing of applications and that although DOH's timely processing rate had improved in 2024, there were still many applications awaiting overdue processing. 3-ER-444–46. The court also decided that Appellants were likely to succeed on their claim that DOH needed to provide notice when benefits are delayed, based on the SNAP Act and related regulations rather than due process. 3-ER-451 n.67 ("The Court need not decide [the due process] issue at this time, given the statute and regulations require notice and hearing apart from any due process requirements.").

DOH filed the required monthly status reports from February 2025 through summary judgment in May 2026. *See* 4-ER-912–18. These reports included detailed updates on FNA's enforcement activities and DOH's work to improve its processing times. *See, e.g.*, 2-ER-99–162. DOH also complied with the injunction by reprogramming its IT system to automatically send the written notices specified

[5] To reach this conclusion, the district court relied on several out-of-circuit cases. *See* 3-ER-434 & n.14.

in the court's order. *See* 1-ER-32–35.

## IV. In *Medina*, the Supreme Court clarified the test for inferring private causes of action from spending-power statutes like SNAP.

In June 2025, after the district court had issued the preliminary injunction, the Supreme Court decided *Medina v. Planned Parenthood South Atlantic*, 606 U.S. 357 (2025). That case clarified the test for inferring private causes of action from statutes and held that a particular Medicaid state-plan requirement does not create a private right enforceable under § 1983. *Id.* Under *Medina*, "a plaintiff must show that the law in question 'clear[ly] and unambiguous[ly]' uses 'rights-creating terms'" and "display[s] 'an unmistakable focus' on individuals like the plaintiff." *Id.* at 368 (first and second alteration in original) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284, 290 (2002)). The Supreme Court cautioned that only a "rare statute" will satisfy this "'stringent' and 'demanding' test," and spending-power statutes like Medicaid are "especially unlikely to do so." *Id.* at 368–69 (quoting *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 180, 186 (2023)).

*Medina* also clarified how to understand the Supreme Court's prior precedent on this issue. The Court characterized its recent decision in *Talevski* as "the only reliable yardstick against which to measure whether spending-power legislation confers a privately enforceable right." *Id.* at 377. In *Talevski*, the Court found a private right of action to enforce two provisions of the Federal Nursing

Home Reform Act (FNHRA) that are phrased unambiguously in terms of nursing-home residents' "rights." 599 U.S. at 181–86. By contrast, *Medina* explicitly disavowed a trio of cases that set a lower bar for creating private rights of action: *Blessing v. Freestone*, 520 U.S. 329 (1997); *Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498 (1990); and *Wright v. Roanoke Redevelopment & Housing Authority*, 479 U.S. 418 (1987). 606 U.S. at 375–76. The Court explained that it had "briefly experimented with a different approach" in these cases, which took a "broad view of [the Court]'s authority to confer new rights under spending-power statutes that did not expressly provide them." *Id.* at 375. But federal courts should no longer "feel obliged, or permitted," to follow that approach; they should not even "consult *Wilder*, *Wright*, and *Blessing* when asking whether a spending-power statute creates an enforceable individual right." 606 U.S. at 376.

## V. The district court granted summary judgment for the State, finding no private right of action to enforce the SNAP provisions at issue and no federal due process violation.

After the *Medina* decision, the State moved for summary judgment on Appellants' SNAP Act claims, arguing that the provisions at issue are not privately enforceable. 1-ER-3, 1-ER-13. Appellants opposed and filed a cross-motion for summary judgment on all claims. 1-ER-3. The State also moved for summary judgment on the merits of Appellants' first-contact-filing claim and constitutional

claims. 1-ER-3–4. The district court held oral argument on the four summary judgment motions in December 2025. 1-ER-4.

In May 2026, the district court granted summary judgment to the State on all claims. 1-ER-2–50. Before summary judgment, five claims remained in the case—three federal statutory claims, one federal constitutional claim, and one state constitutional claim.[6] 1-ER-6–7. The three statutory claims alleged that DOH was violating the SNAP Act by: (1) failing to timely process SNAP initial and recertification applications; (2) failing to ensure that Alaskans can submit SNAP applications on the first day they contact the agency; and (3) failing to provide written notice and an opportunity to request a fair hearing to SNAP applicants whose eligibility was not determined within statutory timeframes. 1-ER-6. The two constitutional claims alleged due process violations under the Fourteenth Amendment to the U.S. Constitution and Article I, Section 7 of the Alaska Constitution. 1-ER-6–7.

Regarding the statutory claims, the district court held that there is no private right of action for the SNAP Act provisions Appellants seek to enforce. 1-ER-11–31. Applying *Medina*'s stringent test for inferring private rights of action from spending-power statutes, the court concluded that the provisions Appellants rely on

---

[6] Plaintiffs stipulated to dismiss their language-access claims in September 2025. 4-ER-915.

do not "clearly bestow a private right to sue." 1-ER-20. "[W]hile the SNAP Act is certainly intended to meet the needs of individuals like Plaintiffs," the court determined that the SNAP provisions at issue do not clearly and unambiguously use rights-creating terms. 1-ER-20. In reaching this conclusion, the court drew heavily on the facts and reasoning of *Medina* and *Talevski*. 1-ER-11–26.

In the district court's view, there were "key" and "dispositive" differences between the SNAP provisions before it and the rights-creating statutory provisions in *Talevski*. 1-ER-19. The court noted that the *Talevski* provisions "expressly invoked the word 'right' or 'rights,' when describing the nursing facilities' obligations to their residents," as did the broader statutory subsection where they were located. 1-ER-19. By contrast, the SNAP provisions at issue "do not mention 'rights,' and the [c]ourt d[id] not discern any language that clearly and unambiguously creates 'rights, privileges, or immunities, not benefits or interests.'" 1-ER-19 (quoting *Medina*, 606 U.S. at 368).

The district court considered the SNAP provisions more analogous to the Medicaid provision in *Medina*, where the Supreme Court found no private right of action. 1-ER-20–24. Like the provision at issue in *Medina*, the disputed provisions of § 2020(e) "'speak[] to what a State must do to participate in [SNAP]' and 'seek[] to benefit' recipient households." 1-ER-22 (second alteration in original) (quoting *Medina*, 606 U.S. at 377–78). Likewise, the § 2020(e) provisions are

missing "anything like FNHRA's clear and unambiguous 'rights-creating language.'" 1-ER-22 (quoting *Medina*, 606 U.S. at 377–78).

The district court also examined the "surrounding statutory context," as the Supreme Court did in *Talevski* and *Medina*. 1-ER-25–26 (quoting *Medina*, 606 U.S. at 379). The court found it significant that *Talevski*'s rights-creating provisions were set apart from others, whereas the relevant § 2020(e) provisions "sit[] amidst dozens of other '[r]equisites of State plan of operation.'" 1-ER-20 (quoting 7 U.S.C. § 2020(e)). And many of those requisites contain multiple detailed subcomponents; the 30-day processing timeframe, for example, appears in the middle of a lengthy run-on sentence detailing several requirements. 1-ER-26. In the district court's view, this statutory structure "does little to 'alert' a State that SNAP funding 'comes with a duty to answer private suits.'" 1-ER-20 (quoting *Medina*, 606 U.S. at 379–80).

The district court declined to rely on *Briggs v. Bremby* and *Barry v. Corrigan*, two out-of-circuit cases that concluded certain SNAP Act provisions are privately enforceable. 1-ER-27–30. *Briggs* relied on the "now disfavored" *Blessing* test, as well as the reasoning of *Wright* and *Wilder* that *Medina* admonished courts not to apply. 1-ER-27–28. *Barry* concerned 7 U.S.C. § 2014, not § 2020, and it too applied the "now-repudiated" *Blessing* test. 1-ER-28–30.

Regarding Appellants' federal due process claim, the district court concluded that Appellants had failed to show the necessary deprivation of a property interest.[7] 1-ER-31–48. The court characterized Appellants' complaint as asserting two bases for their federal due process claim: (1) DOH's failure to provide notice of delayed processing (the "notice-based theory"); and (2) DOH's failure to timely render eligibility determinations (the "arbitrary deprivation theory"). 1-ER-6–7, 1-ER-36–37. In the court's view, these two theories were "effectively separate parts of a singular Due Process analysis." 1-ER-37–38. The court considered the "arbitrary deprivation" theory to go toward whether there was a deprivation of a property interest in the first place, whereas the "notice-based" theory went toward the *Mathews* balancing analysis that would be triggered only if Appellants showed a deprivation. 1-ER-37. Thus, the court viewed the question before it as "whether the delay in SNAP application processing amounts to a deprivation of a property interest such that the Due Process Clause requires notice of the delay and an opportunity for a hearing." 1-ER-38.

[7] Before reaching the merits of this claim, the district court conducted a mootness analysis because DOH had reprogrammed its IT system to automatically send the written notices Plaintiffs sought and asserted it would continue doing so regardless of the litigation's outcome. 1-ER-32–36. The court concluded that the voluntary cessation exception to mootness applied because DOH had changed its practice in response to the preliminary injunction and had not shown that the change was sufficiently "entrenched" or "permanent." 1-ER-35.

Though SNAP benefits themselves constitute a valid property interest, the district court rejected Appellants' contention that "the constitutionally protected property interest is the benefit determination *within the codified timeframe*." 1-ER-39. The court agreed with the State "that there is no bright-line rule as to when a SNAP application processing delay amounts to an unconstitutional deprivation." 1-ER-42. The court noted that some out-of-circuit cases have found due process violations when benefit processing is delayed for many months or years. 1-ER-40 n.146. In this case, however, the processing delays were not "so egregious" as to constitute a deprivation of property. 1-ER-47. The court found that the average pending time for overdue initial and recertification applications was 98 days in May 2025 and 65 days in September 2025. 1-ER-47. And the average pending time for overdue expedited applications was 26 days in May 2025 and 21 days in September 2025. 1-ER-47. Because these processing delays did not rise to the level of constituting a deprivation of property, the court concluded that the State was entitled to summary judgment on the federal due process claim. 1-ER-47.

The court granted the State's *Medina*-focused motion for summary judgment, granted the State's due process motion as to the federal claims, denied

the State's first-contact-filing motion as moot,[8] and denied Appellants' motion for summary judgment. 1-ER-50. In light of its dismissal of the federal claims, the court declined to exercise supplemental jurisdiction over the state constitutional claim and dismissed that claim without prejudice. 1-ER-48–50. The court vacated the preliminary injunction order and entered a final judgment for the State. 1-ER-2, 1-ER-50.

## SUMMARY OF THE ARGUMENT

The Court should affirm the district court's order granting summary judgment to the State on Appellants' statutory and constitutional claims.

Appellants' statutory claims fail because the SNAP Act provisions they seek to enforce do not pass *Medina*'s "'stringent' and 'demanding' test" for creating private rights of action. 606 U.S. at 368 (quoting *Talevski*, 599 U.S. at 180, 186). To prove a statute secures an enforceable private right, a plaintiff must show it both "'clear[ly] and unambiguous[ly]' uses 'rights-creating terms'" and "display[s] 'an unmistakable focus' on individuals like the plaintiff." *Id.* at 368 (alteration in original) (quoting *Gonzaga*, 536 U.S. at 284, 290). Only a "rare statute" will satisfy this exacting test, and spending-clause statutes like SNAP are "especially unlikely to do so." *Id.* at 368–69.

---

[8] Should this Court reverse the district court's decision, it should remand with instructions to the district court to consider the State's first-contact-filing motion for summary judgment, which addresses the merits of that claim.

The SNAP Act provisions at issue do not contain the requisite clear and unambiguous rights-creating terms. *See* 7 U.S.C. § 2020(e)(2)(B)(iii), (3), (4), (9), (10). They use mandatory language and mention individual households, but *Medina* explicitly rejected the idea that "compulsory" and "individual-centric terminology" is enough to create private rights. 606 U.S. at 382. The SNAP provisions look nothing like the statute in *Talevski*, which the Supreme Court has instructed is "the only reliable yardstick against which to measure whether spending-power legislation confers a privately enforceable right." *Id.* at 377. The statutory provisions in *Talevski* were unmistakably rights-creating because they invoked the word "right" or "rights" multiple times and were set apart from other provisions of the FNHRA. 599 U.S. at 181–86. The state-plan requirements at issue here look much more like the provision in *Medina*, as they do not use clear rights-creating language and are undifferentiated subsections of a long list of state-plan requirements. 606 U.S. at 377–80.

The deficient plain language of the state-plan requirements is unchanged by regulations or obscure subsections elsewhere in the SNAP Act. Regulations cannot create private rights, and this Court need not defer to FNA's interpretation of the SNAP Act. *Alexander v. Sandoval*, 532 U.S 275, 291 (2001); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024). Neither *Medina* nor *Talevski* considered implementing regulations. To the extent the Court considers SNAP

regulations, they are a mixed bag—they refer to "rights" at times but also give FNA discretion to waive state-plan requirements, which cannot be squared with those requirements creating private rights. 7 C.F.R. § 272.3(c). As for the other SNAP subsections Appellants identify, those buried provisions shed no light on whether Congress intended private enforcement of the state-plan requirements at issue. At most, they imply that *some* rare SNAP Act provision might be privately enforceable, but they have no clear connection to the specific provisions Appellants seek to enforce.

The SNAP Act's existing enforcement mechanisms provide further confirmation that Congress did not intend private enforcement of the state-plan requirements at issue. Section 2020(g) allows FNA to withhold federal funding and the U.S. Attorney General to seek injunctive relief, but only when a state's noncompliance is "without good cause," and only after FNA has notified the state of its noncompliance and given it an opportunity to resolve the problem. This enforcement structure contradicts the idea that any individual has a private right to compliance with a state plan's administrative procedures.

As for the due process claims, the district court correctly determined that Appellants failed to show the necessary deprivation of a protected property interest. To succeed on a due process claim, a plaintiff must establish both "deprivation by state action of a protected interest in life, liberty, or property" and

"inadequate state process." *Reed v. Goertz*, 598 U.S. 230, 236 (2023). If a district court finds no deprivation, it need not proceed to analyze the adequacy of the state process under the *Mathews v. Eldridge* framework. *Schroeder v. City of Chicago*, 927 F.2d 957, 960 (7th Cir. 1991).

Here, Appellants' due process claims fail at the first step of the analysis because they do not establish deprivation of a protected property interest. There is no constitutionally protected interest in strict compliance with statutory processing timelines. Appellants cite no persuasive authority for this theory, and to conclude otherwise would improperly circumvent *Medina*'s command that private enforcement of spending-power statutes should be rare. This Court should reject Appellants' attempt to repackage their statutory claims as constitutional claims.

Nor are DOH's processing delays extreme enough to functionally deprive Appellants of the property interests they do have: a fair eligibility determination and, if eligible, SNAP benefits. Courts have found that only unreasonable processing delays of many months or years rise to this level. *See, e.g.*, *Kelly v. R.R. Ret. Bd.*, 625 F.2d 486, 490–91 (3d Cir. 1980). When the district court granted summary judgment, the most recently available data showed that the average processing time for all SNAP applications was 47 days, and the average time that overdue applications had been pending past statutory timeframes was 14 days for expedited applications and 35 days for initial and recertification applications. 1-

ER-41, 1-ER-47. Courts have concluded that benefit-processing delays much longer than this pass constitutional muster. *See, e.g.*, *Schroeder*, 927 F.2d at 959–60; *Isaacs v. Bowen*, 865 F.2d 468, 475–77 (2d Cir. 1989); *Littlefield v. Heckler*, 824 F.2d 242, 247 (3d Cir. 1987).

Even if this Court reaches *Mathews* balancing, that framework does not favor finding a due process violation. Though Appellants undoubtedly have an important property interest, any deprivation entails delay, not outright denial. Sending a delay notice to applicants or simply ordering DOH to process all applications on time, as Appellants demand, would not realistically result in faster and more accurate eligibility determinations. And the potential administrative and fiscal burdens on the State are high, as DOH already must allocate scarce resources across multiple crucial benefit programs and faces steep penalties if hasty processing results in payment errors.

## STANDARD OF REVIEW

The Court reviews de novo a district court's grant or denial of summary judgment. *Oppenheimer & Co. v. Mitchell*, 135 F.4th 837, 844 (9th Cir. 2025). "[V]iewing the evidence in the light most favorable to the nonmoving party," the Court determines "whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Collins v.*

*Gee W. Seattle LLC*, 631 F.3d 1001, 1004 (9th Cir. 2011) (quoting *EEOC v. Luce, Forward, Hamilton & Scripps*, 345 F.3d 742, 746 (9th Cir. 2003) (en banc)).

## ARGUMENT

### I. The district court correctly dismissed Appellants' statutory claims because the SNAP provisions at issue are not privately enforceable.

#### A. *Medina* sets out a stringent test for private rights of action that only a rare spending-power statute will satisfy.

*Medina* articulates a "'stringent' and 'demanding' test" for inferring private rights of action from spending-power statutes. 606 U.S. at 368 (quoting *Talevski*, 599 U.S. at 180, 186). "[F]ederal statutes do not confer 'rights' enforceable under § 1983 'as a matter of course.'" *Id.* at 365 (quoting *Talevski*, 599 U.S. at 183). Instead, a plaintiff must meet a high bar to "prove that a statute secures an enforceable right, privilege, or immunity, and does not just provide a benefit or protect an interest." *Id.* at 368. The statute in question must both "'clear[ly] and unambiguous[ly]' use[] 'rights-creating terms" and "display 'an unmistakable focus' on individuals like the plaintiff." *Id.* (first and second alteration in original) (quoting *Gonzaga*, 536 U.S. at 284, 290). Only an "atypical" statute will clear this "significant hurdle." *Id.* at 375 (quoting *Talevski*, 599 U.S. at 183–84).

The Supreme Court has firmly rejected less demanding approaches to the private-rights analysis. *Medina* expressly repudiated *Blessing*, *Wilder*, and *Wright*, warning that courts should not "consider the contrary reasoning" of those cases because they took an impermissibly "broad view of [the Court]'s authority to

confer new rights." 606 U.S. at 375–76. And the *Medina* majority rejected the more lenient test offered by the dissenters, which asked whether a statute "uses 'compulsory' and 'individual-centric terminology'" and "evokes 'language classically associated with establishing rights.'" *Id.* at 382. The Court explained that this test "would risk obliterating the longstanding line between mere benefits and enforceable rights," as "many other provisions (in Medicaid and elsewhere) previously thought to confer only benefits would suddenly create rights instead." *Id.* at 383. The dissent's flawed approach would improperly "leave States guessing about the terms of their deals with the federal government and invite courts to revive their long-abandoned approach of usurping Congress's role in creating rights and remedies." *Id.*

*Medina* also explained in depth why spending-power statutes like Medicaid are "especially unlikely" to confer individual rights. *Id.* at 369–72. Because the spending power does not allow Congress to issue direct orders to state governments, spending-power statutes are more like contracts or treaties between the federal government and states. *Id.* at 370–72. Contract requirements are only enforceable if they were "well known" to the parties when they formed their agreement. *Id.* at 371 (quoting *Neil, Moore & Co. v. Ohio*, 3 How. 720, 741 (1845)). Thus, Congress must "speak[] with a clear voice" to provide "unmistakable" notice to states if they will consent to private lawsuits by accepting

federal funding. *Id.* at 374. And "while treaties may seek to benefit the citizens of the compacting nations, they generally do not confer individually enforceable rights against a sovereign, but 'depen[d] for the enforcement of [their] provisions on . . . the governments which are parties to' them." *Id.* at 372 (alterations in original) (quoting *Head Money Cases*, 112 U.S. 580, 598 (1884)). Under this logic, "as a rule, 'Congress alone has the power to enforce' the conditions it attaches to its grants." *Id.* (quoting *Emigrant Co. v. County of Adams*, 100 U.S. 61, 69 (1879)).

This strict approach to private rights of action "vindicat[es] the separation of powers." *Id.* at 368 (quoting *Talevski*, 599 U.S. at 183). *Medina* identified that "the decision whether to let private plaintiffs enforce a new statutory right poses delicate questions of public policy." *Id.* at 369. "New rights for some mean new duties for others," and "private enforcement actions, meritorious or not, can force governments to direct money away from public services and spend it instead on litigation." *Id.* For this reason, "[t]he job of resolving how best to weigh those competing costs and benefits belongs to the people's elected representatives, not unelected judges charged with applying the law as they find it." *Id.*

Turning to the specific facts of *Medina*, the Supreme Court found that the Medicaid Act provision before it—the "any-qualified-provider provision"—did not confer a privately enforceable right. *Id.* at 377–80. That provision is a state-plan requirement for states participating in Medicaid. *Id.* at 377. It requires state plans

to "provide that . . . any individual eligible for medical assistance (including drugs) may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required . . . who undertakes to provide him such services." *Id.* (alterations in original) (quoting 42 U.S.C. § 1396a(a)(23)(A)). The Court acknowledged that this language clearly "seeks to benefit both providers and patients." *Id.* But this alone was not enough to create a private right of action; crucially, the provision was missing "anything like [*Talevski*'s] clear and unambiguous 'rights-creating language.'" *Id.* at 377–78 (quoting *Talevski*, 599 U.S. at 186).

The Supreme Court also examined the broader statutory context. It highlighted that the provision appears in the Medicaid Act section that "outlines scores of things a state plan must include to qualify for federal funding." *Id.* at 379. By contrast, the rights-creating language in *Talevski* was set apart from other FNHRA provisions. *Id.* at 380. If the any-qualified-provider provision created a private cause of action, then many other Medicaid plan requirements would do so too. *Id.* This would inappropriately make private rights of action "the rule" rather than "'atypical' exceptions." *Id.* (quoting *Talevski*, 599 U.S. at 183). Further, the Medicaid Act allows the federal government to withhold Medicaid funds only if a state fails to "comply substantially" with state-plan requirements. *Id.* at 379. In the

Court's view, this indicated that those requirements "address[] a State's obligations to the federal government," not the rights of individuals. *Id.*

Last, *Medina* rejected the policy argument that § 1983 litigation is needed to give "teeth" to the any-qualified-provider provision. *Id.* at 384–85. The Court considered the federal government's ability to terminate Medicaid funding a "realistic source of relief" and noted that funding cutoffs are the "'typical remedy' when a grant recipient violates the terms of spending-power legislation." *Id.* at 384 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). And even "if existing remedies prove insufficient," it is Congress's prerogative—not the courts'—to create new ones. *Id.* at 385.

**B. The SNAP provisions are missing the clear and unambiguous rights-creating language required by *Medina*.**

The Supreme Court's analysis in *Medina* bars Appellants' statutory claims. Like the Medicaid Act in *Medina*, the SNAP Act is a spending-power statute that requires participating states to have an approved state plan. And like the *Medina* plaintiffs, Appellants seek to bring § 1983 claims to enforce select provisions of the Act's lengthy list of state-plan requirements. Those select SNAP provisions contain no more unambiguous rights-creating language than the any-qualified-provider provision in *Medina*. And they bear little resemblance to the statutory language in *Talevski*, the only controlling case where the Supreme Court has held that a spending-power statute creates a private right of action. Because the SNAP

Act provisions at issue do not clearly and unambiguously use rights-creating terms, they cannot create private rights of action.

Appellants fail to identify any clear and unambiguous rights-creating terms in the specific SNAP Act provisions they seek to enforce. They argue that the provisions contain rights-creating language because they use mandatory and individual-centric language, OB 26–28, but under *Medina*, that is not enough. 606 U.S. at 382–83. "Compulsory" and "individual-centric terminology" is evidence only of intent to "provide a benefit or protect an interest"; it does not itself constitute rights-creating language. *Id.* at 368, 382–83.

A comparison to the statutory language in *Talevski* illustrates how the SNAP Act provisions here fall short. In *Talevski*, the Court found a private right of action to enforce two FNHRA provisions in a statutory subsection called "[r]equirements *relating to residents' rights*." 599 U.S. at 184 (quoting 42 U.S.C. § 1396r(c)). The first provision is entitled "Free from restraints," and it appears in a list of "[s]pecified *rights*" within a "General *rights*" subsection. 42 U.S.C. § 1396r(c)(1)(A)(ii) (emphasis added). The provision requires nursing-home facilities to "protect and promote the *rights* of each resident," including "[t]he *right* to be free from physical or mental abuse, corporal punishment, involuntary seclusion, and any physical or chemical restraints." *Id.* (emphasis added). The second provision appears in a subsection entitled "[t]ransfer and discharge *rights*,"

also nested under "[r]equirements *relating to residents' rights*." *Id.* § 1396r(c)(2)(A) (emphasis added). It provides that "[a] nursing facility must permit each resident to remain in the facility and must not transfer or discharge the resident from the facility unless" certain criteria are met. *Id.* Thus, both *Talevski* provisions are directly associated with multiple explicit invocations of "rights."

The SNAP Act provisions here stand in "stark contrast" to the *Talevski* provisions. *Medina*, 606 U.S. at 380. The titles of the broader section and subsection ("Administration" and "Requisites of State plan of operation") indicate a focus on states' procedures for administering SNAP, not individual rights. The provisions are not "set . . . apart from others," *id.*, but instead appear among dozens of state-plan requirements, some of which do not mention households at all. *See* 7 U.S.C. § 2020(e). Subsection (e)(3)'s 30-day timeframe, for example, is buried in the middle of a 214-word run-on sentence primarily concerned with what information the State must verify when processing a SNAP application:

> The State plan of operation required under subsection (d) of this section shall provide, among such other provisions as may be required by regulation . . . (3) that the State agency shall thereafter promptly determine the eligibility of each applicant household by way of verification of income other than that determined to be excluded by section 2014(d) of this title (in part through the use of the information, if any, obtained under section 2025(e) of this title and after compliance with the requirement specified in paragraph (24)), household size (in any case such size is questionable), and such other eligibility factors as the Secretary determines to be necessary to implement sections 2014 and 2015 of this title, although the State agency may verify prior to certification, whether questionable or not, the size of any applicant

> household and such other eligibility factors as the State agency determines are necessary, so as to complete certification of and provide an allotment retroactive to the period of application to any eligible household ***not later than thirty days following its filing of an application***, and that the State agency shall provide each applicant household, at the time of application, a clear written statement explaining what acts the household must perform to cooperate in obtaining verification and otherwise completing the application process[.]

7 U.S.C. § 2020(e)(3) (emphasis added). This is hardly the kind of language that would provide "'unmistakable' notice" that "accepting [SNAP] funds comes with a duty to answer private suits." *Medina*, 606 U.S. at 374, 380 (quoting *Gonzaga*, 536 U.S. at 287).

Crucially, the SNAP provisions themselves do not contain the term "rights" or any similar language, and they are not associated with any section or subsection titles that contain such language. They require that a state "shall" take certain actions regarding SNAP applications, but they do not frame those actions in terms of a household's rights. Their references to "each household" or "any household" simply show congressional intent to "provide a benefit or protect an interest" for those households, not to create private causes of action. *Id.* at 368. Indeed, it would be impossible for Congress to set up a state-administered public benefit program without using at least some mandatory language to structure the program and some individual-centric language to identify the intended beneficiaries.

To be sure, a statute could theoretically be rights-creating without using the actual word "right." Imagine, for example, that the statute in *Medina* had required a state-plan provision saying that a state "must not infringe on a patient's freedom to choose any qualified medical provider." Or consider SNAP Act § 2020(c), entitled "Civil rights compliance," which forbids "discrimination by reason of race, sex, religious creed, national origin, or political affiliation" and requires that a state's administration of the SNAP program is "consistent with the rights of households" under various federal civil rights laws.[9] While the State offers no opinion on whether this language creates a private right of action, it is certainly closer to the required "rights-creating terms" than the statutory language here. Appellants point to nothing in the SNAP provisions' plain language that is rights-creating other than the mandatory and individual-focused language that the Supreme Court has said is insufficient on its own.

The SNAP Act provisions Appellants seek to enforce bear far more resemblance to the any-qualified-provider provision in *Medina*. Like the provisions at issue here, that provision "speaks to what a State must do to participate in

---

[9] A different provision in § 2020(e) refers to "the right of the household to apply in writing." 7 U.S.C. § 2020(e)(2)(C)(iii)(III). Whether this provision is privately enforceable is outside the scope of this appeal, but it, like § 2020(c), shows that Congress knows how to use the word "right" when it wants to. Congress chose not to do so in the provisions upon which Plaintiffs rely.

Medicaid," seeks to benefit patients, and uses "mandatory terms." *Medina*, 606 U.S. at 377–78, 380. Yet the Supreme Court held the provision is not privately enforceable because it "looks nothing like th[e] FNHRA provisions" at issue in *Talevski*. *Id.* at 377. In the Court's view, those FNHRA provisions show that Congress "knows how to give a grantee clear and unambiguous notice that, if it accepts federal funds, it may face private suits asserting an individual right to choose a medical provider." *Id.* at 378. Congress's decision not to use similar language precluded a private right of action for the any-qualified-provider provision and should do the same here.

The statutory structure here is also similar to *Medina*, with the same concerning implications of inferring a private right of action. The provisions Appellants seek to enforce are undifferentiated sections of the long list of SNAP state-plan requirements, much like the any-qualified-provider provision is one of "scores of things a state plan must include to qualify for [Medicaid] funding." *Id.* at 379. The Supreme Court found this placement "[n]otable" compared to *Talevski*, where Congress "set its rights-creating provisions apart from others." *Id.* at 379–80. In *Medina*, the Supreme Court observed that if the any-qualified-provider provision created a privately enforceable right, "[m]any other Medicaid plain requirements would likely do the same." *Id.* at 380. This would improperly transform rights-creating provisions into the rule rather than the "atypical"

exception. *Id.* (quoting *Talevski*, 599 U.S. at 183). The same is true here, as myriad other provisions in § 2020 and elsewhere in the SNAP Act use mandatory language and mention individual households.

The distinctions Appellants draw between this case and *Medina* are not relevant to interpreting the SNAP provisions' plain language. Appellants assert that the any-qualified-provider provision "does not use mandatory terms" because it uses "may," whereas four of the five SNAP provisions at issue use the word "shall." OB 33–34. As the Supreme Court recognized in *Medina*, however, the any-qualified-provider provision *does* "speak in mandatory terms." 606 U.S. at 380. It says that a "State plan . . . *must* . . . provide that . . . any individual eligible . . . may obtain assistance from any" qualified provider. 42 U.S.C. § 1396a(a)(23)(A) (emphasis added). While Plaintiffs focus on the word "may," OB 33, it confers no discretion in this context. It simply identifies the choice afforded to a Medicaid beneficiary—a choice the state "must" make available. In any event, *Medina* also specifically considered a different Medicaid provision containing the word "shall" and concluded that it did not create a private right either. *Id.* at 380. The other distinction Appellants identify is that the any-qualified-provider provision is not "focused exclusively on individuals receiving Medicaid" because it benefits providers as well. OB 34–35. Yet the provision's dual focus is not why *Medina* declined to find a private right. If anything, the

Supreme Court reached this conclusion *despite* acknowledging that the provision "seeks to benefit both providers and patients." *Medina*, 606 U.S. at 378. *Medina* was focused on the provision's lack of clear and unambiguous rights-creating language. *Id.* at 376–80. The same absence here dictates the same conclusion.

Appellants also invert the proper analysis when they argue that the district court "misapplied" *Medina* because its facts are not perfectly identical to the facts here. OB 32–36. A statute does not create a private right of action merely because it is dissimilar to the provision in *Medina*. Rather, "the only reliable yardstick against which to measure whether spending-power legislation confers a privately enforceable right" is *Talevski*. *Medina*, 606 U.S. at 377. *Medina* provides just one example of a statute failing to meet the high bar set by *Talevski*. Here, too, the provisions at issue "look[] nothing like th[e] FNHRA provisions" in *Talevski*. *Id.*

Appellants' reliance on SNAP's implementing regulations is also misplaced. OB 36–38. "Language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not." *Sandoval*, 532 U.S at 291. And as Appellants acknowledge, OB 37, this Court need not defer to FNA's interpretation of the SNAP Act. *Loper Bright Enters*, 603 U.S. at 412–13. Neither *Talevski* nor *Medina* looked to implementing regulations, despite the existence of regulations interpreting the statutes at issue in

those cases.[10] *See* 42 C.F.R. §§ 431.51, 483.10. And when faced with a similar argument before, the Supreme Court held that a statute was not privately enforceable even though its implementing regulations contained the "rights-creating language" that the statute itself lacked. *See Sandoval*, 532 U.S. at 287–91.

Moreover, to the extent this Court considers the implementing regulations, any inferences that can be drawn from them are mixed. Though the regulations refer to the "[r]ight to same-day filing" and the "right to request a fair hearing," Appellants have not identified any regulation that directly refers to a "right to a timely eligibility determination" or something similar. *See* OB 18, 36–38; 7 C.F.R. §§ 273.2(c), 273.15(f). The regulations require a state agency to report to FNA when it is "sued by any person(s) in a State or Federal Court in any matter which involves the State agency's administration of SNAP," but this in no way suggests that FNA believes households have a valid cause of action to sue over any matter involving SNAP administration. 7 C.F.R. § 272.4(d)(1)(i). FNA simply wants to be notified of any ongoing litigation—meritorious or not. Notably, the regulations also establish FNA's authority to waive state-plan requirements in its discretion.

---

[10] The Medicaid Act's implementing regulations arguably use more rights-creating language than the any-qualified-provider provision itself, as they state that patients "may not be denied freedom of choice of qualified providers." 42 C.F.R. § 431.51(a)(4).

*Id.* § 272.3(c). This waiver provision is incompatible with the idea that households may privately enforce state-plan requirements.

Ultimately, however much Appellants insist they are applying the Supreme Court's current law on private rights of action, the standard they apply looks no different than the more lenient approaches *Medina* rejected. Appellants assert that "each provision at issue bears the classic hallmarks of rights-creating language" because it "uses mandatory language to create clear and specific entitlements for each individual household." OB 17. This calls to mind the *Medina* dissent's proposed standard of "compulsory" and "individual-centric terminology," coupled with "language classically associated with establishing rights." *Id.* at 382. It is also reminiscent of the repudiated *Blessing* test, which asked whether the statute "impose[d] a binding obligation" on states and whether the asserted right was specific and defined enough to allow judicial enforcement. 520 U.S. at 340–41. *Medina* was very clear that federal courts should not follow the approaches from *Blessing* and the dissent; both would inappropriately "usurp[] Congress's role" and "leave States guessing about the terms of their deals with the federal government." *Id.* at 375–77, 383.

In contrast to undermined pre-*Medina* cases, no post-*Medina* case has found a private right of action among SNAP's state-plan requirements. The Eighth Circuit, the only circuit court to consider this question since *Medina*, reached the

same conclusion the district court did here. *Holmes v. Bax*, 187 F.4th 1028, 1045–47 (8th Cir. 2026). In *Holmes*, the court held that § 2020(e)(2)(B) (including the first-contact filing provision) is not privately enforceable because it "focuses neither on the individuals protected nor even on the funding recipients being regulated, but on the agenc[y] that will do the regulating." *Id.* at 1045, 1047 (alteration in original) (quoting *Does v. Gillespie*, 867 F.3d 1034, 1041 (8th Cir. 2017)). The few district courts to consider the issue since *Medina* have also found no private right of action among SNAP's provisions. *See Gelman v. Guinn*, No. 25-cv-4948, 2026 WL 2922941, at *4 (S.D.N.Y. Sept. 29, 2026) (no private right of action for state-plan requirement in § 2020(e)(2)(B)(i) that the state "shall provide timely, accurate, and fair service to applicants for, and participants in, [SNAP]"); *see also Griffith v. Rodgers*, No. 26-cv-08014, 2026 WL 2718451, at *7 (D. Ariz. Sept. 15, 2026) (no private right of action for provision in § 2022(b) addressing a state's collection of overissuances to a household), *appeal docketed*, No. 26-6117 (9th Cir. Sept. 21, 2026); *Ferm v. Cameron*, No. 26-cv-00089, 2026 WL 2606628, at *1 (D. Utah Sept. 3, 2026) (finding no private right of action to address violations of SNAP regulations but not resolving whether provisions of § 2020 are privately enforceable). These cases further confirm that the state-plan requirements at issue are not rights-creating under *Medina*.

### C. The tenuously related SNAP subsections Appellants identify do not overcome the plain language of the provisions at issue.

With the plain language of the relevant SNAP provisions against them, Appellants resort to arguing that other parts of the SNAP Act hint that these provisions were meant to be rights-creating. OB 17, 23–24, 31. But none of the three provisions Appellants invoke provide anything close to "'unmistakable' notice" that Congress intended to create a private right of action for the specific provisions that Appellants seek to enforce. *Medina*, 606 U.S. at 374 (quoting *Gonzaga*, 536 U.S. at 287). To the extent they suggest that *some* SNAP Act provision may be privately enforceable, there is no reason to believe that implication includes the provisions at issue here.

Appellants first argue that § 2020(a)(3)(B)(ii) makes their chosen provisions privately enforceable because it "expressly contemplates" private suits to enforce the SNAP Act, but they offer no meaningful limit on this broad and dubious proposition.[11] OB 17, 23–24, 31. Section 2020(a)(3)(B)(ii) provides that a state must make records "available for review in any action filed by a household to enforce any provision of this chapter (including regulations issued under this chapter)." Based on Appellants' framing of this records-retention provision, an

[11] Plaintiffs rely on an out-of-circuit district court case for this argument: *Barry v. Corrigan*, 79 F. Supp. 3d 712 (E.D. Mich. 2015). OB 24. That pre-*Medina* case is not persuasive authority because it applied the now-repudiated *Blessing* test. *Barry*, 79 F. Supp. 3d at 734–40.

unfamiliar reader might assume it is one of § 2020's primary directives. *See, e.g.*, OB 17, 24. In reality, this records-retention provision is a single subsection of a subsection of a subsection of a subsection. It is just one of many statutory requirements for a state's administration of SNAP and appears in § 2020(a), rather than § 2020(e), where the state-plan requirements Appellants seek to enforce reside. This minor provision sheds no light on whether the disputed SNAP provisions are privately enforceable.

To begin with, it is not clear whether § 2020(a)(3)(B)(ii) refers to judicial actions under § 1983, as opposed to administrative proceedings or actions seeking judicial review of final agency determinations. The records-retention provision merely uses the word "action," whereas other SNAP Act provisions refer specifically to "judicial action" and "judicial review." *See, e.g.*, 7 U.S.C. §§ 2020(g), 2021(e), (f), 2023(a)(5). And even if "action" means "judicial action," households can appeal adverse agency decisions in state court, so judicial actions other than § 1983 actions are possible. *See* Alaska R. App. P. 601(b), 602(a)(2). The records-retention provision also includes "any action . . . to enforce . . . regulations issued under this chapter," but regulations cannot create § 1983 claims, so a freestanding regulatory claim could not be a § 1983 action. *See Sandoval*, 532 U.S at 291. Thus, it is not clear that § 2020(a)(3)(B)(ii) contemplates § 1983 actions at all, let alone ones to enforce Appellants' chosen provisions. This

ambiguous provision hardly constitutes the clear evidence of congressional intent that *Medina* requires.

Section 2020(a)(3)(B)(ii), even if it encompasses judicial actions under § 1983, has no clear relationship to the provisions at issue here. It refers broadly to "any provision of this *chapter*," meaning the entire SNAP Act. The Act encompasses diverse topics including eligibility for benefits, the value of SNAP allotments, disqualification and penalties for household violations, the participation of retail food stores, and special topics like workfare and obesity prevention grants. *See* 7 U.S.C. §§ 2011–2036d. Congress cannot have intended a single provision nested four subsections deep in one SNAP section to make every provision of the SNAP Act and its implementing regulations privately enforceable. Appellants intimate that perhaps § 2020(a)(3)(B)(ii) converts only some SNAP Act provisions, including their chosen ones, into privately enforceable rights. OB 25–26. Yet they offer no rationale for this other than repeating the same arguments about mandatory and individual-centric language that are deficient under *Medina*. OB 26. At most, the records-retention provision reflects that *some* SNAP Act provision is privately enforceable via § 1983. As explained above, the provisions at issue here are not that rare and atypical provision.

Section 2023(b) is similarly unavailing. OB 25. That provision is a single-sentence limitation on the extent to which states can restore SNAP benefits that

were "found to have been wrongfully withheld" "[i]n any judicial action arising under this chapter." It specifically addresses "judicial action[s]" concerning SNAP benefits being withheld from eligible households, not actions challenging delayed processing. And as noted above, these could be administrative appeals in state court, not § 1983 actions. Further, unlike the records-retention provision, § 2023(b) does not even specify *who* would be filing such an action. Given that § 2020(g) envisions the Attorney General seeking injunctive relief for failure to comply with a state plan, § 2023(b) could very well refer to a judicial action filed by the federal government, not private individuals. Thus, like § 2020(a)(3)(B)(ii), this provision perhaps contemplates *some* aspect of the SNAP Act being privately enforceable, but there is no indication it encompasses the provisions at issue here.

Even more far-fetched is the idea that § 2027(a)(2) makes the specific SNAP provisions at issue privately enforceable. OB 25. That provision provides that federal funds cannot be used to interfere with the SNAP program's implementation except for "the provision of legal and related assistance in connection with any proceeding or action before any State or Federal agency or court." Again, SNAP applicants are not the only parties who might seek judicial review under the SNAP Act; the Act expressly allows the Attorney General, participating states, retail food stores, and wholesale food concerns to do so in certain circumstances. *See, e.g.*, 7 U.S.C. §§ 2020(g), 2022(b)(5), 2023(a)(5). Moreover, § 2027(a)(2) merely

contemplates that an "action before [a] State or Federal . . . court" might exist, not that such an action would be meritorious or authorized by the SNAP Act's provisions. This in no way confirms that specific state-plan requirements are privately enforceable via § 1983.[12]

Congress's intent cannot be inferred from three ambiguous provisions with no clear relationship to the specific state-plan requirements at issue. Under *Medina*, Congress must "speak[] with a clear voice" to provide states with "unmistakable" notice if certain state-plan requirements are privately enforceable. 606 U.S. at 374 (quoting *Gonzaga*, 536 U.S. at 280, 287). Nothing short of clear and unambiguous rights-creating language can provide this notice. *Id.* at 368. The state-plan requirements at issue do not contain such language, and the oblique implications of provisions buried elsewhere in the SNAP Act cannot change that fact.

---

[12] Moreover, § 2027(a)(2)'s legislative history shows that it was enacted to prevent nonprofit advocacy groups from using federal grant funding to advise clients on how to thwart the SNAP Act's "workfare" program, including through civil disobedience. H.R. Rep. No. 96-788, at 143–44 (1980). The carve-out for legal assistance was to ensure that advocacy groups could still "represent participants as clients in court or before an administrative agency or department, be it Federal or State or local, or to advise recipients of their rights or obligations under the Act and consult with them prior to any legal proceedings or action." *Id.* This unique historical context further demonstrates § 2027(a)(2)'s irrelevance to the statutory interpretation issue in this appeal.

### D. The SNAP Act's existing enforcement mechanisms further suggest Congress did not intend private enforcement.

The SNAP Act's existing enforcement mechanisms provide additional evidence that Congress did not envision private enforcement of state-plan requirements. *See Medina*, 606 U.S. at 379, 384–85. Appellants argue that alternative enforcement mechanisms have no relevance unless the State identifies a remedial scheme that explicitly or implicitly preempts § 1983 enforcement. OB 18, 38–40. But a remedial scheme need not be exclusive to shed light on congressional intent. *See* 606 U.S. at 384–85 (discussing Medicaid Act remedies, despite lack of preemption).

Like the Medicaid Act in *Medina*, the SNAP Act does not require states to perfectly comply with their state plans. In *Medina*, the Supreme Court reasoned that the Medicaid Act's requirement of substantial compliance "suggests that [the] statute addresses a State's obligations to the federal government," not individual rights. *Id.* at 379. Though the Court's primary focus was on the plain language of the any-qualified-provider provision, the substantial-compliance requirement also provided "weighty statutory evidence" that Congress did not intend private enforcement. *Id.* Here, § 2020(g) authorizes FNA to take enforcement actions only when a state fails to comply with the SNAP Act "without good cause." Before finding noncompliance, the SNAP Act contemplates FNA receiving information or conducting investigations, including investigations "initiate[d] upon receiving

sufficient information evidencing a *pattern* of lack of compliance." 7 U.S.C. § 2020(g) (emphasis added). And FNA is required to notify state agencies of noncompliance and "allow . . . a specified period of time for the correction of such failure" before taking enforcement action. *Id.* Further, Congress specifically gave the U.S. Attorney General the power to seek an injunction only after FNA has given a state time to come into compliance. *Id.* These mechanisms, like the Medicaid Act's focus on substantial compliance, contradict the notion that the SNAP Act also empowers individuals to seek injunctive relief, immediately and regardless of the reason for noncompliance.

Section 2020(g) also provides for funding cutoffs, which *Medina* explains is the "'the typical remedy' when a grant recipient violates the terms of spending-power legislation," not private lawsuits. *Id.* at 384 (quoting *Pennhurst*, 451 U.S. at 17). The Supreme Court concluded that funding termination was a "realistic source of relief" for state-plan violations in *Medina*, even though there was no indication that the federal government had made any effort to enforce the provision at issue. *See id.* That point is all the more compelling here, where FNA has been actively engaged in comprehensive enforcement and oversight activities with DOH regarding application processing delays.

## II. The district court correctly dismissed Appellants' federal due process claim because moderate processing delays do not constitute deprivation of a property interest.

The Due Process Clause of the Fourteenth Amendment forbids "governmental deprivation of substantive rights without constitutionally adequate procedure." *Shanks v. Dressel*, 540 F.3d 1082, 1090–91 (9th Cir. 2008). "Not every procedural requirement ordained by [federal] law, however, creates a substantive property interest entitled to constitutional protection." *Id.* at 1091. To succeed on a due process claim, a plaintiff must establish both "deprivation by state action of a protected interest in life, liberty, or property" and "inadequate state process." *Reed v. Goertz*, 598 U.S. 230, 236 (2023). To assess whether a state process is adequate, courts apply the three-factor balancing test from *Mathews v. Eldridge*, 424 U.S. 319 (1976).

### A. Appellants do not have a constitutionally protected interest in eligibility determinations that strictly adhere to the SNAP Act's statutory timeframes.

Appellants have not established a necessary element of their constitutional due process claim: "deprivation by state action of a protected interest in life, liberty, or property." *Reed*, 598 U.S. at 236. They are certainly entitled to a fair eligibility determination, and if found eligible, have a property interest in SNAP benefits. *See Atkins v. Parker*, 472 U.S. 115, 128 (1985); *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970). But Appellants overextend these interests, arguing that

they also have a property interest in an eligibility determination *within precise statutory timeframes*. OB 42–45; *see also* OB 52 (asserting that a delay of "even 31 days" would violate due process). There is no support for the theory that a statute can establish a hard seven- or thirty-day time limit on administrative decision making as a matter of *constitutional* law. To the contrary, the Supreme Court has rejected the idea that statutory procedures define what process is due. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 539–41 (1985); *see also Coe v. Thurman*, 922 F.2d 528, 531 (9th Cir. 1990) ("[T]here is no talismanic number of years or months, after which due process is automatically violated.").

The Appellants selectively quote the Seventh Circuit's decision in *Schroeder v. City of Chicago*, OB 43, but that case provides little support for their novel claim. In *Schroeder*, the Seventh Circuit found that an eight-month delay in receiving disability benefits did *not* constitute deprivation of a property interest. 927 F.2d at 959–60. The court reasoned in passing that "[i]f you are entitled to receive $1,000 on May 1, 1989, and you receive it on May 2, you have been deprived of an entitlement." *Id.* at 959. But even "assum[ing]" that this hypothetical delay was "actionable," the appellant "point[ed] to no source in positive law" to "begin receiving money within a fixed interval of the application." *Id.* This dictum in *Schroeder* presumes that the person alleging a due process violation has already shown their eligibility for the benefit in question. Here,

Appellants are asserting a property interest in an *eligibility determination* within statutory timeframes, and the "timeliness" class includes applicants who may ultimately be found ineligible for SNAP benefits. *See* 4-ER-650.

The other case that Appellants cite, *Kelly v. Railroad Retirement Board*, helps them even less. OB 44. There, the Third Circuit considered whether an "extraordinary and unreasonable" four-year delay in a benefit-eligibility determination violated due process. 625 F.2d at 490–91. It did not address whether the beneficiary had a property interest in adherence to a specific statutory timeframe. *See id.* Indeed, *Kelly* acknowledged that "there is no magic length of time after which due process requirements are violated." *Id.* at 490.

Defining Appellants' property interest to follow the exact contours of SNAP's processing timeframes also presents troubling implications. Nothing about the argument Appellants make is unique to SNAP; it would mean that any agency administering any public-benefit program cannot process an application even a day late without depriving the applicant of a constitutionally protected interest. Constitutionalizing administrative rules in this way would wreak havoc on public-benefit programs. And it would completely circumvent *Medina*'s direction that private rights of action should be the exception, not the rule. Any time a statute dictates procedures for ascertaining benefit eligibility, private plaintiffs could bring

suit under a due process theory even if those statutory requirements did not create a private right of action under § 1983.

### B. The processing delays here are not long enough to constitute deprivation of a property interest.

Though some courts have recognized that an unreasonable delay in the delivery of an entitlement can amount to deprivation of that entitlement,[13] the delays here are not extreme enough to do so. *Schroeder*, 927 F.2d at 960. Benefit-processing delays only "become so unreasonable as to deny due process" when they are "egregious and without any rational justification." *Kraebel v. N.Y.C. Dep't of Hous. Pres. & Dev.*, 959 F.2d 395, 405 (2d Cir. 1992).

In cases where federal courts have concluded a delay is so unreasonable that it violates due process, the delays have been far longer than they are here. For example, the Third Circuit held that a nearly four-year delay in processing annuity benefits for a disabled child violated due process. *Kelly*, 625 F.2d at 490–91. Here, the district court found that the average processing time for a SNAP application

[13] Courts have differed in whether they consider unreasonable delay as part of the interest-deprivation analysis versus part of *Mathews* balancing. *See Schroeder*, 927 F.2d at 960–61. In *Schroeder*, Judge Posner explained that "[t]he cases on unreasonable delay are best understood as holding that implicit in the conferral of an entitlement is a further entitlement, to receive the entitlement within a reasonable time," but "[a]nother interpretation of these cases" is that they "define what process is due." *Id.* The State addresses unreasonable delay as part of the interest-deprivation analysis given the district court's framing, but either way, the moderate length of the delays cuts against finding a due process violation.

was 47 days. 1-ER-41. Even limiting this metric to the most recent statistics on unprocessed, overdue applications, the average time that overdue applications had been pending past statutory timeframes was 14 days for expedited applications and 35 days for initial and recertification applications. 1-ER-47. Courts have found that far longer delays than this do not violate due process.[14] *See, e.g.*, *Schroeder*, 927 F.2d at 959–60 (concluding eight-month delay in receiving disability benefits did not deprive appellant of property interest); *Isaacs*, 865 F.2d at 475–77 (holding that six- to nineteenth-month delay in processing Medicare Part B benefits did not violate due process); *Littlefield*, 824 F.2d at 247 (permitting nine-month delay in processing Social Security disability benefits).

*Fusari v. Steinberg*, 419 U.S. 379 (1975), which Appellants rely on heavily, does not change this analysis. OB 57–59. The *Fusari* plaintiffs alleged that Connecticut was violating due process because it took on average 126 days to provide administrative review of an unemployment-benefits termination. 419 U.S. at 379–80, 383–84. Before the case reached the Supreme Court, Connecticut

[14] Plaintiffs note that *Ressler v. Pierce*, 692 F.2d 1212 (9th Cir. 1982), upheld a district court order requiring a decision on a Section 8 housing application within 15 days. OB 57. However, the due process issue the Court actually decided in *Ressler* was whether an applicant for Section 8 benefits has a protected property interest in those benefits. 692 F.2d at 1214–16. The Court discussed the 15-day timeline only in the context of determining whether the injunctive relief the district court ordered should be modified. *Id.* at 1219–21.

passed statutory amendments that changed its system for providing such review. *Id.* at 386–87. The Supreme Court remanded to the district court, reasoning that it could not address the due process claim without first knowing the "promptness and adequacy of review under the new system." *Id.* at 389–90. Appellants argue *Fusari* implies that DOH's delays are unreasonably long, but this reads too much into the case. OB 57–59. The Supreme Court characterized Connecticut as "often fail[ing] to deliver benefits in a timely manner" under the old system, but it never determined whether this untimely delivery violated due process because it remanded the case. 419 U.S. at 388, 390. Further, *Fusari* concerned a clear deprivation of a property interest because the beneficiaries there had their *preexisting* benefits terminated. *Id.* at 379–80. Here, by contrast, the delay is in the eligibility determination itself. Not to mention, *Fusari*'s 126-day processing time is far longer than the average processing time here: 47 days. 1-ER-41.

Contrary to Appellants' criticism, the district court relied on appropriate metrics about the length of processing delays. OB 47–51. The court considered several measurements: (1) the average processing time for SNAP applications at the time of summary judgment[15] (47 days); (2) the average pending time for

---

[15] In May 2026, when the district court granted summary judgment, the most recent available data was for "SNAP timeliness for the six month reporting period of October 2025 through March 2026." 2-ER-103.

unprocessed, overdue 30-day SNAP applications in May 2025 (98 days) and, more recently, September 2025 (65 days); (3) the average pending time for unprocessed, overdue expedited applications in May 2025 (26 days) and, more recently, September 2025 (21 days). 1-ER-41, 1-ER-45, 1-ER-47. Appellants argue the 47-day number was "overinclusive" because it "includes the non-delayed applications of non-class members." OB 48. Yet surely this number has at least some relevance to predicting the delays class members might face, as they are also included in the statistic. The district court also cited the 47-day statistic specifically in the context of discussing *Fusari*'s corresponding 126-day average processing time. 1-ER-45.

Moreover, the district court did not rely solely on the overall average processing time; it also considered multiple measurements of the average pending time for *overdue* applications. 1-ER-47. Appellants suggest that these more granular measurements were still inadequate because the court "arbitrarily" selected "two seemingly random and disparate point-in-time metrics." OB 49. But the metrics the court cited were not random; they are the exact numbers the parties provided in their summary judgment briefing. *See* 1-ER-47 & n.174; 4-ER-915–16. This precise metric was not included in DOH's monthly court reports,[16] so these

---

[16] The numbers the parties provided in summary judgment briefing came from discovery. *See, e.g.*, 2-ER-181–82 (citing 2-ER-259–335; 3-ER-337–88). The monthly court reports are less granular; they display the number of pending, overdue SNAP applications by date range. *See, e.g.*, 2-ER-128–30. For example, the May 2026 court report showed that as of April 2026, there were 107 unresolved

were the most recent numbers the district court had to work with. Though Appellants have the burden to prove their due process claims, they do not identify a specific number that the district court should have used instead. *See* OB 49.

Appellants ignore the requirements for class actions seeking prospective injunctive relief when they assert that the district court should have considered outlier delays and years-old data. OB 49–51. Long processing delays for a select number of outlier individuals would not show that Appellants face unreasonable delays on a class-wide basis, as they must to establish a class-wide due process violation.[17] *See Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 420 (1977) ("[O]nly if there has been a systemwide impact may there be a systemwide remedy."). And to obtain prospective injunctive relief against state officials, a plaintiff must show "an ongoing violation of [their] constitutional rights." *R.W. v.*

---

recertification applications that had been pending for between 46 and 60 days. 2-ER-128. Without knowing the precise number of days each application had been pending for, the district court could not calculate the average pending time for overdue applications from the court reports.

[17] Plaintiffs rely on a passage from the vacated case *Veterans for Common Sense v. Shinseki* for the argument that averages "obscure constitutional violations," OB 50, but that discussion occurred in a very different context. 678 F.3d 1013, 1027 (9th Cir. 2012). *Shinseki* was not a class action, and the Court was discussing whether a veterans' group could circumvent a statutory prohibition on individual suits by relying on average delays. *Id.* at 1026–27. In class actions, average processing times are obviously relevant. To answer the common question of whether the delays experienced by a group are unreasonable, it makes sense to use a statistic that represents the whole group.

*Columbia Basin Coll.*, 77 F.4th 1214, 1220, 1222 (9th Cir. 2023). The district court therefore properly considered average, ongoing processing delays, rather than outlier delays going back to when the complaint was filed. *See* OB 51.

In sum, the district court used the best available data to conclude that DOH's processing delays are not long enough to constitute deprivation of a property interest. The court therefore did not need to reach the *Mathews* balancing test because "without a deprivation, the issue of due process does not arise."[18] *Schroeder*, 927 F.2d at 960.

### C. Even if reached, the *Mathews* balancing test does not favor finding a due process violation.

Even if DOH's processing delays are considered deprivation of a protected interest, the *Mathews* framework does not support finding a due process violation. *Mathews* requires balancing three factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including

[18] Thus, the district court did not err when it did not reach the notice-focused aspect of Appellants' due process claims. *See* OB 60–62. Alternatively, the Court could affirm this aspect of the district court's decision because that claim is moot, and the voluntary cessation exception does not apply given that the State has made firmly entrenched changes to its IT system to send automated delay notices. 1-ER-32–33; *see Schechner v. KPIX-TV*, 686 F.3d 1018, 1022–23 (9th Cir. 2012) ("We may affirm the district court on any grounds supported by the record.").

the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1207 (9th Cir. 2022) (quoting *Mathews*, 424 U.S. at 335).

For the first *Mathews* factor, there is undoubtedly an important private interest in a fair eligibility determination, and, if eligible, the receipt of SNAP benefits. But those interests are not at their apex in this context, where the issue is temporary *delay* in receiving such benefits (which Appellants may or may not be eligible for)—not an outright denial, termination, or reduction of benefits. *Cf. Goldberg*, 397 U.S. at 264 (discussing the important interest at play "when welfare is *discontinued*" (emphasis added)).

As to the second *Mathews* factor, the relatively moderate delay in eligibility determinations weighs against finding a due process violation. As *Fusari* acknowledged, the *length* of a deprivation "is a significant factor in assessing the sufficiency of the entire process." 419 U.S. at 389. As discussed above, the average delay here—14 days for expedited applications and 35 days for initial and recertification applications—is much shorter than benefit-processing delays that have passed constitutional muster in other cases. 1-ER-41, 1-ER-47; *see, e.g.*, *Schroeder*, 927 F.2d at 959–60 (eight months); *Isaacs*, 865 F.2d at 475–77 (six to nineteen months); *Littlefield*, 824 F.2d at 247 (nine months).

Moreover, the value of the additional procedures Appellants suggest is low because they would not realistically speed up application processing or improve the accuracy of eligibility determinations. Appellants appear to request that the State be required to process all SNAP applications within statutory timeframes and, failing that, that the State notify applicants of delayed processing and inform them that they can request a hearing. OB 47–62. To the extent a demand for faster processing can be considered an additional or substitute procedure, DOH is already doing everything reasonably possible to process applications more quickly while still complying with other statutory obligations. "Speed cannot be an end in itself," and to force slapdash processing of applications "could be expected to result in a deterioration of the quality of the review, and possibly more injustice to claimants than justice." *Wright v. Califano*, 587 F.2d 345, 356 (7th Cir. 1978). As for the notice procedure, Appellants in no way explain how it would enable applicants to speed up processing of their benefits.[19] OB 60–62. They note that "due process requires notice and a hearing where the individual has a meaningful opportunity to confront the evidence against him," but in the context of a delayed eligibility determination, there is not yet any "evidence against [applicants]" that they could confront in a hearing. OB 61.

---

[19] The value of reminding applicants that they can request a hearing is also low because DPA already informs applicants of this on the SNAP application form. 3-ER-451.

Turning to the third *Mathews* factor, processing every SNAP application within statutory timeframes would be a significant fiscal and administrative burden given the State's current resources. Though "[f]inancial cost alone is not a controlling weight in determining whether due process requires a particular procedural safeguard," *Mathews* instructs that the government's interest in "conserving scarce fiscal and administrative resources" must be weighed. 424 U.S. at 348. The State would need to divert resources away from other critical public-benefit programs to ensure that every SNAP application is timely processed. *See* SER-41. And conducting hasty eligibility determinations would risk violating other SNAP Act provisions, subjecting the State to burdensome penalties. *See* 7 U.S.C. § 2025(c); *see, e.g.*, SER-5, SER-17.

On balance, the State's moderate processing delays do not violate due process.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's order granting summary judgment to Defendants on all claims.

Date: November 9, 2026.

CORI MILLS
ACTING ATTORNEY GENERAL

*/s/ Jennifer Teitell*
Jennifer Teitell
Alaska Bar No. 2405054

## STATEMENT OF RELATED CASES

**(Circuit Rule 28-2.6)**

The State is aware of the following cases touching on related issues that are currently pending before this Court:

- *Griffith v. Rodgers*, No. 26-cv-08014, 2026 WL 2718451 (D. Ariz. Sept. 15, 2026), *appeal docketed*, No. 26-6117 (9th Cir. Sept. 21, 2026).

## CERTIFICATE OF COMPLIANCE

I certify that:

This brief complies with the word limit of Ninth Circuit Rule 32-1 because this brief contains 13,763 words, including words manually counted in any visual images, and excluding the items exempted by Fed. R. App. P. 32(f).

This brief complies with the type size and typeface requirements of Fed. R. App. P. 32(a)(5) and (6).

Date: November 9, 2026

CORI MILLS
ACTING ATTORNEY GENERAL

*/s/ Jennifer Teitell*
Jennifer Teitell
*Attorney for Appellee Heidi Hedberg*

## CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system.

Participants in the case who are registered ACMS users will be served by the ACMS system.

Date: November 9, 2026.

CORI MILLS
ACTING ATTORNEY GENERAL

*/s/ Jennifer Teitell*
Jennifer Teitell
*Attorney for Appellee Heidi Hedberg*