**No. 26-4167**

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

JOHN ANDREW, AUTUMN ELLANNA, and TERERESA FERGUSON,
on behalf of themselves and all those similarly situated,
*Plaintiffs-Appellants*,

v.

HEIDI HEDBERG, in her official capacity as
Commissioner of the Alaska Department of Health,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Alaska
Case No. 3:23-cv-00044-SLG

# BRIEF OF IDAHO, ALABAMA, ARKANSAS, FLORIDA, GEORGIA, INDIANA, IOWA, KANSAS, LOUISIANA, MISSISSIPPI, MONTANA, NEBRASKA, SOUTH CAROLINA, TENNESSEE, TEXAS, UTAH, AND WEST VIRGINIA AS *AMICI CURIAE* IN SUPPORT OF APPELLEE AND AFFIRMANCE

RAÚL R. LABRADOR
ATTORNEY GENERAL

OFFICE OF THE IDAHO
ATTORNEY GENERAL
700 W. Jefferson St.
Boise, ID 83720
(208) 334-2400
aaron.green@ag.idaho.gov

MICHAEL A. ZARIAN
Solicitor General

AARON M. GREEN
Assistant Solicitor General

*Counsel for Amici*
Additional Signatories Listed Below Signature Block

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... ii

INTEREST OF THE *AMICI* STATES .......... 1

SUMMARY OF THE ARGUMENT .......... 1

ARGUMENT .......... 2

I. SNAP does not create any private right of action in federal court. .......... 2

A. *Medina* sets the benchmark for private rights of action in the spending power context. .......... 3

B. The SNAP program requirements are indistinguishable from the Medicaid program requirements in *Medina*. .......... 6

C. This Court should not split with the Eighth Circuit. .......... 15

II. Appellants' rule improperly authorizes suits even when the executive branch is satisfied with state performance. .......... 16

CONCLUSION .......... 19

# TABLE OF AUTHORITIES

## CASES

*Allen v. State*,
203 P.3d 1155 (Alaska 2009) ........ 14

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
548 U.S. 291 (2006) ........ 4

*Barnes v. Gorman*,
536 U.S. 181 (2002) ........ 4

*Blessing v. Freestone*,
520 U.S. 329 (1997) ........ 6

*Carter v. State Div. of Welfare & Supportive Servs.*,
134 Nev. 922, 422 P.3d 1233 (Nev. 2018) ........ 14

*Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*,
527 U.S. 666 (1999) ........ 14

*Cudal v. Sunn*,
742 P.2d 352 (Haw. 1987) ........ 14

*Devi v. Senior & Disabled Servs. Div.*,
905 P.2d 846 (Or. Ct. App. 1995) ........ 14

*Gonzaga Univ. v. Doe*,
536 U.S. 273 (2002) ........ 11

*Green v. State*,
260 P.3d 254 (Wash. Ct. App. 2011) ........ 14

*Health & Hosp. Corp. of Marion Cnty. v. Talevski*,
599 U.S. 166 (2023) ........ 5, 11

*Holmes v. Bax*,
187 F.4th 1028 (8th Cir. 2026) ........ 15

*Kelton Arms Condo. Owners Ass'n, Inc. v. Homestead Ins. Co.*,
346 F.3d 1190 (9th Cir. 2003) ........ 15

*Landor v. La. Dep't of Corr. & Pub. Safety*,
609 U.S. 59 (2026) ........ 1, 3

*McGee v. Mathis*,
71 U.S. (4 Wall.) 143 (1866) ........ 3

*McGee v. State*,
398 P.3d 245 (Mont. 2017) ........ 14

*McMicken v. Webb*,
47 U.S. (6 How.) 292 (1848) ..... 18

*Medina v. Planned Parenthood S. Atl.*,
606 U.S. 357 (2025) ..... *passim*

*Nelson v. IDHW*,
2015 WL 1249570 (Idaho Ct. App. Mar. 19, 2015) ..... 14

*NFIB v. Sebelius*,
567 U.S. 519 (2012) ..... 18, 19

*Ortega v. Johnson*,
271 Cal. Rptr. 3d 509 (Cal. Ct. App. 2020) ..... 14

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981) ..... 4, 5

*Planned Parenthood of Greater Tex. Fam. Plan. & Preventative Health Servs., Inc. v. Kauffman*,
981 F.3d 347 (5th Cir. 2020) ..... 12

*Stoffel v. Ariz. Dep't of Econ. Sec.*,
784 P.2d 275 (Ariz. Ct. App. 1989) ..... 14

**STATUTES**

7 U.S.C. § 2013 ..... 1

7 U.S.C. § 2020 ..... *passim*

7 USC § 2023 ..... 13, 14

7 U.S.C. § 2025 ..... 8, 9, 12

7 U.S.C. § 2027 ..... 13, 15

42 U.S.C. § 1396a ..... 3, 5, 10

42 U.S.C. § 1396r ..... 5

42 U.S.C. § 1983 ..... *passim*

Alaska Stat. § 44.62.560 ..... 14

Ariz. Rev. Stat. Ann. § 41-1993 ..... 14

Cal. Welf. & Inst. Code § 10962 ..... 14

Haw. Rev. Stat. § 91-14 ..... 14

Idaho Code § 67-5270 ..... 14

Mont. Code Ann. § 2-4-702 ..... 14

Nev. Rev. Stat. § 233B.130 ..... 14

Or. Rev. Stat. § 183.482 ........ 14

Wash. Rev. Code § 34.05.570 ........ 14

**RULES AND REGULATIONS**

7 C.F.R. § 272.1 ........ 10

7 C.F.R. § 273.15 ........ 13

7 C.F.R. § 275.3 ........ 8

7 C.F.R. § 275.12 ........ 8

7 C.F.R. § 275.16 ........ 8, 12

7 C.F.R. § 275.23 ........ 9

7 C.F.R. § 276.5 ........ 9, 12

**OTHER AUTHORITIES**

Food and Nutrition Administration, *FY 2024 SNAP Application Processing Timeliness* ........ 17

Food and Nutrition Administration, *FY 2025 SNAP Application Processing Timeliness* ........ 16

Food and Nutrition Administration, *FY 2025 SNAP Recertification Processing Timeliness* ........ 16

Food and Nutrition Administration, *SNAP Application Processing Timeliness* ........ 17

Food and Nutrition Administration, *Supplemental Nutrition Assistance Program: Case and Procedural Error Rates (CAPER) Fiscal Year 2025* ........ 16

Food and Nutrition Administration, *Supplemental Nutrition Assistance Program: Payment Error Rates Fiscal Year 2025* ........ 16

U.S. Dep't of Agriculture, *USDA Announces FY 2025 State Payment Error Rates in SNAP* ........ 9

USDA Food and Nutrition Service, *Supplemental Nutrition Assistance Program (SNAP) – Updated Guidance for Improving State Agency Application Processing Timeliness Rates: Standardizing the Escalation Process* (Aug. 2, 2023) ........ 9

## INTEREST OF THE *AMICI* STATES

Amici States are among the 53 jurisdictions in the United States that administer the Supplemental Nutrition Assistance Program (SNAP). SNAP provides money for food to low-income households and is a quintessential spending power statute: it is a direct entitlement program administered by state agencies through funds allocated by Congress. 7 U.S.C. §§ 2013(a)(1), 2020(a)(1).

Because SNAP is an entitlement program administered by states through Congress's spending power, Amici States have an interest in getting the benefit of their bargain with the federal government. They have a further interest in obtaining those funds without subjecting themselves to programmatic, expensive, and time-consuming class-action lawsuits that Congress has not clearly and unambiguously required as a condition of that funding. Amici States also have an interest more broadly in courts faithfully applying recent Supreme Court precedent that fairly preserves the limits on private rights of action against states under 42 U.S.C. § 1983 and rejects "results that would violate the principle of state sovereignty." *Landor v. La. Dep't of Corr. & Pub. Safety*, 609 U.S. 59, 79 (2026) (cleaned up).

## SUMMARY OF THE ARGUMENT

*Medina v. Planned Parenthood South Atlantic*, 606 U.S. 357 (2025), clarified and emphasized that a spending power statute gives rise to a private cause of action only in the rarest of circumstances: when Congress has given clear and unambiguous notice to a state that by accepting federal funds it is agreeing to be subject to suit by private parties

to enforce the terms of the statute. Nothing in the SNAP provisions at issue points to a private right of action. There is no clear and unambiguous rights-creating language. The focus is not on individuals, but instead on a long list of program requirements that govern the relationship between state agencies and the Department of Agriculture. And Congress included an extensive enforcement regime of self-correction, monitoring, penalties, and ultimately injunctive relief that can be sought by the federal government—displacing any implicit private cause of action.

Idaho's recent experience drives this point home. Idaho boasts an exceptionally well-run SNAP program. But Appellants' theory is that any program deficiency, even a temporary one, can give rise to private litigation if it is "prevalent" enough (according to a plaintiff). That directly contradicts SNAP's scheme of aggregate (rather than exact) compliance and federal enforcement, and it unfairly springs liability on unsuspecting states that never agreed to be subject to private suits.

## ARGUMENT

### I. SNAP does not create any private right of action in federal court.

SNAP does not confer a private right of action on benefit recipients to sue states for alleged non-compliance with the conditions of federal funding because it does not give states clear and unambiguous notice that they will be subject to such lawsuits. For all relevant purposes, the sections of the SNAP statute at issue here are indistinguishable from the Medicaid statute at issue in the Supreme Court's recent decision in *Medina v. Planned Parenthood South Atlantic*, 606 U.S. 357 (2025).

### A. *Medina* sets the benchmark for private rights of action in the spending power context.

The Supreme Court recently clarified the circumstances in which spending power legislation provides for a private right of action through 42 U.S.C. § 1983 in *Medina*, returning to a historical understanding that rarely implied such rights.

In *Medina*, the Court considered a requirement in the Medicaid statute that a state reimburse medical assistance covered under the state's Medicaid plan rendered by "any-qualified-provider" who offers the service. *Medina*, 606 U.S. at 364 (citing 42 U.S.C. § 1396a(a)(23)(A)). A patient and Planned Parenthood filed a putative class-action lawsuit under Section 1983 to enforce the any-qualified-provider provision against South Carolina to force the state to reimburse Planned Parenthood through South Carolina Medicaid. *Medina*, 606 U.S. at 364–65.

In holding that no private cause of action existed, *Medina* built its foundation on centuries of historical understanding, recognizing that from the beginning of the Republic, spending power legislation was generally thought to operate as a contract: a state accepts funding in exchange for express conditions. 606 U.S. at 371–72 (citing *McGee v. Mathis*, 71 U.S. (4 Wall.) 143, 155 (1866)).[1] But "[f]or much of the Nation's history, the Court had little occasion to employ these ideas. Congress rarely granted

[1] An alternative analogy the Court occasionally uses is to a treaty between two sovereigns. *See Landor v. La. Dep't of Corr. & Pub. Safety*, 609 U.S. 59, 69 (2026) (cleaned up) (citing *Medina* for analogy in parenthetical).

money to States and, when it did, those grants rarely came with many conditions." *Id.* at 372. That frequency changed in the twentieth century with the New Deal and Great Society programs, and the new federal outlays to state governments that came with them. *Id.* at 372–73. As the Court addressed these statutes, it consistently applied the principle that a "'typical remedy for state noncompliance' with a federal grant's conditions is an 'action by the Federal Government to terminate funds to the State.'" *Id.* at 373 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 28 (1981)).

The Court's approach tracks the contractual nature of legislation invoking Congress's spending power. As a matter of fundamental fairness, "[j]ust as a valid contract requires offer and acceptance of its terms, the legitimacy of [congressional] power to legislate under the spending power rests on whether the recipient voluntarily and knowingly accepts the terms of the contract." *Barnes v. Gorman*, 536 U.S. 181, 186 (2002) (cleaned up). And so, if Congress wants to impose conditions on states for the receipt of federal funds, such terms must be presented "unambiguously" so the state has a real choice to accept or decline federal funds with those conditions. *Id.*; *see also Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) ("States cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'") (quoting *Pennhurst*, 451 U.S. at 17).

Thus, for a plaintiff to come into federal court to assert a cause of action through Section 1983 authorized as a spending power condition, "the Court held, a plaintiff must show, at a minimum, that Congress alerted the State in advance, 'clear[ly]' and

'unambiguously,' that responding to private enforcement suits was a condition of its offer." *Medina*, 606 U.S. at 373 (quoting *Pennhurst*, 451 U.S. at 17). This requires showing not only that Congress sought to "benefit [plaintiffs] or serve their interests but clearly and unambiguously [gave] them individual federal rights" by using "rights-creating terms." *Id.* at 368, 376 (cleaned up). A plaintiff must also show that "the statute . . . display[s] 'an unmistakable focus' on individuals like the plaintiff." *Id.* at 368 (cleaned up); *see also Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 180, 183–84 (2023) (describing this test as a "demanding bar" and "significant hurdle" that will be met in only the "atypical case").

In deciding whether the any-qualified-provider provision of Medicaid provided a privately enforceable right, the Court relied on particular aspects of the Medicaid statute that serve as helpful benchmarks for future cases.

- ***Rights-creating language:*** the Court explained that the "only reliable yardstick" for a spending power private right of action is that a statute refers clearly and unambiguously to the "rights" of the persons at issue, but the Medicaid statute did not refer to any such rights. *Medina*, 606 U.S. at 377–78 (comparing 42 U.S.C. § 1396a(a)(23)(A) with 42 U.S.C. § 1396r(c)).

- ***Aggregate compliance:*** because Medicaid requires states only to "comply substantially" with the any-qualified-provider mandate, the statute "addresses a State's obligations to the federal government, not the rights of any particular person." *Id.* at 379 (cleaned up).

- ***Plan requirements:*** the placement of the any-qualified-provider requirement in a "Contents" section "outlin[ing] scores of things a state plan must include"—in a section directed to the Secretary of Health and Human Services which "must 'approve any plan' that meets them"—also undermined the existence of a private right. *Id.* at 379–80.

At the same time the Court laid out these benchmarks, the Court took the opportunity to clearly overrule confusing outliers in the Court's spending power jurisprudence. The Court repudiated several cases that culminated in the three-part test enunciated in *Blessing v. Freestone*, 520 U.S. 329 (1997). That test required only that a plaintiff show (1) a general congressional intent to benefit the plaintiff, (2) a statement of the asserted right clear enough to not be "so 'vague and amorphous' that its enforcement would strain judicial competence," and (3) a binding obligation on the states, couched in "mandatory" terms. *Id.* at 340–41. Each prong of *Blessing* took the focus away from the notice a state must have of future lawsuits over a specific provision to give its informed consent. *Medina*, 606 U.S. at 376. *Medina* urged that "[t]o the extent lower courts feel obliged, or permitted, to consider the contrary reasoning of . . . *Blessing*, they should resist the impulse." 606 U.S. at 376.

### B. The SNAP program requirements are indistinguishable from the Medicaid program requirements in *Medina*.

None of the SNAP provisions in this case are distinguishable from the any-qualified-provider provision at issue in *Medina*. They do not contain rights-creating language, are not focused on individuals, and contemplate federal-government (not private) enforcement. They do not contain a private right to sue under Section 1983.

At issue are five provisions of the SNAP "Administration" statute, which Appellants seek to enforce through private rights of action under Section 1983. 7 U.S.C. § 2020. These provisions require a state agency administering a SNAP program to: (1)

permit an applicant household to apply for benefits on the same day the household contacts an office in person, (2) promptly determine the eligibility of an applicant household within 30 days, (3) provide a notice of expiration and timely recertification processing, (4) provide benefits on an expedited basis under certain circumstances, and (5) provide prompt determination after a fair hearing. *Id.* at (e)(2)(B)(iii), (e)(3), (e)(4), (e)(9), and (e)(10).

***Rights-creating language***. As in *Medina*, none of the provisions at issue contain clear and unambiguous rights-creating language. None of the provisions use the word "rights" or any other word that would make it unmistakable that these provisions require a state to submit to suit by private parties as a condition for receiving federal funds. Take for instance Section 2020(e)(2)(B)(iii). It says, when read in context:

> In carrying out [its obligation to establish SNAP procedures], a State agency shall permit an applicant household to apply to participate in the program on the same day that the household first contacts a supplemental nutrition assistance program office in person during office hours. (cleaned up).

There is nothing about rights in this language, only, as in *Medina*, language that at most describes a "benefit" and "speaks to what a State must do to participate" in the SNAP program. 606 U.S. at 377.

Take another section, Section 2020(e)(9):

> The State plan of operation required under subsection (d) of this section shall provide, among such other provisions as may be required by regulation that the State agency shall provide benefits no later than 7 days after the date of application to any household. (cleaned up).

Here, rather than *rights* language, there is express *benefits* language—unsurprising for an entitlement program, but a trap for an unwary state if used to confer a private right of action. As *Medina* noted, there is a "longstanding line between mere benefits and enforceable rights," so benefits language cannot put a state on notice that it is going to be subject to private suits by agreeing to that term. 606 U.S. at 383.

***Aggregate compliance***. Like Medicaid, SNAP is an aggregate compliance statute. Every state is required to monitor the efficiency of its SNAP program, and states work with the Department of Agriculture through the Food and Nutrition Administration (FNA) to perform quality control as required by statute and regulation. 7 U.S.C. § 2025(c)(1)(A)(i), (d)(6)(A). This includes monitoring for overpayment or underpayment to a household (payment error rate), procedural errors in processing an application or payment (case and procedural error rate, or "CAPER"), and processing times for initial applications and renewals. *See* 7 C.F.R. §§ 275.12 (review of active cases for eligibility and allotment), 275.16(b)(3) (corrective action plan authorized for other deficiencies identified by FNA review). In addition to the state's own affirmative obligation to identify problems and implement its own corrective action, FNA will also flag issues that it identifies for state correction. *Id.* §§ 275.3, 275.16(b).

Notably, neither SNAP statutes nor regulations insist on 100% accuracy and efficiency in meeting any SNAP program metric on pain of losing federal funds. SNAP regulations require states to develop corrective action plans if their negative case CAPER reaches or exceeds 1% of cases. *Id.* § 275.16(b)(2). SNAP regulations also allow

FNA to impose liability—by requiring states to invest money in program improvement or by requiring repayment to the federal government—for excessive payments only when an analysis of sampled state cases reveals there is a 95% probability that a state's overpayments exceed 105% of the national performance measure.[2] *Id.* § 275.23(d)(2), (e). And neither statute nor regulation has set out a firm benchmark for when application or renewal processing times require programmatic corrective action by the state—the only such metrics come from guidance lacking the force of law.[3]

While certain overpayment rates may trigger automatic financial penalties, these rates are themselves statistical estimates. *E.g.*, 7 U.S.C. § 2025(c)(1)(C) (imposing liability for estimated overpayment); 7 C.F.R. § 275.23(d)(2). And some corrections by FNA may be pursued in a discretionary fashion. *See* 7 C.F.R. § 276.5 (permitting the Secretary of Agriculture to seek injunctive relief to compel compliance when FNA determines a state has failed to comply with the FNA approved state plan of operations). Thus, SNAP requirements assume and tolerate some degree of error on the state's part and grant federal enforcement discretion, which "suggests that [SNAP]

---

[2] The national performance measure is effectively the average error of all the states. In FY 2025 this was 10.62%. *See* U.S. Dep't of Agriculture, *USDA Announces FY 2025 State Payment Error Rates in SNAP*, https://tinyurl.com/5n8ssffu (last visited Nov. 16, 2026).

[3] *See* USDA Food and Nutrition Service, *Supplemental Nutrition Assistance Program (SNAP) – Updated Guidance for Improving State Agency Application Processing Timeliness Rates: Standardizing the Escalation Process* (Aug. 2, 2023), https://tinyurl.com/2prn8wka (last visited Nov. 16, 2026).

addresses a State's obligations to the federal government, not the rights of any particular person." *Medina*, 606 U.S. at 379 (cleaned up).

***Plan requirements***. *Medina* held that the context of the any-qualified-provider provision—housed within a section titled "State plans for medical assistance" in a subsection titled "Contents"—suggested that it did not create a private right of action. 606 U.S. at 379–80; *see also* 42 U.S.C. § 1396a(a). The SNAP provisions at issue are similarly situated, found in a section titled "Administration" in a subsection titled "Requisites of State plan of operation." 7 U.S.C. § 2020(e). That subsection itself contains 26 requirements (most with a litany of technical sub-requirements) that states must include in their individual SNAP plans that the Secretary of Agriculture must approve, monitor, and enforce compliance with by directing corrective action, withholding funds or assessing penalties, or seeking injunctive relief. *Id.* § 2020(d) (approval by Secretary), 2020(e) (plan requirements), 2020(g) (enforcement). The section further incorporates any regulations adopted by the Department. *Id.* § 2020(e). Those regulations themselves contain hundreds of paragraphs and subparagraphs of program requirements. *See, e.g.*, 7 C.F.R. § 272.1.

Each subsection Appellants raise contains a directive for what a state agency must provide in its SNAP program—not a set of "rights-creating provisions apart from others . . . [which] help[s] alert . . . grantees that accepting federal funds comes with a duty to answer private suits." *Medina*, 606 U.S. at 380. Put another way, an omnibus list like the SNAP Administration statute is not an effective way to communicate clear and

unambiguous notice to a state government that private persons were authorized to sue to enforce that list if the state took federal funds. Indeed, *Medina* noted the odd result that would occur if even one plan provision in a set of dozens was held to contain a private cause of action—it would turn the "atypical" example of an enforceable right into something resembling a rule in favor of such rights. *Id.* (quoting *Talevski*, 599 U.S. at 183).

***No unmistakable focus on individuals***. The SNAP provisions at issue also fail to display an unmistakable focus on individuals. *Id.* at 368. Again, the sections of the SNAP statute at issue set forth the state's plan obligations and are focused on the state agency and the Secretary's responsibilities. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 287–88 (2002) (holding provisions directed to an agency prohibiting funding an educational program with certain policies were "two steps removed from the interests" of individuals). The plain text of the opening sentence fixes the focus on the relationship between the state agency and the Secretary: "The *State plan of operation* . . . shall provide, among such other provisions as may be required by regulation." 7 U.S.C. § 2020(e).

***Federal enforcement***. In all events, any implied right would be displaced by express enforcement provisions authorizing the Secretary of Agriculture to compel compliance with the SNAP statutes and regulations. *Medina*, 606 U.S. at 376 n.6. Congress planned for a state's failure to meet mandatory benchmarks or systematic failure to meet statutory requirements, showing that it did not intend the program

requirements to be privately enforced. The statute requires states to identify issues on their own and create corrective action plans to meet identified deficiencies, and to correct issues FNA brings to their attention. 7 U.S.C. § 2025(c)(1)(G); 7 C.F.R. § 275.16. The statute holds states responsible for financial penalties for failing to meet enumerated payment error rate standards. 7 U.S.C. § 2025(c)(1)(C). The statute also allows the Department to ask the United States Attorney General to sue seeking injunctive relief to force a state to comply with the terms of its agreement with the federal government. *Id.* § 2020(g); *see also* 7 C.F.R. § 276.5. If all else fails, Congress or the Secretary can also simply decline to fund a state's program if the state fails to comply with its obligations under the statute. 7 U.S.C. § 2020(g).

Moreover, a private cause of action would conflict with the remedies contemplated by the statute. In bringing an action for injunctive relief, the Secretary of Agriculture must first notify the state of the programmatic deficiency and provide the state agency time to comply. *Id.*; *see also* 7 C.F.R. § 276.5(b). But class-action litigants do not need to provide notice and time for compliance and may seek relief when the Secretary and Attorney General are seeking compliance by other means. Add in the potential for conflicting orders for injunctive relief compelling compliance, including in cases where the Secretary has intentionally chosen *not* to use his sharpest tools, and it is clear that Congress did not mean to authorize freewheeling class actions by private parties. *See Planned Parenthood of Greater Tex. Fam. Plan. & Preventative Health Servs., Inc. v. Kauffman*, 981 F.3d 347, 360, 363–64 (5th Cir. 2020).

***Other provisions***. Appellants claim that SNAP is distinguishable from Medicaid by pointing to provisions in other subsections or statutes that seem to contemplate, but do not authorize, lawsuits. Opening Br. at 23–25 (discussing 7 U.S.C. §§ 2020(a)(3)(B)(ii), 2023, 2027(a)(2)). These provisions do not give the clear notice required by *Medina* for the specific provisions at issue in this case.

The first of these requires a state agency to make records it creates to determine compliance with the SNAP statute "available for review in any action filed by a household to enforce any provision of this chapter (including regulations issued under this chapter)." 7 U.S.C. § 2020(a)(3)(B)(ii). As an initial matter, neither this provision nor the others that Appellants flag are relevant to whether the specific provisions at issue in this case authorize a private right of action—each provision stands on its own two feet. *See Medina*, 606 U.S. at 377–79 (conducting analysis at the level of individual provisions). But even on its own terms, this provision is not only ambiguous about what exactly it is authorizing, it is also explainable as judicial review of fair hearing determinations in *state* court, not Section 1983 litigation.

Every state participating in SNAP is required to have a fair hearings process for households to contest adverse decisions. 7 C.F.R. § 273.15. And most states (including every state in this circuit) provide that these fair hearings, when a final administrative

decision is issued, are subject to judicial review *in state court*.[4] The fact that there is no federal cause of action does not result in surplusage—a state is required to make compliance records available if, after a fair hearing, a party continues to litigate their claim in the forum a state has made available. But "a State does not consent to suit in federal court merely by consenting to suit in the courts of its own creation." *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 676 (1999). So, it would not be clear to a state that it was consenting to federal litigation through this statute.

The second provision Appellants cite is exactly in this vein. It outlines, assuming an action is filed "seeking review of a final State agency determination," the maximum restoration of benefits to the recipient. 7 U.S.C. § 2023(b). That statute does nothing in itself to authorize such actions. Even if this statute is read to authorize a private right of action to challenge the benefit amount, that is not authorization for a private right of action for *any* violation of *any* provision of the SNAP statute.

---

[4] *See*, *e.g.*, Alaska Stat. § 44.62.560, *Allen v. State*, 203 P.3d 1155 (Alaska 2009); Ariz. Rev. Stat. Ann. § 41-1993, *Stoffel v. Ariz. Dep't of Econ. Sec.*, 784 P.2d 275 (Ariz. Ct. App. 1989); Cal. Welf. & Inst. Code § 10962, *Ortega v. Johnson*, 271 Cal. Rptr. 3d 509 (Cal. Ct. App. 2020); Haw. Rev. Stat. § 91-14, *Cudal v. Sunn*, 742 P.2d 352 (Haw. 1987); Idaho Code § 67-5270, *Nelson v. IDHW*, No. 41282, 2015 WL 1249570 (Idaho Ct. App. Mar. 19, 2015); Mont. Code Ann. § 2-4-702, *McGee v. State*, 398 P.3d 245 (Mont. 2017); Nev. Rev. Stat. § 233B.130, *Carter v. State Div. of Welfare & Supportive Servs.*, 134 Nev. 922, 422 P.3d 1233 (Nev. 2018) (unpub.); Or. Rev. Stat. § 183.482, *Devi v. Senior & Disabled Servs. Div.*, 905 P.2d 846 (Or. Ct. App. 1995); Wash. Rev. Code § 34.05.570, *Green v. State*, 260 P.3d 254 (Wash. Ct. App. 2011).

The third provision is no better. It permits appropriated SNAP funds to be used in legal aid for proceedings before "any State or Federal agency or court." 7 U.S.C. § 2027(a)(2). It does not, itself, authorize any such actions.

### C. This Court should not split with the Eighth Circuit.

The first circuit court to consider whether SNAP's Administration statute implies a private right of action after *Medina*—including through one of the provisions at issue in this case—came out against such a right. The Eighth Circuit in *Holmes v. Bax*, 187 F.4th 1028 (8th Cir. 2026), conducted a *Medina* analysis of 7 U.S.C. § 2020(e)(2)(B) and concluded that there was no private right because there is no individual rights-creating language in the relevant subsection and the section is focused on the agency rather than any individual, despite the statute commanding that the state provide "timely, accurate, and fair service" to "applicants . . . and participants." *Holmes*, 187 F.4th at 1046–47. Appellants, in a footnote, acknowledge that this is directly contrary to their position without explaining what the Eighth Circuit did wrong under *Medina*. Opening Br. at 27–28 n.5. The Court should decline to create the first post-*Medina* circuit split "unless there is a compelling reason to do so," and there is none here. *Kelton Arms Condo. Owners Ass'n, Inc. v. Homestead Ins. Co.*, 346 F.3d 1190, 1192 (9th Cir. 2003) (cleaned up).

## II. Appellants' rule improperly authorizes suits even when the executive branch is satisfied with state performance.

As the Supreme Court noted in *Medina*, an aggregate compliance statute capable of being enforced by the federal government is an especially poor fit for a private right of action. Both Idaho's proud history of SNAP efficiency, and recent experiences, demonstrate exactly why.

Idaho has very good reason to be proud of its SNAP program, having scored at or near the top of jurisdictions that administer SNAP in every timeliness and efficiency metric tracked and published by the Department of Agriculture in FY 2025. Today, Idaho stands second in the nation for timely processing of initial applications with a 96.30% timeliness rate,[5] first for timely processing of recertifications with a 99.87% timeliness rate,[6] second for lowest CAPER,[7] and second for the lowest payment error rate.[8] None of this exemplary performance is new. Idaho has maintained consistently

---

[5] Food and Nutrition Administration, *FY 2025 SNAP Application Processing Timeliness*, https://tinyurl.com/9cczrspe (last visited Nov. 16, 2026).

[6] Food and Nutrition Administration, *FY 2025 SNAP Recertification Processing Timeliness*, https://tinyurl.com/2zj5324a (last visited Nov. 16, 2026).

[7] Food and Nutrition Administration, *Supplemental Nutrition Assistance Program: Case and Procedural Error Rates (CAPER) Fiscal Year 2025*, https://tinyurl.com/mtjtf3uu (last visited Nov. 16, 2026).

[8] Food and Nutrition Administration, *Supplemental Nutrition Assistance Program: Payment Error Rates Fiscal Year 2025*, https://tinyurl.com/5cp4kz3n (last visited Nov. 16, 2026).

high scores on most of these metrics for the past decade.[9] For initial application processing in particular, Idaho has been either first or second place for timely processing all years—save one—going back to 2012.[10]

But no state is immune to challenges, and that includes a high-performing state like Idaho. In FY 2024, Idaho's timely application processing rate unexpectedly dropped to about 91%, below the 95% benchmark set by FNA guidance.[11] This was likely due to several operational factors. Most notably, states were required to unwind temporary Medicaid eligibility protections implemented during COVID-19. Idaho experienced an increase in Medicaid enrollment by approximately 125,000 individuals during the pandemic. But once the temporary protections were removed, Idaho was required to complete eligibility redeterminations for this population within a compressed timeframe while also maintaining its regular eligibility workload for SNAP, Temporary Assistance for Needy Families (TANF), and the Idaho Child Care Program. This was a difficult ask—it greatly increased staff workload. But ultimately it proved to be a temporary and limited challenge. Idaho's recertification processing

[9] Recertification processing timeliness data are only available as a separate metric going back to FY 2024, and the Department of Agriculture does not report data for all years for all metrics.

[10] *See* reports available at Food and Nutrition Administration, *SNAP Application Processing Timeliness*, https://tinyurl.com/ywmc8wa8 (last visited Nov. 16, 2026).

[11] Food and Nutrition Administration, *FY 2024 SNAP Application Processing Timeliness*, https://tinyurl.com/44bf2238 (last visited Nov. 16, 2026); *see also supra* n.3.

timeliness rate remained at 99.53% and its application processing times rebounded the following year.

Idaho's experience shows the problems with Appellants' theory of private lawsuits to enforce SNAP. Appellants offer a theory that would see, for instance, Idaho's one-year dip as justifying injunctive relief against a statewide program. Indeed, *just three states* met the 95% benchmark for initial application timeliness in 2025, so Appellants' theory suggests there is a spring trap of liability waiting for almost every state. *See supra* n.5. The cause of action in Appellants' complaint makes no distinction between a SNAP program that falls just below par for only one year and a program that must be managed by a federal court—it simply requires that such failure be "prevalent." 4-ER-874. What does that mean? And where does that requirement come from? There is no such language in the statute, let alone alongside rights-creating provisions that could support a private right of action. Rather, SNAP is a system that *assumes* some degree of error, *see* Section I, and leaves it for the executive branch to decide when a state's non-compliance warrants corrective action and what that action should be.

State notice and consent to suit are the touchstones of a private right of action under Section 1983. *Medina*, 606 U.S. at 376. As with any other contract, "a court will not bind parties to conditions or obligations to which they have not bound themselves." *McMicken v. Webb*, 47 U.S. (6 How.) 292, 298 (1848). "Respecting this limitation is critical to ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system." *NFIB v. Sebelius*, 567 U.S.

519, 577 (2012) (opinion of Roberts, C.J.) (cleaned up). And so it is with SNAP—because no state would have had any notice that it was consenting to suit when it accepted federal funds, states cannot be subject to private suits to enforce SNAP provisions without infringing on state sovereignty by imposing nonconsensual terms.

## CONCLUSION

*Medina* was clear. Statutes like SNAP do not provide private causes of action subjecting states to suit without clear and unambiguous terms saying so. This Court should affirm the judgment of the district court and hold that no private right of action exists to enforce SNAP program requirements.

Dated: November 16, 2026.

Respectfully submitted,

RAÚL R. LABRADOR
ATTORNEY GENERAL

*/s/ Aaron M. Green*
MICHAEL A. ZARIAN
Solicitor General

AARON M. GREEN
Counsel of Record
Assistant Solicitor General

*Counsel for Amici States*

## ADDITIONAL SIGNATORIES

STEVE MARSHALL
Attorney General
State of Alabama

TIM GRIFFIN
Attorney General
State of Arkansas

JAMES UTHMEIER
Attorney General
State of Florida

CHRIS CARR
Attorney General
State of Georgia

THEODORE E. ROKITA
Attorney General
State of Indiana

BRENNA BIRD
Attorney General
State of Iowa

KRIS W. KOBACH
Attorney General
State of Kansas

LIZ MURRILL
Attorney General
State of Louisiana

LYNN FITCH
Attorney General
State of Mississippi

AUSTIN KNUDSEN
Attorney General
State of Montana

MICHAEL T. HILGERS
Attorney General
State of Nebraska

ALAN WILSON
Attorney General
State of South Carolina

JONATHAN SKRMETTI
Attorney General
State of Tennessee

KEN PAXTON
Attorney General
State of Texas

DEREK BROWN
Attorney General
State of Utah

JOHN B. MCCUSKEY
Attorney General
State of West Virginia

## Certificate of Compliance

I certify that this amicus brief contains 4,881 words, excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6). I certify that this brief complies with the word limit of FRAP 29(a)(5).

/s/ *Aaron M. Green*
Aaron M. Green

## CERTIFICATE OF SERVICE

I certify that on November 16, 2026, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

/s/ *Aaron M. Green*
Aaron M. Green